**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ORI WILBUSH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:16-cv-05076-RMB |
| | Honorable Richard M. Berman |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| AMBAC FINANCIAL GROUP, INC., DIANA N. ADAMS, DAVID TRICK, JEFFREY S. STEIN, NADER TAVAKOLI and CATHY MATANLE, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION ............................................................................ 2

II.  JURISDICTION AND VENUE .......................................................................... 7

III. THE PARTIES ................................................................................................... 8

   A.   Plaintiff ...................................................................................................... 8

   B.   Defendants ................................................................................................. 8

IV.  BACKGROUND ................................................................................................ 12

   A.   Ambac's Guarantee Monoline Insurance Business is Dependent Upon Ambac
        Regaining its "AAA" Credit Rating ........................................................ 12

        1.   The Financial Guarantee Segment ................................................... 12

        2.   The Financial Services Segment ...................................................... 15

        3.   Ambac's Credit Rating is Critical to the Company's Long-Term Viability .............. 16

   B.   Ambac's Puerto Rican Bond Exposure ..................................................... 18

   C.   Throughout the Class Period, the Individual Defendants Sat on Risk Management
        Committees that Closely Monitored the Company's Credit and Loss Exposure to
        Puerto Rico ............................................................................................... 23

        1.   The Asset and Liability Committee ("ALCO") ................................ 24

        2.   The PRM Committee ........................................................................ 26

        3.   RRG .................................................................................................. 28

        4.   CRM .................................................................................................. 28

   D.   Throughout the Class Period, Ambac Was Subject to Substantial Undisclosed Credit
        Risk and Loss Exposure Related to the Puerto Rican Bonds the Company Insured ..... 29

        1.   The Puerto Rican Economy Was in Decline Prior to and Throughout the Class
             Period ............................................................................................... 30

        2.   The Credit Ratings of the Puerto Rican Bonds Ambac Insured Rapidly Declined
             Throughout the Class Period ............................................................ 32

        3.   The Skyrocketing Cost of Credit Default Swap Insurance on Puerto Rican Bonds
             During the Class Period Indicated an All But Guaranteed Default on the Bonds ...... 42

        4.   The Widening Yields and Credit Spreads on Puerto Rican Bonds During the Class
             Period Reflected a Rapid Diminution in Credit Quality and Growing Likelihood of
             Widespread Defaults ........................................................................ 45

   E.   Ambac Established a Special Situations Group to Address the Company's Exposure
        to Puerto Rico ........................................................................................... 52

   F.   In the Wake of the Puerto Rican Bond Crisis, Ambac Terminates Defendant Adams.. 54

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD
     STATEMENTS AND OMISSIONS .................................................................... 55

A.    Materially False and Misleading Statements in the November 13, 2013 Press Release ............................................................................. 55

B.    Materially False and Misleading Statements in the Third Quarter 10-Q for the Period Ending September 30, 2013 ........................................... 56

    1.    Materially False and Misleading Statements Concerning Credit Risk Management . 57

    2.    Materially False and Misleading Statements Concerning Loss Exposure and Reserves ....................................................................... 57

    3.    Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure ....................................................................... 58

    4.    Materially False and Misleading Statements Concerning Internal Controls ............. 59

C.    Materially False and Misleading Statements in the November 14, 2013 Earnings Conference Call ............................................................... 63

D.    Materially False and Misleading Statements in the December 18, 2013 Annual Shareholder Meeting Call ................................................... 64

    1.    Materially False and Misleading Statements Concerning Ambac's Risk Management ................................................................... 66

    2.    Materially False and Misleading Statements Concerning Ambac's Loss Exposure and Reserves ................................................... 67

    3.    Materially False and Misleading Statements Concerning the Credit Rating and Exposure of Ambac's Puerto Rican Bond Portfolio ................... 69

    4.    Materially False and Misleading Statements Concerning Ambac's Internal Controls ....................................................................... 70

E.    Materially False and Misleading Statements in the March 4, 2014 Earnings Call ........ 75

F.    Materially False and Misleading Statements in the March 27, 2014 Investor Day Presentation ................................................................. 76

G.    Materially False and Misleading Statements in the First Quarter Form 10-Q for the Period Ending March 31, 2014 ........................................ 77

    1.    Materially False and Misleading Statements Concerning Credit Risk Management . 78

    2.    Materially False and Misleading Statements Concerning Loss Exposure and Reserves ....................................................................... 78

    3.    Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure ....................................................................... 79

    4.    Materially False and Misleading Statements Concerning Internal Controls ............. 81

H.    Materially False and Misleading Statements in the May 12, 2014 Press Release ......... 81

I.    Materially False and Misleading Statements in the Second Quarter Form 10-Q for the Period Ending June 30, 2014 ................................... 82

    1.    Materially False and Misleading Statements Concerning Credit Risk Management . 83

2.  Materially False and Misleading Statements Concerning Losses and Loss Reserves ............................................................................................. 83

3.  Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure ................................................................................. 84

4.  Materially False and Misleading Statements Concerning Internal Controls ............. 86

J.  Materially False and Misleading Statements in the August 12, 2014 Earnings Call and August 11, 2014 Press Release ................................................. 87

K.  Materially False and Misleading Statements in the Third Quarter 2014 Form 10-Q for the Period Ending September 30, 2014 .................................. 88

1.  Materially False and Misleading Statements Concerning Credit Risk Management . 88

2.  Materially False and Misleading Statements Concerning Loss Expense and Reserves ................................................................................................. 89

3.  Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure ................................................................................. 90

4.  Materially False and Misleading Statements Concerning Internal Controls ............. 91

L.  Materially False and Misleading Statements in the November 10, 2014 Press Release ............................................................................................... 92

M.  Materially False and Misleading Statements in the November 11, 2014 Conference Call with Investors ..................................................................... 93

N.  Materially False and Misleading Statements in the 2014 Form 10-K........................... 94

1.  Materially False and Misleading Statements Concerning Credit Risk Management . 94

2.  Materially False and Misleading Statements Concerning Ambac's Loss Expense and Reserves ........................................................................... 96

3.  Materially False and Misleading Statements Concerning Ambac's Credit Rating and Exposure......................................................................... 98

4.  Materially False and Misleading Statements Concerning Internal Controls ............. 99

O.  Materially False and Misleading Statements in the March 2, 2015 Earnings Conference Call and the March 2, 2015 Press Release ............................... 101

P.  Materially False and Misleading Statements in the First Quarter 2015 Form 10-Q .... 102

1.  Materially False and Misleading Statements Concerning Credit Risk Management............................................................................................. 103

2.  Materially False and Misleading Statements Concerning Losses and Loss Reserves ................................................................................................. 103

3.  Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure ................................................................................. 105

4.  Materially False and Misleading Statements Concerning Internal Controls ............ 106

Q.  Materially False and Misleading Statements in the May 11, 2015 Press Release ....... 107

R.     Materially False and Misleading Statements in the May 12, 2015 Earnings Conference Call ..................................................................................... 108

VI.  THE TRUTH IS REVEALED ............................................................................ 110

A.     Puerto Rico's Governor Reveals the Commonwealth Intended to Default on Its $70 Billion of Debt, Including the Bonds Ambac Insures .................................................. 110

B.     Puerto Rico Announces It Only Paid A Fraction of Its $58 Million August 3 Payment ........................................................................................... 111

C.     Ambac Continues to Materially Misrepresent Its Puerto Rican Exposure in the August 10, 2015 Press Release ........................................................ 111

D.     Continued Materially False and Misleading Statements in the Second Quarter 2015 Form 10-Q ........................................................................ 112

     1.    Materially False and Misleading Statements Concerning Losses and Loss Reserves 112

     2.    Materially False and Misleading Statements Concerning Internal Controls ............ 114

     3.    Continued Materially False and Misleading Statements in the August 11, 2015 Earnings Call ................................................................ 115

E.     Defendants Finally Admit that Puerto Rico is an "Overhang" on the Company's Guarantee Portfolio and, as a Result, Ambac was Forced to Take a $514.5 Million Goodwill Impairment Charge ........................................................ 116

VII.  POST CLASS PERIOD EVENTS ..................................................................... 116

VIII.  AMBAC'S ACCOUNTING VIOLATIONS ...................................................... 127

A.     Applicable Accounting Standards Under GAAP ...................................... 130

B.     Defendants Misstated The Company's Loss Expense and Reserves for Puerto Rican Bonds Arising From the Imminent Default of Puerto Rico ........................................................ 133

C.     Defendants' Failure To Disclose The True Risk Arising From The Company's Guaranteed Puerto Rican Bond Portfolio ...................................... 136

IX.  AMBAC'S INTERNAL CONTROL VIOLATIONS ........................................ 140

X.    ADDITIONAL SCIENTER ALLEGATIONS .................................................. 144

A.     The Individual Defendants Knowingly and Recklessly Misrepresented Ambac's Loss Exposure and Default Risk Related to its Puerto Rican Bonds .......................... 145

     1.    The Individual Defendants Admittedly, Actively Monitored the Company's Exposure to Puerto Rico Throughout the Class Period ........................................................ 146

     2.    The Individual Defendants Were Aware of Puerto Rico's Credit and Loss Exposure Through Their Direct Discussions With the Puerto Rican Government .. 149

     3.    Defendants Admitted That the Company's Internal Controls with Respect to Financial Reporting and Calculating Loss Reserves Were Inadequate ................... 150

     4.    The Individual Defendants Were Aware That the Credit Quality of Ambac's Puerto Rican Bonds Were Deteriorating Because They Closely Monitored Credit Risk Through Membership on Credit Committees ........................................................ 152

5.    The Individual Defendants Admitted that the Company Was Aware of Market Factors Indicating an Imminent Likelihood of Defaults on Ambac's Puerto Rican Bonds .................................................................................... 154

6.    Defendants Were Aware That the Credit Quality of Ambac's Puerto Rican Bonds Were Deteriorating as a Result of Their Unique Industry Knowledge And Experience................................................................................................ 156

7.    Defendants Were Aware of Ambac's Credit Risk and Loss Exposure As Evidenced By Ambac's Belated Buyback of Puerto Rican Bonds............................................. 158

8.    The Curiously Timed Resignation of Defendant Adams and Matanle Support an Inference of Scienter ............................................................................ 159

B.    Defendants Had Motive to Make Material Misrepresentations and Conceal Material Information from Investors ................................................................ 160

1.    Defendants Had Motive to Commit the Alleged Fraud In Order to Conceal Ambac's Risk and Loss Exposure so that Ambac Could Regain its AAA Credit Rating and Write New Business Again ..................................................................... 161

2.    Defendants Had Motive to Commit the Alleged Fraud to Preserve Their Excessive Compensation ....................................................................................... 163

XI.  LOSS CAUSATION ............................................................................. 167

XII. CLASS ACTION ALLEGATIONS.............................................................. 171

XIII.NO STATUTORY SAFE HARBOR.......................................................... 172

XIV. APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE ................................. 173

COUNT I .............................................................................................. 174

COUNT II ............................................................................................. 176

PRAYER FOR RELIEF ............................................................................. 178

JURY DEMAND...................................................................................... 178

Plaintiff Ori Wilbush ("Plaintiff") brings this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, on behalf of himself and all persons similarly situated who purchased or otherwise acquired Ambac Financial Group, Inc. ("Ambac" or the "Company") securities between November 13, 2013 and November 17, 2015, inclusive (the "Class Period").

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of his undersigned counsel, which included, among other things, review and analysis of: (i) Ambac's public filings with the U.S. Securities and Exchange Commission ("SEC") and other Company public statements; (ii) reports of securities and financial analysts; (iii) news articles; (iv) accounts from former Ambac employees; (v) industry reports and (vi) consultation with a financial expert. Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants (defined below).   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This securities fraud class action is based upon an extensive and pervasive fraud, orchestrated by Defendants, who sought to conceal Ambac's true credit risk and loss exposure to the more than $10 billion in Puerto Rican bonds the Company insured in order to reclaim Ambac's "AAA" credit rating and enable the Company to write new business.

2.    Ambac, headquartered in New York, New York, is a holding company whose subsidiaries provide financial guarantee products and other financial services to clients in both the public and private sectors around the world. The Company operates in two segments: Financial

Guarantee and Financial Services. The primary type of financial guarantee that Ambac provides, monoline insurance, guarantees the timely repayment of bond principal and interest when a bond issuer defaults.

3.      Ambac lost its credit rating in November 2010 after being forced to file for bankruptcy in connection with unprecedented losses the Company incurred on its mortgage-backed securities during the 2007 housing crisis.   Since then, Ambac has been unable to write new business and has spent the last several years in run-off.

4.      As Defendants admit, Ambac's long-term viability is dependent upon the Company reclaiming its AAA credit rating[1] and the "inability to write new business has and will continue to negatively impact Ambac's future operations and financial results."  Accordingly, rather than face another financial crisis that would threaten Ambac's long-term viability, Defendants embarked on a scheme to conceal the Company's true credit risk and loss exposure to Puerto Rico, at all costs.

5.      Prior to the Class Period, the Puerto Rican economy was in rapid decline with mounting debt levels, high unemployment, falling housing prices and a decline in bank assets.  As a result, the credit ratings on Puerto Rican bonds were being downgraded repeatedly throughout the Class Period to levels indicating imminent default.   In addition, several relevant metrics relating to the very Puerto Rican bonds Ambac insured all pointed to an imminent default, including higher bond yields, increased costs on credit default swap insurance and widening credit spreads, among others.

6.      Defendants were admittedly aware of these metrics at the time they materialized (starting before the beginning of the Class Period), because they were "continuously analyzing . . . developments in the market" and spending "a considerable amount of time focusing on

_____

[1] Ambac's AAA rating was from Moody's Corporation ("Moody's").

[Ambac's] exposure to . . . Puerto Rico" in which they admittedly were "actively monitoring the situation in Puerto Rico."  In addition, Ambac created various credit committees to address credit risk and loss exposure related to the Company's guarantee portfolio.  In particular, Ambac had an Asset and Liability Committee ("ALCO"), upon which defendants Trick, Matanle and Adams/Tavakoli sat, which dealt with issues concerning "liquidity management, asset valuation hedging, and risk remediation."  Former employees at Ambac confirmed that during the Class Period, Defendants discussed at the ALCO meetings the Company's Puerto Rican bond exposure. Ambac also created a "Special Situations Group" in 2014 for the sole purpose of leading "[Ambac's] efforts to mitigate losses on over $2.2 bn of financial guarantees on municipal bonds of Puerto Rico."

       7.     In order to conceal Ambac's credit and loss exposure to Puerto Rico throughout the Class Period, Defendants made numerous materially false and misleading statements and omitted material facts concerning, *inter alia*: the Company's losses and loss exposure on Puerto Rican bonds, risk management, internal controls over financial reporting and financial condition and prospects, including the following:

- Ambac "***actively*** manag[es] its assets and liabilities with a focus on maximizing investment portfolio returns and mitigating or remediating losses on poorly performing transactions."

- "As part of its ***efforts*** to increase the residual value of its financial guarantee business, ***Ambac Assurance[2] pursues loss mitigation strategies***."

- "As a result of our analysis, we did take some small reserves on Puerto Rico. ***But our*** expectations ***continue to be that we will have no losses on those exposures***."

- Ambac's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ("GAAP")" and the Company's "reserves for

---

[2] Ambac Assurance Corporation ("Ambac Assurance") is a subsidiary of Ambac.

losses and loss expenses and unearned premium reserves are ***adequate*** to cover the ultimate net cost of claims."

- ***"I will re-emphasize the fact*** that ***we do think we are very well reserved for our exposure to Puerto Rico***."

- "Management believes that the timely receipt of all principal and interest on these [municipal obligation] positions ***is probable***."

- Ambac's *"**internal control over financial reporting is effective**."*

(Emphasis added).  As a result of Defendants' false statements, Ambac stock traded at artificially inflated prices throughout the Class Period, reaching a Class Period high of $35.61 per share on March 4, 2014.

8.      As set forth herein, Defendants' statements were each materially false and misleading because, among other reasons: (i) given the deterioration and increased volatility related to the Company's Puerto Rican bonds, Ambac had far greater credit risk and loss exposure than disclosed; (ii) the Company's credit risk management strategies were inadequate; (iii) Ambac's reserves for losses on the Company's Puerto Rican bond exposure were inadequate because, among other reasons, Ambac did not consider the credit risk of the issuer, as represented, and the payment of the bonds was anything but "probable"; (iv) Ambac's financial statements were not in compliance with GAAP; (v) as a result of the foregoing, the Company's financial condition was much worse than represented; and (vi) Ambac failed to maintain adequate internal controls over financial reporting.

9.      Defendants acted with knowledge and/or with reckless disregard for the fact that their Class Period statements were materially false and misleading when made.  As alleged herein, Defendants were aware throughout the Class Period that Ambac had substantial credit and loss exposure on the Puerto Rican bonds it insured that would subject Ambac to major losses as a result of, among other things: (1) the Individual Defendants' (defined below) own admissions during the

Class Period that Ambac was actively monitoring the Company's exposure to Puerto Rico; (2) Defendants' discussions with the Puerto Rican government; (3) the Company's admitted internal control violations with respect to financial reporting and calculating loss reserves; (4) the Individual Defendants' admitted close monitoring of credit risk and loss exposure on the ALCO and other credit committees; and (5) the rapid and sharp decline of the bond credit ratings and widening spread of Puerto Rican bond yields and Credit Default Spread ("CDS") insurance.

10. Investors would ultimately begin to learn the truth about the risk and quality of Ambac's Puerto Rican bonds when, on June 29, 2015, Puerto Rico's governor announced that the island's more than $70 billion in debt was "not payable" and Puerto Rico would likely default on upcoming interest payments. The governor's announcement made Ambac's true exposure undeniably apparent: the Company was potentially liable for up to $10 billion of the Commonwealth's debt it insures (rather than the $2.5 billion Ambac disclosed during the Class Period).

11. Such news sent the Company's stock price careening downwards, falling roughly 29 percent, from a closing price of $22.38 per share on June 26, 2015, to a closing price of $15.91 per share on July 1, 2015, causing investors to sustain substantial losses.

12. On November 9, 2015, Defendants revealed that Ambac was forced to take a goodwill impairment charge of $514.5 million as a result of, among other things, a "substantial decrease in the Financial Guarantee reporting unit's fair value" driven by the decrease in Ambac's market capitalization and stock price and "wider Ambac credit spreads" relating at least in part to Puerto Rico. Indeed, as Defendants revealed for the first time, "our guarantees of various obligations of entities affiliated with Puerto Rico continue to be an overhang."

13. Upon this news, Ambac's stock price dropped $2.05 per share, from $16.84 per share on November 9, 2015 to $14.79 per share on November 17, 2016, or 12%.

14. Defendants ultimately admitted that Ambac had "not maintained effective internal controls over financial reporting" during the Class Period and that Ambac had identified "material weaknesses," related to, among other things, the Company's "estimate of loss reserves."

15. The turmoil surrounding Ambac's Puerto Rican bond exposure resulted in the termination of defendant Adams in December 2014, who conspicuously left the Company in December of 2014. Several other key management were also terminated shortly thereafter.

16. Through this action, Plaintiff seeks to recoup the millions of dollars that he and other Ambac shareholders incurred as a result of Defendants' fraud alleged herein.

## II.    JURISDICTION AND VENUE

17. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

18. This Court has subject matter jurisdiction over this action under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the NASDAQ (a national securities exchange located in this District).

19. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Many of the acts complained of herein occurred in this district,

including the dissemination of materially false and misleading statements in connection with the sale of securities.

### III.   THE PARTIES

#### A.   Plaintiff

20.   Plaintiff purchased Ambac common stock during the Class Period at artificially inflated prices and has been damaged thereby, as previously set forth in his PSLRA Certification, filed with the Court on August 29, 2016 (Dkt. No. 13-1), incorporated herein by reference.

#### B.   Defendants

21.   Defendant Ambac, a holding company incorporated in the State of Delaware, maintains its corporate headquarters in New York, New York.  Through its subsidiaries, Ambac provides financial guarantee products and other financial services to clients in both the public and private sectors around the world.  During all times relevant hereto, the Company's common stock was traded on the NASDAQ under the ticker symbol "AMBC."

22.   Defendant Diana N. Adams ("Adams") previously served as the Company's President and Chief Executive Officer ("CEO") from July 7, 2011 to December 31, 2014.  Prior to that, Adams served as Senior Managing Director and Ambac's Chief Administrative Officer with executive responsibility for Human Resources, Technology and Administration. During the Class Period, Adams was responsible for issuing the materially false and misleading statements alleged herein, until her resignation on December 31, 2014.  Defendant Adams directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Ambac and its business, operations, growth, financial statements, and financial condition.  Moreover, because of her position of control and authority, her ability to exercise power and influence with respect to Ambac's course of conduct, and her access to material inside information about Ambac during the Class Period, at all relevant times

- 8 -

until her resignation in December 2014, Defendant Adams was a controlling person of Ambac within the meaning of §20(a) of the Exchange Act.  As alleged herein, during the Class Period, Defendant Adams made materially false and misleading statements concerning Ambac's exposure to Puerto Rico, risk management and financial condition in, among others, the Company's public filings, press releases, and investor conference calls.

23.     Defendant David Trick ("Trick") has been Ambac's Chief Financial Officer ("CFO") and Treasurer since January 2010 and May 10, 2006, respectively. Defendant Trick has also been the CFO and Treasurer of Ambac Assurance since January 6, 2010.  During the Class Period, Trick was responsible for issuing the materially false and misleading statements alleged herein.  Defendant Trick directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Ambac and its business, operations, growth, financial statements, and financial condition. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to Ambac's course of conduct, and his access to material inside information about Ambac during the Class Period, at all relevant times, Defendant Trick was a controlling person of Ambac within the meaning of §20(a) of the Exchange Act. As alleged herein, during the Class Period, Defendant Trick made materially false and misleading statements concerning Ambac's exposure to Puerto Rico, risk management and financial condition in, among others, the Company's public filings, press releases, and investor conference calls.

24.     Defendant Nader Tavakoli ("Tavakoli") has been the President and CEO of Ambac since January 1, 2015, following Defendant Adams's resignation on December 31, 2014.  Tavakoli was the Co-Chairman of the Board of Directors of Ambac and Ambac Assurance from May 1, 2013 until his appointment as President and CEO of Ambac. During the Class Period, Tavakoli

was responsible for the Company's false statements.  Defendant Tavakoli directly participated in the management and the day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Ambac and its business, operations, growth, financial statements, and financial condition.  Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to Ambac's course of conduct, and his access to material inside information about Ambac during the Class Period, at all relevant times, Defendant Tavakoli was a controlling person of Ambac within the meaning of §20(a) of the Exchange Act.  As alleged herein, during the Class Period, Tavakoli made materially false and misleading statements concerning Ambac's exposure to Puerto Rico, risk management and financial condition in, among others, the Company's public filings, press releases, and investor conference calls.

25.    Defendant Jeffrey S. Stein ("Stein") has served as a director of Ambac since 2013 and as Chairman of the Board of Directors of Ambac ("Board") since 2015.  Stein also served as a member of the Audit Committee, Governance and Nominating Committee, Strategy and Risk Policy Committee and Compensation Committee.  During the Class Period, Stein was responsible for the Company's false statements.  Defendant Stein directly participated in the management of the Company and had actual knowledge of confidential proprietary information concerning Ambac and its business, operations, growth, financial statements, and financial condition.  Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to Ambac's course of conduct, and his access to material inside information about Ambac during the Class Period, at all relevant times, Defendant Stein was a controlling person of Ambac within the meaning of §20(a) of the Exchange Act.  As alleged herein, during the Class Period, Stein made materially false and misleading statements concerning Ambac's exposure to Puerto

Rico, risk management and financial condition in, among others, the Company's public filings, press releases, and investor conference calls.

26.     Defendant Cathy Matanle ("Matanle") joined Ambac in 2001 and served as Senior Managing Director and Head of Portfolio and Credit Risk Management of Ambac from February 2012 until her resignation on September 30, 2016.   During the Class Period, Matanle was responsible for the Company's false statements.   As the Senior Managing Director and Head of Portfolio and Credit Risk Management, Matanle was responsible for monitoring distressed credits, like the Company's Puerto Rico exposure, and directly reporting updates regarding such distressed credits to the CEO of Ambac, the Audit Committee, and the Board.   Her areas of responsibility comprised the credit oversight and remediation of structured and public finance exposures as well as management of the firm's senior credit function, loss reserving, model governance, quantitative strategies and risk operational functions.   From January 2003 to January 2012 Matanle was Managing Director with the risk management responsibilities across the insured portfolio. Moreover, because of her position of control and authority, her ability to exercise power and influence with respect to Ambac's course of conduct, and her access to material inside information about Ambac during the Class Period, at all relevant times, Defendant Matanle was a controlling person of Ambac within the meaning of §20(a) of the Exchange Act.   As alleged herein, during the Class Period, Matanle made materially false and misleading statements concerning Ambac's exposure to Puerto Rico, risk management and financial condition in, among others, the Company's public filings and investor conference calls.

27.     Defendants Adams, Trick, Tavakoli, Stein and Matanle are collectively referred to hereinafter as the "Individual Defendants" and, with Ambac, the "Defendants."   The Individual Defendants, because of their positions within the Company, possessed the power and authority to

control the contents of Ambac's reports filed with the SEC.  Each Individual Defendant had the ability and opportunity to prevent their issuances or cause them to be corrected. The Individual Defendants are liable for the misstatements pleaded herein.

## IV.    BACKGROUND

### A.    Ambac's Guarantee Monoline Insurance Business is Dependent Upon Ambac Regaining its "AAA" Credit Rating

28.    Incorporated in 1991, Ambac describes itself as a leading financial services holding company that provides financial guarantee products and other financial services to clients in the public and private sectors worldwide.  Ambac was the first financial guarantor to insure the principal and interest of municipal bonds, known as "monoline" insurance, because it provided one type of insurance – a guarantee to protect against credit risk, *i.e.* the risk of default.  The extra confidence generated in the market by this coverage allows insured bonds to be priced higher, have lower interest rates, and be more liquid.

29.    As a Wisconsin-domiciled insurer, the Company is regulated by the Wisconsin Office of the Commissioner of Insurance ("OCI").

30.    As discussed below, Ambac's business is comprised of two business segments: (1) Financial Guarantee, which provides monoline insurance and other credit enhancement products; and (2) Financial Services, which provides financial and investment products.

### 1.    The Financial Guarantee Segment

31.    Ambac's Financial Guarantee segment provides monoline insurance and other credit enhancement products, such as credit derivatives, for public finance and structured finance obligations through Ambac Assurance, its principal operating subsidiary, and Ambac Assurance UK Limited ("Ambac UK"), a foreign wholly-owned subsidiary.  Ambac Assurance has another

- 12 -

wholly-owned financial guarantee subsidiary, Everspan Financial Guarantee Corporation ("Everspan"), which has been in runoff since its acquisition in 1997.

32.     Insurance policies issued by Ambac Assurance and Ambac UK provide an unconditional and irrevocable guarantee of payment for the principal and interest on the obligations they insure if the obligor responsible for making those payments fails to do so when scheduled. Accordingly, Ambac's financial guarantee insurance policies and credit derivative contracts expose the Company to direct credit risk of the assets and/or obligors underlying the guaranteed obligation.

33.     Premiums for financial guarantees are received either up front (typical of public finance obligations) or on an installment basis from the cash flows generated by the underlying assets (typical of structured finance obligations). Although the deterioration of Ambac Assurance's financial condition has prevented it from writing new business in recent years, Ambac continues to collect premiums on an installment basis (run-off) on its existing portfolio of guarantees.

34.     The Financial Guarantee segment sells its products in three principal markets: (i) the U.S. public finance market; (ii) the U.S. structured finance and asset-backed market; and (iii) the international finance market. As demonstrated in the chart below, the public finance market, which insures municipal bonds such as those issued by Puerto Rico, comprised the lion's share of the Financial Guarantee segment throughout the Class Period:

| Market | $ Net Par Outstanding | % of Total Financial Guarantee Segment |
|---|---|---|
| **U.S. Public Finance** | | |
| -     December 31, 2013 | $116,062 million | 64.80% |
| -     December 31, 2014 | $93,448 million | 64.60% |
| -     September 30, 2015 | $ 73,074 million | 61.40% |

| U.S. Structured Finance | | |
|---|---|---|
| - December 31, 2013 | $31,412 million | 17.50% |
| - December 31, 2014 | $26,334 million | 18% |
| - September 30, 2015 | $23,168 million | 19.50% |
| **International Finance** | | |
| - December 31, 2013 | $31,618 million | 17.70% |
| - December 31, 2014 | $24,952 million | 17% |
| - September 30, 2015 | $22,735 million | 19% |

35.    The U.S. public finance portfolio consists predominantly of municipal bonds such as general and revenue obligations and lease and tax-backed obligations of state and local government entities, including Puerto Rico.  Governments and municipalities have historically taken advantage of financial guarantee insurance because the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds.  According to Ambac's public filings during the Class Period, risk factors in municipal bonds "derive from the municipal issuer, including its fiscal management, politics, and economic position, as well as its ability and willingness to continue to pay its debt service while undergoing severe stress."

36.    Ambac's U.S. public finance portfolio also includes non-municipal types of bonds, including financings for not-for-profit entities and transactions with public and private elements, housing and other public interests.

37.    Of the $65 billion in public finance bonds, $2.5 billion net par relate specifically to Puerto Rican-related debt.  The $2.5 billion of Puerto Rican debt represents approximately 494.9%, 516.5%, and 506.7% of Ambac's net income for 2013, 2014 and 2015, respectively.[3]

---

[3] Ambac reported net income of $505.2 million, $484.1 million and $493.4 million for 2013, 2014 and 2015, respectively.

38.     Ambac's U.S. structured finance portfolio consists of insured exposures, including securitizations of mortgage loans, home equity loans, student loans, leases, operating assets, collateralized debt obligations ("CDO"), collateralized loan obligations ("CLO"), and other asset-backed financings.  Ambac's structured finance portfolio also encompasses both secured and unsecured debt issued by investor-owned utilities.  In structured transactions, Ambac Assurance often is the control party insuring the transaction's senior class or tranche.  The control party may direct specified parties, usually the trustee, to take or not take certain actions following contractual defaults or trigger events.

39.     Finally, Ambac's international finance portfolio includes a variety of obligations in the international markets, including infrastructure financing, asset-securitizations, CDOs, utility obligations, and whole business securitizations.

### 2.     The Financial Services Segment

40.     Ambac's Financial Services business segment is conducted through subsidiaries of Ambac Assurance, which provide financial and investment products principally to the clients of its financial guarantee business.  Ambac Assurance insures all of the obligations of its financial services subsidiaries.

41.     Ambac's Financial Services segment is conducted through Ambac Assurance's subsidiaries, which provide financial and investment products, including investment agreements, funding conduits, interest rate swaps, currency and total return swaps, principally to its clients of the financial guarantee business.  Ambac Assurance insures all of the obligations of its financial services subsidiaries.

42.     These business are in active runoff.  To mitigate exposure to floating rate insured obligations in the Financial Guarantee segment, the Financial Services segment maintains interest rate derivatives.

### 3.    Ambac's Credit Rating is Critical to the Company's Long-Term Viability

43.    For over thirty years, Ambac had a reputation of being one of the leading financial guarantee insurers in the world, known for its coveted "AAA" investment grade credit rating[4] and strong record of insuring the highest quality municipal bonds.  Ambac's purported stringent underwriting requirements were so successful that Ambac paid on only a small amount of defaults and was able to assume that any exposure that passed Ambac's risk assessment investigation and credit analysis was not going to default. In the Company's public filings during the Class Period, Ambac boasted that the Company only had a remote risk of loss.  The Company's credit rating is, and always has been, a critical part of Ambac's business and long-term viability because, without a AAA credit rating, Ambac cannot write new business.

44.    This is because through a financial guarantee insurance contract, known as a "wrap", Ambac enhances a bond's or asset-backed security's credit rating by "lending" its own top rating to the security.  The "wrapped" bonds and asset-backed securities are then effectively converted to a AAA-rated investment, allowing an issuer to save money by lowering the interest rate it has to pay to investors.  In exchange for the backing of Ambac's AAA credit rating, the issuer pays Ambac (the guarantor) a premium that is calculated as a portion of the "spread" between the amount of interest it would pay absent insurance and the lower amount it pays by virtue of the financial guarantee.  Not surprisingly, Ambac's initial AAA credit ratings jumpstarted the market for Ambac's bond insurance policies, and, by 1988, more than 25% of domestic public finance bond issuances were being insured by Ambac.

---

[4] In 1979, Ambac received its first AAA credit rating from Standard & Poor's ("S&P").  In 1987, Moody's Corporation ("Moody's") awarded its equivalent rating, Aaa, to Ambac.  Fitch Ratings also followed suit, awarding Ambac its AAA rating in 1994.

45.     As with other bond guarantors, Ambac was hit hard by the 2007 subprime mortgage financial crisis.  At this time, Ambac was a major issuer of CDS, having written CDS with retained exposures of tens of billions of dollars on CDOs, synthetic CDOs (CDOs comprised of CDS), and Residential Mortgage Backed Securities ("RMBS"). When these investments deteriorated during the economic crisis, Ambac's projected future liabilities grew while its credit ratings and statutory surplus plummeted.

46.     Ambac was the first major bond insurer to lose its AAA rating when Fitch downgraded Ambac to AA on January 18, 2008.  By mid-2009, S&P had dropped Ambac to "CC", a rating level indicating "extremely weak financial security characteristics," and Moody's dropped Ambac to "Caa2," a rating level indicating "very poor financial security."

47.     After losing its AAA credit rating, Ambac was forced to stop writing new policies and began executing a run-off strategy for policies in force.

48.     On November 8, 2010, with approximately $1.7 billion in debt, Ambac filed for Chapter 11 bankruptcy and lost its credit rating altogether. Ambac emerged from bankruptcy on May 1, 2013, issuing 45 million new common shares and approximately 5 million new warrants to holders of allowed claims.  Since Ambac emerged from bankruptcy in 2013, the Company has not been able to write new business due to its loss of credit rating.  Accordingly, throughout the Class Period continuing through the present, Ambac's entire business has been focused on managing and reducing the Company's risk in order to regain a AAA credit rating. As Ambac openly acknowledges, "[a]n inablility to write new business has and will continue to negatively impact Ambac's future operations and financial results."  Moreover, any opportunities to de-risk transactions "depend on market conditions, including *the perception of Ambac Assurance's creditworthiness*." (Emphasis added).

49.     The Individual Defendants were motivated to conceal Ambac's true risk and loss exposure to the Puerto Rican bonds the Company insured at all costs in order to obtain the AAA credit rating Ambac desperately needed to write new business.

   **B. Ambac's Puerto Rican Bond Exposure**

50.     Ambac insures the following seven Puerto Rican bonds:

- <u>PR Commonwealth General Obligation Bonds</u> ("PR General Obligation").  Ambac insures $56 million net par worth of PR General Obligation bonds, which focus on initiatives aimed at producing more diversified and sustainable economic development.  The net proceeds of these bonds are used to carry out capital improvement programs.  PR General Obligation bonds are backed by the full faith and credit of the Constitution of the Commonwealth of Puerto Rico ("Commonwealth Constitution").

- <u>PR Public Buildings Authority Revenue – GO Guaranty</u> ("PBA").  The Company insures $191 million net par worth of PBA bonds issued to finance office buildings and other facilities leased to various departments, public agencies and instrumentalities of Puerto Rico.  The principal and interest payments on PBA bonds are payable from lease rentals derived from such facilities and are secured by the Commonwealth of Puerto Rico's guarantee and by debt service reserves or other guarantees.

- <u>PR Highway and Transportation Revenue 1968 Resolution – Highway Revenue</u> ("PRHTA – Highway"), and PR Highway and Transportation Revenue 1998 Resolution – Senior Transportation Revenue ("PRHTA – Transportation", collectively with PRHTA – Highway, "PRHTA").  Ambac insures $26 million net par worth of PRHTA – Highway bonds and $445 million net par worth of PRHTA - Transportation bonds.  PRHTA is a public corporation created to assume responsibility for construction of highways and other transportation systems in Puerto Rico and are secured by PRHTA's property and revenues, as well as by any tax the Commonwealth makes available to PRHTA.  PRHTA bonds are secured by a lien on (i) revenues derived from PRHTA's toll facilities; (ii) gasoline, diesel, crude oil, and other excise taxes levied by Puerto Rico; and (iii) motor vehicle license fees.

- <u>PR Infrastructure Financing Special Tax Revenue</u> (Rum Tax) ("PRIFA").  Ambac insures $503 million net par worth of PRIFA bonds, which were created to provide financial, administrative and

other types of assistance to political subdivisions, public corporations, instrumentalities and municipalities of the Commonwealth that develop and operate infrastructure facilities. PRIFA bonds are secured by a portion of a federal excise tax imposed on rum and other items produced in Puerto Rico and sold in the United States.

- <u>Convention Center</u> (Hotel Occupancy Tax) ("PRCCDA").   The Company insures $137 million net par worth of PRCCDA bonds. PRCCDA is a public corporation created for the purpose of developing and operating a convention center in San Juan, Puerto Rico, and related improvements and facilities.  PRCCDA bonds are secured by a lien on certain hotel occupancy taxes imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act.  In the Hotel Tax Act, Puerto Rico guarantees that it (i) will ensure that each month, the PRCDA Pledged Funds will be deposited in certain accounts with the trustee for PRCCDA Bonds to pay principal and interest on the PRCCDA Bonds, and (ii) will not limit or alter the rights of PRCCDA to comply with its obligations to the holders of PRCCDA Bonds.

- <u>Sales Tax Revenue</u> ("COFINA").  Ambac insures $805 million net par worth of COFINA bonds.   COFINA is an independent instrumentality of the Commonwealth of Puerto Rico created for the purpose of financing the payment, retirement or defeasance of certain obligations of Puerto Rico.  COFINA is secured by a portion of Puerto Rico's sales and use tax.

51.     In 2013, Ambac only reported net par outstanding for the Company's Puerto Rican bonds of approximately $2.4 billion, exclusive of nearly $8 billion of additional exposure the Company had for these bonds related to interest. After much criticism from the market for a lack of transparency related to the Company's exposure to Puerto Rico, in July 2014, Ambac began providing principal and interest exposure on its Puerto Rican bonds in presentations conspicuously located on its website. Noticeably absent from these presentations, however, was any information regarding Ambac's loss exposure or reserves related to Puerto Rico.

52.     Throughout 2014 and 2015, Ambac's net exposure to Puerto Rican bonds was reportedly approximately $2.5 billion net par and $10.4 billion net par and interest.

53.     Ambac's Puerto Rico exposure in 2014 was as follows:[5]

| Issuer | As of June 30, 2014 | | As of September 30, 2014 | | As of December 31, 2014 | |
|---|---|---|---|---|---|---|
| | Net Par (millions) | Net Par + Interest (millions) | Net Par (millions) | Net Par + Interest (millions) | Net Par (millions) | Net Par + Interest (millions) |
| PR General Obligation | $59.0 | $79.8 | $59.0 | $78.3 | $59.0 | $78.3 |
| PBA | $191.2 | $313.9 | $191.2 | $308.9 | $191.2 | $308.9 |
| PRHTA – Highway | $26.5 | $37.1 | $26.5 | $36.5 | $26.5 | $36.5 |
| PRHTA - Transportation | $706 | $1432.9 | $685.6 | $1,397.0 | $685.6 | $1,397.0 |
| PRIFA | $560.7 | $1,166.1 | $532.5 | $1,126.0 | $532.5 | $1,126.0 |
| PRCCDA | $137.1 | $219.3 | $137.1 | $215.8 | $137.1 | $215.8 |
| COFINA | $804.7 | $7,321.3 | $804.7 | $7,321.3 | $804.7 | $7,321.3 |
| **Total** | **$2,485.2** | **$10,570.4** | **$2,436.6** | **$10,483.8** | **$2,436.6** | **$10,483.8** |

54.     During the Class Period in 2015, Ambac's exposure to Puerto Rico was reported as follows:

| Issuer | As of March 31, 2015 | | As of June 30, 2015 | | As of September 30, 2015 | |
|---|---|---|---|---|---|---|
| | Net Par (millions) | Net Par + Interest (millions) | Net Par (millions) | Net Par + Interest (millions) | Net Par (millions) | Net Par + Interest (millions) |
| PR General Obligation | $59.0 | $76.9 | $59.0 | $76.9 | $56 | $72.4 |
| PBA | $191.2 | $303.9 | $191.2 | $303.9 | $191.2 | $298.8 |
| PRHTA – Highway | $26.5 | $35.9 | $26.5 | $35.9 | $26.5 | $35.3 |

---

[5] Ambac disclosed its gross par exposure as of December 31, 2013, as follows: (i) COFINA - $808 million; (ii) PRHTA - $760 million; (iii) PRIFA - $574 million; (iv) PRCCDA - $137 million; (v) PBA - $191 million; and (vi) PR General Obligation - $59 million.

| PRHTA - Transportation | $685.6 | $1,382.0 | $685.6 | $1,382.0 | $673.5 | $1,345.2 |
|---|---|---|---|---|---|---|
| PRIFA | $532.5 | $1,114.8 | $532.5 | $1,114.8 | $502.8 | $1,073.9 |
| PRCCDA | $137.1 | $212.4 | $137.1 | $212.4 | $137.1 | $209.0 |
| COFINA | $804.7 | $7,321.3 | $804.7 | $7,321.3 | $804.7 | $7,321.3 |
| **Total** | **$2,436.6** | **$10,447.2** | **$2,436.6** | **$10,447.2** | **$2,391.8** | **$10,355.9** |

55.     Certain PR issuers identified above are subject to the Priority Debt Provision under Section 8 of Article VI of the Commonwealth Constitution.  These include PRHTA – Highway, PRHTA – Transportation, PRIFA, and PRCCDA.  Pursuant to this provision, Puerto Rico has pledged its good faith, credit and taxing power towards the prompt repayment of its General Obligation bonds over all other debt:

> In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

56.     Accordingly, if actual revenues are insufficient in any given fiscal year, General Obligation debt receives priority over other debts and constitutes a first claim on the Commonwealth's resources.   Therefore, Puerto Rico's General Obligation bonds receive repayment before PRHTA, PRIFA and PRCCDA.  Accordingly, in the event of a default, Ambac will not receive repayment on its PRHTA, PRIFA, or PRCCDA insured bonds until Puerto Rico's General Bonds are satisfied.  PBA and COFINA, however, are not subject to the Priority Debt Provision.

57.     Additionally, to ensure further protection for insurers of General Obligation bonds, Section 2 of Article VI of the Commonwealth Constitution provides that full faith and credit bonds

or notes shall not be issued if Puerto Rico's debt service exceeds 15% of the average annual revenues raised and deposited into the treasury in the two fiscal years preceding the fiscal year of such proposed issuance. The purpose of article VI of the Puerto Rican Constitution is to provide further protection for General Obligation bonds and their repayment.

58.     As Ambac has learned from prior experience, however, the fact that bonds are backed by a state constitution does not necessarily mean that Ambac will receive priority payments on its General Obligation bonds in the event of a default. For example, Ambac Assurance insured general obligation bonds for the city of Detroit that were backed by the full faith and credit of the city of Detroit, meaning the bonds would receive priority payment over other debt. When Detroit went bankrupt in 2013, however, it halted payment on general bond obligations, including payments due to Ambac. This default, and Detroit's failure to stick by its full faith and credit pledge, left Ambac with exposure to $92.7 million in Detroit limited-tax general obligation debt and $77.6 million in unlimited tax bonds.

59.     Furthermore, the majority of Ambac's Puerto Rican exposure, or $9.8 billion of the total $10.4 billion as of September 30, 2015, are also zero coupon, or capital appreciation bonds. These include PRHTA – Highway, PRHTA - Transportation, PRIFA, and COFINA. Zero coupon bonds do not pay interest until they mature and can cost municipalities more in interest than regular bonds. Because the entire payment is offered at maturity, zero-coupon bonds tend to fluctuate in price more than regular coupon bonds and tend to increase in value as time goes by. After accounting for the accumulated interest in zero-coupon bonds, Ambac's exposure to Puerto Rican

bonds is actually $10.5 billion, or more than four (4) times the $2.5 billion net par exposure Defendants reported throughout the Class Period.[6]

> ### C. Throughout the Class Period, the Individual Defendants Sat on Risk Management Committees that Closely Monitored the Company's Credit and Loss Exposure to Puerto Rico

60. Ambac's business is dependent on effective risk management in order to successfully manage credit risk. After the Company emerged from bankruptcy in May 2013, risk management became Ambac's *only* focus because the Company had lost its credit rating and thus, could not write new business. Thus, after May 2013, Ambac focused *solely* on reducing risk in order to reclaim its AAA credit rating.

61. According to Ambac's Annual Report on Form 10-K, filed with the SEC on March 3, 2014 (the "2013 Form 10-K"), "*[o]ngoing surveillance of credit risks in [Ambac's] insured portfolio is an important component of [Ambac's] risk management*." (Emphasis added).

62. Accordingly, the Company purportedly established strict investment guidelines in order to manage credit risk:

> Ambac manages credit risk associated with its investment portfolio through adherence to specific investment guidelines. These guidelines establish limits based upon single risk, asset type, and minimum credit rating standards. Additionally, *senior credit personnel monitor the portfolio on a continuous basis*. Credit monitoring of the investment portfolio includes procedures on residential mortgage-backed securities consistent with those utilized to assess the risk of [Ambac's] insured RMBS exposures.

(Emphasis added).

63. In 2013, purportedly "[a]s a result of the current credit and economic environment," Ambac "heightened its surveillance efforts on all exposures, focusing on the identification of

---

[6] Brian Chappatta, *Puerto Rico Balloon Payments Seen as Risk for Some Bond Insurers,* Bloomberg (Setp. 4, 2015), http://www.bloomberg.com/news/articles/2015-09-04/puerto-rico-balloon-payments-seen-as-risk-for-some-bond-insurers.

credits and asset types across the portfolio that were likely to experience increased stress or potential for losses."

64.     Throughout the Class Period, Ambac maintained the following four risk management committees: (1) ALCO; (2) Portfolio Risk Management and Analysis ("PRM"); (3) Risk Restructuring Group ("RRG"); and (4) Credit Risk Management ("CRM").   These risk management groups, which were primarily responsible for the development, implementation and oversight of loss mitigation strategies, surveillance and remediation of the insured financial guarantee portfolio, were described as "integral to Ambac's strategy of mitigating losses on poorly performing transactions."

65.     As discussed below, the Individual Defendants either sat directly on these risk management committees, or senior members of the committees reported directly to the Individual Defendants and regularly informed them about the committee discussions and actions taken. Accordingly, Defendants had personal knowledge of the risk management meetings and discussions and were well aware of Ambac's credit risk and loss exposure associated with the Company's Puerto Rican bond portfolio, yet falsely represented to investors that "reserves for losses and loss expenses and unearned premium reserves are **adequate** to cover the ultimate net cost of claims"[7] and that "timely receipt of all principal and interest . . . is probable."

1.     **The Asset and Liability Committee ("ALCO")**

65.     In the Company's public filings, Ambac describes ALCO as a multidisciplinary committee whose objective is to "implement and foster an enterprise wide culture and approach to liquidity management, asset valuation hedging, and risk remediation." According to Ambac's annual SEC filings, members of ALCO **include the CEO, CFO** and senior managers from

---

[7] 2013 Form 10K (Emphasis added).

investment management, capital markets and risk management.  A former Assistant Vice President at Ambac from July 2011 through December 2015 was responsible for surveillance of the public finance portfolio to minimize risk exposure, identify and review distressed credits, and analyze credit quality ("CW1").  CW1 confirmed that the CEO and CFO were members of the ALCO committee.  In addition, a former Ambac Assurance Management Director, Head of Quantitative Strategy/Analytics Group from May 2009 until September 2014 responsible for pioneering loss estimation models for Private Student Loans ("CW2"), stated the witness attended ALCO meetings to present models he/she developed for loss estimation.  CW2 reported to defendant Matanle and recalled defendants Adams, Trick and Matanle attending the ALCO meetings that this witness attended.

66.     According to the Company's public filings, ALCO met monthly and also held ad hoc meetings when necessary to discuss the commutation of distressed financial guarantee exposures, such as Ambac's exposure to Puerto Rican bonds.  CW2 confirmed that there were concerns about the Puerto Rican bond portfolio raised during at least the last year or year and a half this witness was employed at Ambac.  Specifically, CW2 recalled internal discussions at the committee meetings where the witness presented during the first half of 2014 about the validity of the portfolio, including "do we have the tools, do we have the capabilities to, how do we assess the losses, how do we project the losses."

67.     Moreover, CW2 stated that at the ALCO meetings attended by Adams, Trick and Matanle, there were discussions about the Puerto Rican bond portfolio.  Specifically, they discussed whether Ambac could capture all of the exposure related to the portfolio because, historically, Ambac did not have a good model or the tools to do it because it had not happened before.  According to a former Financial Group Municipal Credit Analyst, Public Finance Group

from March 2012 until May 2014 who worked directly on the Puerto Rican bond portfolio pulling information together for purposes of determining Ambac's exposure ("CW3"), the Company's Puerto Rican bond portfolio was "convoluted" and it was difficult to gather data because, among other reasons, there were so many different bonds and policies involved.  CW3 confirmed that the Puerto Rican bonds were a "major part" of Ambac's bond portfolio and that the credit quality of the Company's Puerto Rican bonds began deteriorating between October 2013 and May 2014.

68.     Similarly, a former Ambac Assurance Corporation Vice President, Accounts Payable from May 2011 to June 2016 ("CW4"), stated that Puerto Rico was a big portion of Ambac's business.  CW4 recalled attending a quarterly staff meeting in 2013 or 2014 where defendant Tavakoli acknowledged that Ambac had some exposure to Puerto Rico.

69.     According to CW2, at the ALCO meetings he attended with Adams, Trick and Matanle, defendant Matanle recommended the Puerto Rico bond portfolio reserves that should be taken. CW2 stated that recommendation regarding reserves for Puerto Rico were directly under the supervision of Matanle.

70.     According to the Company's public filings, "[d]ecisions that also have material asset, liability, and liquidity implications, such as commutations and buybacks also *require ALCO approval* of such asset, liability and liquidity implications." Accordingly, the Individual Defendants approved the decision to buyback Puerto Rican bonds during the March 10, 2014 through May 2, 2016 timeframe (discussed *infra* VII).

## 2.  The PRM Committee

69.     The PRM Committee's focus is on remediation, loss mitigation, risk reduction and surveillance.  PRM personnel perform "periodic surveillance reviews of exposures according to a schedule based on the risk profile of the guaranteed obligations or as necessitated by specific credit

events or other macro-economic variables." Risk-adjusted surveillance strategies have been developed for each bond type with review periods and scope of review based upon each bond type's risk profile. The risk profile is assessed "regularly." These monitoring activities are purportedly designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely affect the portfolio. In fact, in some instances, PRM represents that it will engage workout experts or attorneys and other consultants with appropriate expertise in the targeted loss mitigation area to assist management in examining the underlying contracts or collateral, provide industry specific advice and/or execute strategies.

70.   Ambac's "active surveillance" allows PRM to "track single credit migration and industry credit and performance trends." In Ambac's public filings with the SEC throughout the Class Period, Ambac assured its stockholders that in the event a problem is detected, the group focuses on loss mitigation:

> [B]y recommending appropriate action and working with the issuer, trustee, bond counsel, servicer and other interested parties in an attempt to remediate the problem and minimize Ambac Assurance's exposure to potential loss. Those credits that are either in default or have developed problems that eventually may lead to a default or claim payment are tracked closely by the appropriate surveillance team and senior risk managers and discussed at regularly scheduled meetings with Credit Risk Management.

71.   The senior risk managers in PRM have also established cross-functional teams to "promote active mitigation and/or targeted remediation of the insured portfolio." The purpose of these cross-functional teams is to target and address Ambac's highest risk exposures. Members of these teams work with both internal and external experts in the pursuit of risk reduction on all fronts.

72.   The senior managers within PRM report directly to CEO and regularly inform and update the Audit Committee of the Board of Ambac and Ambac Assurance with respect to risk-

related topics in the insured portfolio.  During the Class Period, Defendant Matanle was the head of PRM.

### 3. RRG

73.     RRG focuses on the "analysis, implementation and execution of commutation and related claims reduction or defeasance strategies primarily for policies allocated to the Segregated Account.  Analysts evaluate the estimated timing and severity of projected policy claims as well as the potential impact of other loss mitigation strategies in order to target and prioritize policies, or portions thereof, for commutation, refinancing, bond purchase (of securities guaranteed by Ambac Assurance) or other claims reduction or defeasance strategies."

### 4. CRM

75.     CRM "manages the decision process for all material matters that affect credit exposures within the insured portfolio." While PRM is responsible for the credit analysis, recommendation, and execution of credit remediation strategies, CRM provides a forum for independent assessments and sign-offs and drives consistency and timeliness.  The scope of credit matters include material amendments, waivers and consents, remediation plans, credit review scheduling, adverse credit classification and below investment grade rating designations, adversely classified credit reviews, sector reviews and overall political and credit issues, as well as determining the proper level of approval.  The decision process may involve a review of structural, legal, political and credit issues and includes determining the proper level of approval, which varies based on the nature and materiality of the matter.  According to Ambac's public filings, "*[i]mportant strategic level credit and restructuring issues will involve the CEO and other executive management to augment the CRM process*." (Emphasis added).

76.     With respect to credits that are either in default or have developed problems that eventually may lead to a default, PRM reportedly tracks them closely and discusses them at meetings with CRM.   Adversely classified credit meetings include members of CRM, PRM surveillance and legal analysts.  At these meetings, relevant information is discussed, including a plan for corrective actions and a reassessment of the credit's rating and credit classification are considered.  The review schedule for adversely classified credits is "tailored to the remediation plan to track and prompt timely action and proper internal and external resourcing." A summary of any developments concerning adversely classified credits and credit trends is provided to Ambac's and Ambac Assurance's board of directors "no less than on a quarterly basis."

77.     Ambac further represents that it specifically has surveillance in place for its insured portfolio, which consists of identifying types of exposures and risks that would or could trigger credit deterioration across the related exposures.  Some of the risks that Ambac's surveillance is designed to monitor include the impact of potential municipal bankruptcy contagion or large scale domestic military cutbacks on its military housing portfolio, natural disasters, or other regional stresses.  Accordingly, the risk of default and declining credit ratings of Puerto Rican bonds was purportedly tracked and monitored closely by Ambac and its CRM team.

> **D.     Throughout the Class Period, Ambac Was Subject to Substantial Undisclosed Credit Risk and Loss Exposure Related to the Puerto Rican Bonds the Company Insured**

78.     As discussed below, Puerto Rico's economy had been declining for over a decade and the credit ratings on Puerto Rican bonds were rapidly declining as Puerto Rican bonds were close to default.  In addition to the risk management committees described above, Defendants were aware of the Company's significant loss exposure on its Puerto Rican bond portfolio prior to and throughout the Class Period from at least the following sources: (1) the downturn in the Puerto Rican economy; (2) rapidly declining credit ratings of the individual Puerto Rican bonds insured;

(3) significant increase in the cost of credit default risk insurance; and (4) widening yields and credit spreads on Puerto Rican bonds.  Despite these known metrics indicating an imminent Puerto Rican default, Ambac concealed the Company's true loss exposure and falsely assured investors in the 2013 Form 10-K and elsewhere that "[w]e have historically experienced low levels of defaults in our public finance insured portfolio" and "[h]igh severity outcomes are unprecedented, [and] would represent a paradigm shift in the municipal bond market."

### 1. The Puerto Rican Economy Was in Decline Prior to and Throughout the Class Period

79.     Over the last several years, the Puerto Rican economy has been mired in a recession.  According to an analysis of the Puerto Rican economy by former World Bank Chief Economist Anne Krueger, Ranjit Teja, and Andrew Wolfe (the "Krueger Report"), investment in the Puerto Rican economy fell by more than ten percentage points of gross national product ("GNP") from 2004 to 2014.[8]

80.     As noted in the Krueger Report, much of the damage to the investment in percentage of GNP ratio came from the residential real estate market and the steep fall in housing prices since 2004. Lower home prices reduced the net wealth of individuals and small firms, thereby affecting their capacity to borrow, resulting in weakness in consumption and investment.

81.     On top of a struggling economy and failing housing market, Puerto Rico was also encountering serious stress in the banking sector.  Between 2005 and 2015, commercial bank assets fell by 30% "as banks reduced their balance sheets in response to the hit to their capital from lower asset prices."[9]  Puerto Rico's economy is also suffering from extreme levels of public debt, which

---

[8] Krueger, Teja & Wolfe, *Puerto Rico – A Way Forward*, at 4 (June 29, 2015), http://www.bgfpr.com/documents/PuertoRicoAWayForward.pdf (the "Krueger Report").
[9] *Id.* at 5.

have risen every year since 2000 and reached 100 percent of GNP by the end of fiscal year ("FY") 2014.[10]

82.    Puerto Rico also has an unusually high unemployment, with only 40% of its population employed.[11]

83.    On January 3, 2014, an article published in Forbes warned that "the debt burden currently burying this economy [of Puerto Rico] may eventually send nasty tremors into the United States' municipal bond market."[12]   To put Puerto Rico's debt in perspective, the Forbes article explained:

> Texas's state government debt is relatively modest, near $40 billion, or $1,577 per resident.  Puerto Rico's public debt of $53 billion is nearly $15,000 per person, but when we add inter-governmental debt the mountain rises to $70 billion, or $17,500 per person.  Throw in a violently under-funded pension and healthcare obligations, the noose approaches $160 billion. That's $46,000 per person, enough to make one think about trying a swim for Miami.[13]

84.    As Defendants admit in Ambac's public SEC filings throughout the Class Period, they actively monitored market factors as they affected credit risk and were interacting with the Puerto Rican government on matters related to the Puerto Rican bonds Ambac insures.  According to Ambac's 2014 Annual Report, the Company had "been actively involved in the development surrounding the restructuring of the revenues and obligations of the Puerto Rico Highways and Transportation Authority."   Thus, Defendants were aware of Puerto Rico's poor economy and

---

[10] *Id.* at 9.
[11] Krueger Report at 6.
[12] Larry McDonald, *Could Puerto Rico Default Hammer the $3.7 Trillion U.S. Muni Bond Market in 2014?* Forbes (Jan. 3, 2014), http://www.forbes.com/sites/larrymcdonald/2014/01/03/puerto-rico-default-to-re-price-the-3-7-trillion-municipal-bond-market-in-2014/#56c757882dca.
[13] *Id.*

financial situation, indicating an imminent default on the Commonwealth's bonds prior to and throughout the Class Period.

### 2. The Credit Ratings of the Puerto Rican Bonds Ambac Insured Rapidly Declined Throughout the Class Period

85.     Throughout the Class Period, the credit quality of the Puerto Rican bonds Ambac insured was rapidly deteriorating. *See* Exhibit A (Ambac's Puerto Rico Exposure).

86.     While Ambac only disclosed its internal credit ratings on the individual Puerto Rican bonds it insured after the Class Period, the Company's Puerto Rico exposure in the aggregate was assigned an ambiguous internal rating of "BIG" – meaning below investment grade – by the Company throughout the Class Period.  The Company's public filings defined BIG as anything below BBB on a S&P rating scale, or the equivalent of below Baa on Moody's rating scale.  *See* Exhibit B (Moody's Rating Scale). Given the breadth of possible credit quality scenarios encompassed by the BIG rating, the actual credit quality of a BIG issuer could range anywhere from Baa1 on a Moody's rating scale (meaning of medium quality with moderate credit risk), all the way to Ca-C on a Moody's rating scale (meaning in default or default imminent with little prospect for recovery of principal or interest).

87.     As detailed further in the charts below, the credit quality of every single Puerto Rican issuer Ambac insured deteriorated significantly over the course of the Class Period, with the overwhelming majority of issuers rated Ca or C by mid-2015 according to Moody's. *See* Exhibit A.   Specifically, as detailed in Exhibit A, in total, the Company's Puerto Rico exposure deteriorated fifteen ratings on a Moody's scale and the individual series Ambac insured were downgraded no less than 224 times over the course of the Class Period.  *Id.*  At least three of the issuer series insured by Ambac have received a C rating on a Moody's scale – the worst possible level of credit quality contemplated by that rating agency. Another fifteen of the issuer series

insured by Ambac have received a Ca rating on a Moody's scale – only the second worst possible level of credit quality contemplated by that rating agency. By November 2015, these series were actively defaulted or facing imminent default with little prospect for recovery.

88.     Indeed, each credit rating on an S&P or Moody's rating scale has a correlating statistical likelihood of default based on historical data. In particular, the Municipal Bond Fairness Act (HR 6308), introduced September 9, 2008, detailed historical bond default rates for municipal versus corporate bonds by rating and rating agency, with default rates detailed in percent. *See* Exhibit C (Municipal Bond Fairness Act – Historical Default Data). Based on the historical default data from the Municipal Bond Fairness Act, the Company's C-level ratings (meaning Caa – C on a Moody's scale) throughout the majority of the Class Period had a rapidly increasing historical default rate ranging from 16.48 – 44.81 percent.

89.     Moreover, this historical data is based on observations from traditional municipal bond issuers. Puerto Rico, in contrast, is a United States territory with no federal bankruptcy protection, long-standing economic stagnation, and an unprecedented level of debt.  Accordingly, the actual estimated default rate of Ambac's Puerto Rico exposure was much higher than could be reflected by historical municipal bond data.  For example, if Puerto Rican debt is more comparable to a corporate bond than a traditional municipal bond, the Company's C-level ratings throughout the majority of the Class Period would have had a historical default rate ranging from 69.18 – 69.19 percent.

90.     Critically, the deteriorating credit quality of the Company's Puerto Rican exposure was extreme and affected every single Puerto Rican issuer insured by Ambac during the Class

Period.  For example, the Company's exposure to the PRHTA increased as follows throughout the

Class Period[14]:

| PR Highways and Transportation Authority | | | | |
|---|---|---|---|---|
| **Rating Date** | **Rating** | **Rating Action** | **Credit Worthiness** | **Historic Default Rate** |
| 12-13-2012 | Baa3 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 2-7-2014 | Ba2 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 6-27-2014 | Ba3 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 7-1-2014 | Caa1 | Downgraded | Speculative of substantial risk, subject to very high credit risk. | 16.48 – 44.81 |
| 2-19-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Ca | Downgraded | Highly speculative and likely in, or very near default. | 16.48 – 44.81 |

91.    Thus, the Company's exposure to the PRHTA, in the aggregate, deteriorated ten

ratings on a Moody's scale, was downgraded no less than six times (or 54 times when individual

series are analyzed), and the correlating historical municipal bond default rate increased

approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81 percent by mid-

2015.

92.    What is more, Moody's routinely issued ratings reports when downgrading the

credit quality of the PRHTA and explicitly warned of the risks that would eventually materialize.

For instance, in a ratings report dated September 17, 2014, Moody's explained its Caa1 rating,

citing the long-running economic stagnation of the Puerto Rican economy and the potential for the

government to default:

---

[14] Where the rating of an individual series differed slightly from the majority, the rating of the majority of the series insured was used. The ratings and historical downgrades of each series and tranche Ambac insured is listed by issuer in Exhibit A (Ambac's Puerto Rico Exposure).

Moody's Investors Service has confirmed ratings on the Puerto Rico Highway and Transportation Authority (PRHTA), the Puerto Rico Aqueduct and Sewer Authority (PRASA), and the Puerto Rico Convention Center District Authority (CCDA), concluding a review for possible downgrade that began July 1. The ratings have been confirmed at Caa1, except for PRHTA subordinate-lien bonds, which are confirmed at Caa2. *The outlooks are negative, in line with the Commonwealth of Puerto Rico* (B2, negative).

SUMMARY RATING RATIONALE

Confirmation of the ratings on bonds issued by PRHTA, PRASA and CCDA ends a review period that began after the commonwealth passed a law permitting these entities, along with the Puerto Rico Electric Power Authority (PREPA) to restructure their debt….The passage of a debt restructuring law applicable to these public corporations indicates that *a default trigger could emerge, and it underscores that the central government of the commonwealth (B2, negative) will no longer be able to provide operating support to these entities as it struggles with an onerous debt burden and long-running economic stagnation*.

(Emphasis added).

93.    Despite Moody's warnings, Defendants falsely represented to investors that Puerto Rico was improving and there was no chance of default, with Defendant Adams stating only one month prior that Ambac was "proactively involved in managing [its] exposures [to Puerto Rico]" and assuring that Ambac had "put in place a team of external advisor to complement [Ambac's] internal resources. [Ambac] believe[s] [it is] adequately reserved for the range of outcomes . . . currently identified."[15]

94.    The Company's exposure to the PRIFA increased as follows throughout the Class Period:

| PR Infrastructure Financing Authority | | | | |
|---|---|---|---|---|
| **Rating Date** | **Rating** | **Rating Action** | **Credit Worthiness** | **Historic Default Rate** |
| 12-13-2012 | Baa3 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |

---

[15] August 12, 2014 Earnings Conference Call.

| 2-7-2014 | Ba2 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
|----------|-----|------------|----------------------------------------|-------------|
| 7-1-2014 | B3 | Downgraded | Speculative, high credit risk. | 11.86 – 8.48 |
| 2-19-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Ca | Downgraded | Highly speculative and likely in, or very near default. | 16.48 – 44.81 |

95.     In total, the Company's exposure to PRIFA deteriorated ten ratings on a Moody's scale, was downgraded no less than five times, and the correlating historical municipal bond default rate increased approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81 percent by mid-2015.

96.     Again, Moody's routinely issued ratings reports when downgrading the credit quality of PRIFA and explicitly warned of the risks that would eventually materialize.  For instance, in a ratings report dated December 11, 2013, Moody's explained its recent downgrade and announced the Financing Authority had been placed on review for further downgrades, again citing the long-running stagnation of the Puerto Rican economy and the potential for the government to default:

> Moody's Investors Service has placed on review for downgrade the general obligation (G.O.) Baa3 rating of the Commonwealth of Puerto Rico. At the same time, ratings that are capped by or linked to the commonwealth's G.O. rating were also placed on review, including the Puerto Rico Sales Tax Financing Corporation's (COFINA's) senior and junior lien bonds.
>
> SUMMARY RATING RATIONALE
>
> Downward pressure on the rating arises from the ***Commonwealth's weakening liquidity, increasing reliance on external short-term debt, and constrained market access, within the context of a weakened and now sluggish economy. These developments exacerbate the longstanding financial strain brought by the commonwealth's very high debt load and pension obligations, as well as its chronic budget deficits***.

(Emphasis added).

97.     Again, despite Moody's warnings, Defendants falsely represented to investors that Puerto Rico was improving and there was no chance of default, stating: "We are actively reviewing our Puerto Rico exposure. We do not expect to have losses at this point."[16]

98.     The Company's exposure to PRCCDA similarly increased as follows throughout the Class Period:

| PR Convention Center District Authority | | | | |
|---|---|---|---|---|
| Rating Date | Rating | Rating Action | Credit Worthiness | Historic Default Rate |
| 12-13-2012 | Baa3 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 2-7-2014 | Ba2 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 7-1-2014 | Caa1 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 2-19-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Ca | Downgraded | Highly speculative and likely in, or very near default. | 16.48 – 44.81 |

99.     Thus, the Company's exposure to the PRCCDA deteriorated, in the aggregate, ten ratings on a Moody's scale, was downgraded no less than five times, and the correlating historical municipal bond default rate increased approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81 percent by mid-2015.

100.     The Company's exposure to the PR General Obligation bonds increased in three deterioration pathways during the Class Period: (i) Scenario 1, ending with Caa3 ratings; (ii) Scenario 2, ending with Ca ratings; and (iii) Scenario 3, ending in actual default.  In Scenario 1,

---

[16] December 18, 2013 Annual Shareholder Meetings Call.

the Company's exposure to the PR General Obligation Bonds increased as follows throughout the

Class Period:

| Commonwealth of PR – General Obligation Bonds – Scenario 1 | | | | |
|---|---|---|---|---|
| **Rating Date** | **Rating** | **Rating Action** | **Credit Worthiness** | **Historic Default Rate** |
| 12-13-2012 | Baa3 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 2-7-2014 | Ba2 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 7-1-2014 | B2 | Downgraded | Speculative, high credit risk. | 11.86 – 8.48 |
| 2-19-2015 | Caa1 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 7-1-2015 | Caa3 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |

101.    With respect to Scenario 1, the Company's exposure to the Commonwealth of

Puerto Rico deteriorated nine ratings on a Moody's scale, was downgraded no less than six times,

and the correlating historical municipal bond default rate increased approximately 345 times from

0.13 percent at the end of 2012 to a high of 44.81 percent by mid-2015.

102.    In Scenario 2, the Company's exposure to the PR General Obligation bonds

increased as follows throughout the Class Period:

| Commonwealth of PR – General Obligation Bonds – Scenario 2 | | | | |
|---|---|---|---|---|
| **Rating Date** | **Rating** | **Rating Action** | **Credit Worthiness** | **Historic Default Rate** |
| 12-13-2012 | Baa3 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 2-7-2014 | Ba2 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 7-1-2014 | Caa1 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 7-27-2014 | Ba3 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 2-19-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Ca | Downgraded | Highly speculative and likely in, or very near default. | 16.48 – 44.81 |

103.    With respect to Scenario 2, the Company's exposure to the Commonwealth of Puerto Rico deteriorated ten ratings on a Moody's scale, was downgraded no less than six times, and the correlating historical municipal bond default rate increased approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81 percent by mid-2015.

104.    Finally, with respect to Scenario 3, the Company's exposure to the Commonwealth of Puerto Rico deteriorated eleven ratings on a Moody's scale, was downgraded no less than six times, and the correlating historical municipal bond default rate increased approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81 percent by mid-2015.  At least three of the series of General Obligation Bonds insured by Ambac received a C rating on a Moody's scale – the worst possible level of credit quality contemplated by the credit rating agency.  These series are actively defaulted with little prospect for recovery:

| Commonwealth of PR – General Obligation Bonds – Scenario 3 | | | | |
|---|---|---|---|---|
| Rating Date | Rating | Rating Action | Credit Worthiness | Historic Default Rate |
| 12-13-2012 | Ba1 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 2-7-2014 | Ba3 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 7-1-2014 | B3 | Downgraded | Speculative, high credit risk. | 11.86 – 8.48 |
| 2-19-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Ca | Downgraded | Highly speculative and likely in, or very near default. | 16.48 – 44.81 |
| 12-22-2015 | C | Downgraded | Defaulted | Defaulted |

105.    The Company's exposure to the PBA increased as follows throughout the Class Period:

| PR Public Buildings Authority | | | | |
|---|---|---|---|---|
| Rating Date | Rating | Rating Action | Credit Worthiness | Historic Default Rate |
| 12-13-2012 | Baa3 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |

| 2-7-2014 | Ba2 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 7-1-2014 | B2 | Downgraded | Speculative, high credit risk. | 11.86 – 8.48 |
| 2-19-2015 | Caa1 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 5-21-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 7-1-2015 | Caa3 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |

106.     Thus, the Company's exposure to the PBA deteriorated nine ratings on a Moody's

scale, was downgraded no less than six times, and the correlating historical municipal bond default

rate increased approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81

percent by mid-2015.

107.     Finally, the Company's exposure to the COFINA increased as follows throughout

the Class Period:

| PR Sales Tax Financing Corporation | | | | |
|---|---|---|---|---|
| Rating Date | Rating | Rating Action | Credit Worthiness | Historic Default Rate |
| 10-3-2013 | A2 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 2-7-2014 | Baa1 | Downgraded | Medium quality, moderate credit risk. | 0.13 – 0.32 |
| 7-1-2014 | Ba3 | Downgraded | Speculative, substantial credit risk. | 1.74 – 2.65 |
| 2-19-2015 | B3 | Downgraded | Speculative, high credit risk. | 11.86 – 8.48 |
| 5-21-2015 | Caa2 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |
| 7-1-2015 | Caa3 | Downgraded | Speculative of poor standing, subject to very high credit risk. | 16.48 – 44.81 |

108.     Thus, the Company's exposure to the Puerto Rico Sales Tax Financing Corporation

deteriorated thirteen ratings on a Moody's scale and was downgraded no less than six times, and

the correlating historical municipal bond default rate increased approximately 345 times from 0.13 percent at the end of 2012 to a high of 44.81 percent by mid-2015.

109.     In sum, the Company's Puerto Rico exposure deteriorated, in the aggregate, fifteen ratings on a Moody's scale and was downgraded no less than 224 times on an individual series basis over the course of the Class Period. Following the Class Period, as of July 1, 2016, three of the seven Puerto Rico issuers to which Ambac was continually exposed had wholly or partially defaulted – causing Ambac to incur millions of dollars in coverage payments:

| Issuer | Status |
|---|---|
| PR Highways and Transportation Authority (1968 Resolution - Highway Revenue) | Default speculated for January 2017 |
| PR Highways and Transportation Authority (1998 Resolution - Senior Lien Transportation Revenue) | Default speculated for January 2017 |
| PR Infrastructure Financing Authority (Special Tax Revenue) | Default – Ambac payout of $10.3 million on 1-1-2016<br>Default – Ambac payout of $41.7 million on 7-1-2016 |
| PR Convention Center District Authority (Hotel Occupancy Tax) | |
| Commonwealth of Puerto Rico - General Obligation Bonds | Default – Ambac payout of $1.4 million on 7-1-2016 |
| PR Public Buildings Authority - Guaranteed by the Commonwealth of Puerto Rico | Partial Default – Ambac payout of $9.9 million on 7-1-2016 |
| PR Sales Tax Financing Corporation - Senior Sales Tax Revenue | |
| **TOTAL AMBAC PAYOUT** | **$63.3 Million** |

Rather than disclose to investors that it was highly likely that Puerto Rico was going to default on its bonds as a result of all of the clear indicia alleged herein, throughout the Class Period, the Individual Defendants continued to represent to investors that they actively managed credit risk and default was unlikely.  As set forth below, Defendants' continued refusal to disclose Ambac's loss exposure to Puerto Rico throughout the Class Period, apparent failure to

meaningfully increase reserves to an appropriate level to comport with the Company's exposure to Puerto Rico and assurances that "reserves for losses and loss expenses and unearned premium reserves are *adequate* to cover the ultimate net cost of claims"[17] and that "timely receipt of all principal and interest . . . is probable", was accepted by investors as true, yet was demonstrably false.

> **3.** **The Skyrocketing Cost of Credit Default Swap Insurance on Puerto Rican Bonds During the Class Period Indicated an All But Guaranteed Default on the Bonds**

110.    Through a CDS, the buyer can mitigate the risk of its underlying municipal bond investment by shifting all or a portion of that risk onto a CDS seller in exchange for a periodic fee, similar to an insurance premium. In this way, the buyer of a CDS receives credit protection, whereas the seller of the swap guarantees the credit worthiness of the debt security and is obligated to pay only if a negative credit event occurs. As such, the price of a particular CDS reflects the markets expectation that the issuer will default – the higher the price of a CDS, the greater likelihood of default. The price of a CDS is referred to as the "spread," and is denominated in basis points (bp), or one-hundredths of a percentage point.

111.    At the beginning of the Class Period, the cost of a CDS to insure against the default of Puerto Rican bonds already showed an approximate 78 percent likelihood that there would be defaults across the spectrum of Puerto Rican municipal issuances. With the cumulative probability of default (CPD) at 77.59 percent, the cost of a five year CDS at mid-spread (midway between the bid and ask) was 718.77 basis points. That spread implied a cost of $719,000 each year of the five year CDS to insure $10 million of Puerto Rican municipal bonds. According to S&P, this spread

---

[17] 2013 Form 10K (emphasis added).

and implied cost meant that Puerto Rico was the sovereign credit most likely to default in the world by October 2013:

CMA DataVision provides a daily calculation of CPD, and a variety of other risk metrics, on over 1,200 CDS issuers.

**Highest Default Probabilities**

| Entity Name | Mid Spread | CPD (%) |
|---|---|---|
| Puerto Rico/Commonwealth of | 718.77 | 77.59 |
| Argentina | 2071.48 | 74.15 |
| Cyprus | 989.42 | 57.70 |
| Venezuela | 995.80 | 50.64 |
| Ukraine | 906.67 | 46.76 |
| Pakistan | 845.98 | 45.83 |
| Greece | 847.63 | 40.25 |
| Egypt | 674.95 | 37.70 |
| Illinois/State of | 177.69 | 32.00 |
| Portugal | 385.38 | 28.91 |

112.    These figures only increased throughout the course of the Class Period.  By January 2015, the mid-spread cost of a five year CDS on Puerto Rico municipal bonds rose from 719 as of October 2013, to 1,290 basis points.  That spread implied a cumulative probability of default (CPD) above 95 percent.  By June 2015, the mid-spread cost of a five year CDS on Puerto Rico municipal bonds had risen to 1,759 basis points, implying a cost of $1,760,000 each year of the five year CDS to insure $10 million of Puerto Rican municipal bonds. Exacerbating matters, in the last week of June 2015 alone, the CDS spread widened 344 basis points. This spread and implied cost virtually bespoke the certainty that Puerto Rico would default on its municipal bonds, as a purchaser of the Puerto Rico CDS paid, with a present valuing of the $10 million, nearly the entirety of the principal amount insured.

113.    The graph below depicts the increases in five year CDS spreads for Puerto Rico municipal bonds (left axis) against the five year CDS spreads for the municipal market credit index

(right axis). From January to July 2015, the index for the entire municipal credit swap market rose only 12 basis points from 84 basis points to 96 points (right axis) – or, from a cost of $84,000 to $96,000 – to buy annual default insurance on $10 million of municipal bonds over a period of five years. By contrast, in the last week of June 2015, the Puerto Rico municipal CDS spreads rose 344 basis points to 1,759 basis points, such that the annual cost of default insurance on $10 million of Puerto Rican municipal bonds was 18 times that of the entire municipal credit swap market:



114.    The increasing price of CDS insurance for Puerto Rican municipal debt reflected the market's increasing certainty that there would be wide-spread defaults across the Puerto Rican municipal bond market. Indeed, following the Class Period, the claims on Puerto Rico bond CDS contracts increased to such an extent that the International Swap Dealers' Association ("ISDA") announced a "credit default event" on July 18, 2016, triggering the pay-out of all Puerto Rico bond CDS contracts. In the CDS world, a credit event is a trigger that causes the buyer of protection to

terminate and settle the contract. Credit events are agreed upon at the time the trade is entered into and are part of the contract. The majority of single-name CDS are traded with the following credit events as triggers: reference entity bankruptcy, failure to pay, obligation and acceleration, repudiation and moratorium.

115.    In support of its declaration, ISDA specifically resolved "that a failure to pay credit event occurred in respect of the Commonwealth of Puerto Rico." This default event was triggered by two earlier events: $22 million in claims on CDS municipal bonds on May 2, 2016, and another $1.2 billion of CDS investor claims on bond defaults by Puerto Rico on July 1, 2016.  To settle the claims on the Puerto Rico bond CDS contracts, a credit event auction was held on August 17, 2016 and settled on August 22, 2016 – an auction being the functional equivalent of an insurance payout when the insured-against risk eventually materialized.

116.    Thus, Puerto Rico's default risk was a predicate of Puerto Rico CDS insurance costs, and each increased in tandem throughout the Class Period. Still, Ambac continually failed to disclose to investors that it faced substantial losses as a consequence of the increased risk mounting in the Company's Puerto Rico municipal bond guarantees and continued to tout its risk controls and monitoring mechanisms, stating: "We are actively working to: mitigate losses on poorly performing transactions."[18]

### 4.    The Widening Yields and Credit Spreads on Puerto Rican Bonds During the Class Period Reflected a Rapid Diminution in Credit Quality and Growing Likelihood of Widespread Defaults

117.    Throughout the Class Period, the yields and credit spreads on Puerto Rican municipal debt significantly widened, showing a growing likelihood of default.  A bond "yield" is the amount of return an investor realizes on a bond, and reflects the specific bond's risk level.  The

---

[18] December 18, 2013 Annual Shareholder Meeting Call (Defendant Adams).

higher the risk in a given bond, the higher the yield needed to compensate the investor for taking the risk. When the market perceives the yield on a bond to be too low, its price – or "spread" – will fall to bring the yield in line with market expectations or prevailing interest rates. Accordingly, widening yields and credit spreads reflect the market's evaluation that a particular bond is experiencing increased risks, decreased credit quality, and increased likelihood of default.

118.    According to the 2013 Form 10-K, "changes in [credit] spreads are generally caused by changes in the market's perception of the credit quality of the underlying obligor."

119.    During the Class Period, the yields on US Treasuries (10-year notes and 30-year bonds) were in the range of 1.5 to 3 percent (for 10-year notes) and 2.25 to 3.95 percent (for 30-year bonds).  US Treasuries are considered to be low-risk investments because they are backed by the full faith and credit of the United States government and, as a result, are often used as the standard for credit spread comparison.  Generally, a spread to U.S. Treasuries of more than 300 basis points is indicative of "junk" status and credit distress, while a spread of 600 basis points is regarded as an indicator of default.  A spread of 20 percent (two thousand basis points) was regarded as a clear prediction of default.  By the end of December 2015, Puerto Rico municipal bonds insured by Ambac were trading at yields of 42 percent (four thousand two hundred basis points), or roughly 10.6 to 28 times greater than the yields on US Treasuries.

120.    As reflected in the chart below, the widening of the spread in yields between Puerto Rico municipal bonds and U.S. Treasuries showed the rapidly increasing distress of the Puerto Rican bonds.  Even by November 2013 – the very beginning of the Class Period, most Puerto Rico municipal bonds had declined to Ca ratings (or "junk" status), and the yields of many issues had risen to 10 percent, or roughly 2.5 to 6.7 times greater than the yields on US Treasuries.  By

contrast, the average yields on municipal bonds generally over the past 10 years have been just over four percent.



Source: Kamakura Corporation, Municipal Securities Rulemaking Board

121.    By December 31, 2013, the credit spreads of the PR General Obligation bonds, with maturities of 2041 and coupons of 5.75 percent, were over 6 percent to US Treasuries.  This 600 basis point spread is twice the level indicative of junk status and credit distress, and predicted the substantial possibility of default.  In fact, credit spreads of 600 basis points and rising yields over 10 percent observed by the end of 2013 were harbingers of default.

122.    This situation further deteriorated over the course of 2014.  Whereas the credit spread on PR General Obligation bonds at the 10-year maturity point averaged 627 basis points in August 2014, it widened to an average of 695 basis points in November – more than double the level indicative of credit distress and 95 basis points greater than the level indicative of imminent

default.   Over the same period, the Commonwealth's general obligation bonds at the 30-year

maturity widened by an average 25 basis points, as reflected in the chart below:



123.    The credit impairment of the PR General Obligation bonds continued through 2015

such that by July 2015, the 2041 8 percent coupon was trading at yields of nearly 13 percent (before

the July 1, 2016 default), surpassing the bond yields of both Argentina and Greece.   At 13 percent,

the yields on PR General Obligation Bonds were roughly 3.3 to 8.7 times greater than the yields

on US Treasuries and 1.5 times the 8.6 percent yield on 20-year Greek bonds.   Again, these rising

yields meant that Puerto Rico was growing riskier by the day and according to S&P, was the

sovereign credit most likely to default in the world.

124.    These yields meant that the General Obligation Bonds would default even despite

being guaranteed by the government of Puerto Rico:



125.    By January 2016, PR General Obligation bonds with a 5 percent coupon maturing in 2035 traded for an average yield of 8.96 percent, while General Obligation Bonds with an 8 percent coupon maturing in 2035 traded for an average yield of 11.7 percent.  On July 1, 2016 Puerto Rico defaulted on the payments of its General Obligation bonds.  This default caused Ambac to pay out $1.4 million to bond holders for the interest payments of the 2035 and 2023 5.5 percent coupon General Obligation bonds.

126.    The widening yields and credit spreads infecting Ambac's Puerto Rico General Obligation Bonds were similarly reflected in other Ambac-insured Puerto Rico exposures.  For instance, the following chart reflects the early distress of the COFINA:



Source: Markit

127.     As early as January 2014, bonds issued by the COFINA were trading at yields of 8 percent, or roughly 2 to 5.3 times greater than the yields on US Treasuries. By May of 2015, the same bonds showed yields of 12 percent, or 3 to 8 times greater than the yields on US Treasuries. As detailed II.B *supra*, Ambac guarantees approximately $805 million net par in municipal bonds issued by the COFINA – or, approximately $7.321 billion with interest.  Indeed, the Company's exposure to the COFINA is amongst Ambac's ten largest U.S. public finance exposures as a percentage of total finance guarantee.

128.     As reflected in the chart below, the Company's other Puerto Rico exposures were similarly experiencing widening yields and credit spreads in 2014.  By October 2014, credit spreads on the 10-year and 30-year maturities stood at 700 basis points and 475 basis points, respectively.  On December 11, 2014, PR General Obligation bonds carrying an 8 percent coupon

maturing in 2035 closed at a price of $86.25 (offering a 9.538 yield), down from a recent high of

$94.37 (offering a 8.583 percent yield) on September 11, 2014.



**Fig. 2: Select credits and price trends of Puerto Rico municipal bonds**
Last price, in USD

Source: MSRB trade data, Bloomberg, UBS CIO WMR, as of 11 December 2014

129.    This trajectory continued into 2015 and 2016 as follows:

a.  By the end of December 2015, the PRIFA municipal bonds maturing
    in 2044 and 2046 traded at an average yield of 41.9 percent.  By
    January 2016, PRIFA paid $37.2 million in owed interest using
    reserve cash and by July 1, 2016, defaulted on $77.8 million of
    principal and interest.  The default caused Ambac to pay out $41.7
    million to bond holders.

b.  By January 2016, the PRHTA municipal bonds maturing in 2027
    traded at an average yield of 39.3 percent.  Also in January 2016,
    the PRHTA paid $106 million in owed interest using reserve cash
    and by July 2016, defaulted on $220.7 million in principal and
    interest payments.

c.  By December 2015, PBA bonds maturing in 2042 traded for an
    average yield of 10.6 percent.

d.  By January 2016, the senior COFINA bonds maturing in 2040 and
    2054 traded for an average yield of 10.4 percent, while the
    subordinate COFINA bonds maturing in 2039 and 2054 traded for
    an average yield of 15.2 percent.

130.    In sum, throughout the Class Period, the Puerto Rico municipal bond market

experienced higher yields than the composite index of all below investment grade, CCC rated (or

Ca on a Moody's scale) municipal bonds, as reflected in the chart below:



Source: Markit

131.    Accordingly, even early in the Class Period, the yields of many issues had risen to

10 percent and the credit spreads were reflecting the substantial possibility of default.  These yields

and credit spreads continued to widen throughout the Class Period until they reached levels, in

some instances, of 42 percent by the end of December 2015. Nevertheless, Defendants told

investors that the Puerto Rican economy was improving, that the Company was actively

monitoring and managing credit risk, and that there was little to no risk of a Puerto Rican default.

    **E. Ambac Established a Special Situations Group to Address the Company's Exposure to Puerto Rico**

132.    In 2014, Ambac established a "Special Situations Group" specifically for the

purpose of leading "[Ambac's] efforts to mitigate losses on over $2.2 bn of financial guarantees

on municipal bonds of Puerto Rico."[19]   A special situations group is commonplace among competitors in the industry who need to address insured exposures in "significant stress."

133.   Ambac established the Special Situations Group as early as August 12, 2014 when, according to Defendant Adams, the Company "put in place a team of external advisor [sic] to complement our internal resources" in monitoring the "dynamic" situation in Puerto Rico.[20] Adams also stated in the same conference call that the Company proactively monitors all similar situations that involve "stressed credits."

134.   Although Ambac created the Special Situations Group, Defendants were telling investors during the Class Period that management was "confident that our Puerto Rican positions are relatively solid" and that there was little to no risk of a Puerto Rican default.

135.   On November 10, 2015, Defendant Tavakoli discussed the Special Situations Group for the first time, by name, in a conference call.  In discussing risk, Defendant Tavakoli explained that Ambac had created the Special Situations Group to "oversee our more troubled exposures", meaning the Company's exposure to Puerto Rican bonds.  The establishment of the Special Situations Group and the direct involvement of Defendants Adams and Tavakoli had in its creation show that, despite reassurances made to investors, Defendants knew that the Company has significant loss exposure to Puerto Rico well before the Puerto Rican government announced its first default on June 28, 2015.

---

[19]   Myron Manternach, *Linkedin Profile*, LINKEDIN, https://www.linkedin.com/in/myron-manternach-22a7666a. (Former Head of Special Situations Group and Managing Director and Senior Portfolio Manager of Ambac Assurance Corp).
[20] Diana Adams, August 12, 2014 Earnings Call.

F.    **In the Wake of the Puerto Rican Bond Crisis, Ambac Terminates Defendant Adams**

136.    As the situation in Puerto Rico continued to deteriorate, the Company announced on December 23, 2014 that Defendant Adams had "resigned" from her positions as President, CEO, and member of the Board of Ambac "by mutual agreement with the Board of Directors." Defendant Adams's purported resignation would become effective as of the close of business on December 31, 2014, only eight days later.  Defendants Adams similarly resigned from the board of directors of Ambac Assurance, the Company's subsidiary.

137.    Following Adams's resignation, effective January 1, 2015, Defendant Tavakoli was promoted from Board Co-Chair to Interim President and CEO of Ambac, and Executive Chairman of Ambac Assurance. Defendant Stein was similarly promoted, from a member of the Board, to Chairman of the Board of Ambac.  In announcing Defendant Stein's appointment as Chairman, the Company specifically noted his "more than 20 years of experience in the high yield, distressed debt and special situations asset class."  Finally, Defendant Trick – then the CFO of Ambac and Ambac Assurance – assumed the additional role of Interim President and CEO of Ambac Assurance.

138.    While Defendant Adams was seemingly ousted from the Company, as discussed further below, Defendants Tavakoli, Stein, and Trick exploited their new-found promotions to award themselves significant pay raises.  For example, for the 2015 fiscal year – while the majority of the Company's Puerto Rico exposure was downgraded to "Ca" or "C" by Moody's and the Company's stock price declined by 42.5 percent – Defendant Tavakoli received compensation amounting to $4,943,310, consisting of $1.8 million in base salary and $1.3 million in performance bonuses. As compared to the compensation received by Defendant Adams in 2013 (her last full year of employment), Defendant Tavakoli received approximately 149 percent more in

compensation in 2015, including: (i) a 125 percent increase in base salary; (ii) a 174 percent increase in bonuses; and (iii) a 159 percent increase in stock awards.

### V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

139.    In order to conceal the Company's true financial condition from investors throughout the Class Period, Defendants issued a series of pervasive and material misstatements and omitted material facts in the Company's public filings, press releases, conference calls, investor presentations and other documents.  These material misstatements and omissions created the false impression that Ambac had little to no loss exposure related to the Puerto Rican bonds the Company insured, that Ambac maintained adequate loss reserves and that the Company was well on its way to reclaiming a AAA credit rating so it could start writing new policies.

140.    Defendants' false and misleading statements throughout the Class Period served to artificially inflate Ambac's stock price or maintain the inflation in the market. As investors would eventually learn, Ambac's Puerto Rican bond loss exposure and financial condition were far worse than represented.   As discussed below, Ambac's false and misleading statements fall into the following four categories: (1) credit risk management; (2) reserves; (3) credit rating; and (4) internal controls.

### A.    Materially False and Misleading Statements in the November 13, 2013 Press Release

141.    On November 13, 2013, Ambac issued a press release entitled "Ambac Financial Group, Inc. Announces Third Quarter 2013 Results" (the "November 13 Press Release").  The November 13 Press Release falsely stated that the "Company's quarterly financial results [were reported] in accordance with U.S. GAAP."

- 55 -

142.    The November 13 Press Release also falsely reported a net benefit for loss and loss expenses for the three months-ended September 30, 2013 of $154.3 million, and loss reserves for the period-ended September 30, 2013 of $5.4 billion in total and $275 million for Domestic Public Finance.

143.    In addition, in the November 13 Press Release, Defendants misrepresented the Company's risk exposure to public finance bonds, stating: "[t]he Company continues to shift the Financial Guarantee investment portfolio away from tax-exempt municipal securities toward higher yielding assets."

144.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

**B.      Materially False and Misleading Statements in the Third Quarter 10-Q for the Period Ending September 30, 2013**

145.    On November 14, 2013, Ambac filed its Form 10-Q for the period ending September 30, 2013 ("Third Quarter 2013 Form 10Q"), which was signed by Defendant Trick. The Third Quarter 2013 Form 10-Q contained materially false and misleading statements regarding: (1) credit risk management; (2) losses and reserve for losses on Puerto Rican bonds; (3) credit rating and risk exposure; and (4) internal controls.

1.      **Materially False and Misleading Statements Concerning Credit Risk Management**

146.    In the Third Quarter 2013 Form 10-Q, Defendants made materially false and misleading statements concerning the Company's risk surveillance and loss mitigation, stating that Ambac's "primary goal" is "actively managing its assets and liabilities with a focus on . . . mitigating or remediating losses on poorly performing transactions."

147.    Ambac's assurances regarding its risk management were materially false and misleading at the time made because: (i) the Company was failing to implement adequate mitigation strategies; and (ii) Defendants knew that Puerto Rico was likely to default as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

2.      **Materially False and Misleading Statements Concerning Loss Exposure and Reserves**

148.    The Third Quarter 2013 Form 10-Q falsely represented that Ambac's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."

149.    The Third Quarter 2013 Form 10-Q further misrepresented that Ambac's loss and loss expense reserves were "adequate":

> Ambac's management believes that ***the reserves for losses and loss expenses and unearned premium reserves are adequate to cover the ultimate net cost of claims*** . . . . We have attempted to identify reasonably possible additional losses using more stressful assumptions.  The reasonably possible scenario considers the highest stress scenario that was utilized in development of our probability-weighted expected loss at September 30, 2013 and assumes an inability to execute commutation transactions with issuers and/or investors.

(Emphasis added).

150.    While the Third Quarter 2013 Form 10-Q did not disclose the loss and loss expense reserves for Puerto Rico municipal bonds, it reported for Public Finance, total reserves of $275 million and loss and loss expense of $154.3 million for the period-ended September 30, 2013, and loss and loss expense of $720.3 million for the nine months ending September 30, 2013.

151.    In the Third Quarter 2013 10-Q, Defendants also made materially false and misleading statements concerning the likelihood of default, stating "[m]anagement believes that the timely receipt of all principal and interest on these [municipal obligation] positions is probable" and that "[o]ur experience has shown that, *for the **majority of bond types, we have not experienced significant claims.**"  (Emphasis added).

152.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

### 3.      Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure

153.    With respect to credit quality of Ambac's bond portfolio, Defendants falsely represented Ambac's total exposure to Puerto Rican was $2,485 million net par outstanding:

| ($ in millions) | Successor Ambac – September 30, 2013 | Predecessor Ambac – December 31, 2012 |
|---|---|---|
| Public Finance [(1)] | $        122,061 | $        143,018 |
| Structured Finance | 34,053 | 42,359 |
| International Finance | 33,077 | 38,256 |
| Total net par outstanding | $        189,191 | $        223,633 |

(1)   Includes $2,485 of Puerto Rico net par outstanding at September 30, 2013.

154.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion Defendants represented; (ii) Puerto Rico's bond ratings were rapidly being downgraded well below that represented by Defendants. Indeed, according to Moody's and S&P the Puerto Rican bonds insured by Ambac were rated A2, Baa3, and Ba1 as of December 13, 2012.

### 4.    Materially False and Misleading Statements Concerning Internal Controls

155.    In addition, the Third Quarter 201 Form 10-Q, the Individual Defendants falsely assured investors that Ambac had designed the Company's internal controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP:

> **Item 4.                    Controls and Procedures.**
>
> In connection with the preparation of this Third Quarter Form 10-Q, an evaluation was carried out by Ambac's management, with the participation of Ambac's Chief Executive Officer and Chief Financial Officer, of the effectiveness of Ambac's disclosure controls and procedures (as defined in rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (Exchange Act)) as of the end of the period covered by this Quarterly Report on Form 10-Q. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.
>
> Disclosure controls and procedures are designed to ensure that the information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures. Ambac management is committed to maintaining an effective internal control environment over financial reporting. ***Based on its evaluation, Ambac's Chief Executive Officer and***

- 59 -

*Chief Financial Officer have concluded that, as of September 30, 2013, Ambac's disclosure controls and procedures were effective.*

(Emphasis added.)

156.    The Third Quarter 2013 Form 10-Q also included certification signed by Defendants Trick and Adams, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that Ambac's financial statements did not contain material misstatements or omissions, and that the Company employed adequate internal disclosure controls over financial reporting and related disclosures.

157.    In this regard, the Third Quarter Form 10-Q contained a certification signed by defendant Trick, which stated:

I, David Trick, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Ambac Financial Group, Inc;

2.    **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a—15(e) and 15d—15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated**

**subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;**

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

**a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

**b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting..**

By: /s/ David Trick
David Trick
Senior Managing Director, Chief
Financial Officer and Treasurer

(Emphasis added).

- 61 -

158.   The Third Quarter Form 10-Q contained a separate certification signed by defendant Adams, which contained a verbatim reproduction of Trick's certification statements above.

159.   Moreover, the Third Quarter Form 10-Q contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Trick, which stated:

**Certification of CFO Pursuant to**
**18 U.S.C. Section 1350,**
**as Adopted Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Quarterly Report on Form 10-Q of Ambac Financial Group, Inc. (the "Company") for the four month period ended April 30, 2013 for Predecessor Ambac, and the three and five month periods ended September 30, 2013 for Successor Ambac, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), David Trick, as Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ David Trick_____
Name:   David Trick
Title:    Chief Financial Officer and Treasurer
Date:    November 14, 2013

160.   The Third Quarter Form 10-Q contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Adams.

161.    The above certifications and statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented

162.    As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"[21]

## C.    Materially False and Misleading Statements in the November 14, 2013 Earnings Conference Call

163.    On November 14, 2013, Defendants held an earnings conference call for the Company's public stockholders (the "November 2013 Call") to discuss Ambac's third quarter results.  During the November 2013 Call, Defendants falsely stated that "[w]e believe the Commonwealth has taken serious steps to reform its fiscal situation towards a more sustainable path and has substantially increased its disclosures and transparency."

164.    Defendant Adams falsely assured investors during the November 2013 Call that Ambac was "driven by a belief that the actions [Ambac] take[s] to reduce or eliminate losses and to improve returns have had, and will continue to have, a positive long-term impact on the value of Ambac Assurance."

---

[21] Form 10-K/A filed on May 11, 2016.

165.    When an investor asked about the amount of reserves the Company recorded for its

the Puerto Rican exposure, Defendant Adams refused to answer the question and, instead, provided

the following non-responsive answer:

> We do not announce what our reserves are on a deal by deal basis.  I think
> David had mentioned that we did classify the credit this quarter.  It's
> classified as a 1-A credit.  And we define 1-A as fully current with no claims
> anticipated.  Many of our 1-A's are still investment grade, but they are
> vulnerable to a downgrade.  So Puerto Rico fits very nicely within that.  As
> a result of our analysis, we did take some small reserves on Puerto Rico.
> ***But our expectations continue to be that we will have no losses on those
> exposures***.

(Emphasis added).

166.    The above statements were materially false and misleading at the time they were

made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss

exposure to Puerto Rico than disclosed; (ii) Puerto Rico's fiscal situation was not improving at all

and, in fact, was only getting worse; (iii) the Company was failing to implement adequate

mitigation strategies (*e.g.*, CDSs); (iv) several metrics, including rapidly declining credit ratings,

sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields

indicated an imminent Puerto Rican default; (v) as a result of the foregoing, the Company's

financial condition was much worse than represented.  Furthermore, as a result of the above,

Ambac had no reasonable basis for its statement that "***we will have no losses on those exposures***."

### D.    Materially False and Misleading Statements in the December 18, 2013 Annual Shareholder Meeting Call

167.    On December 18, 2013, Defendants held an annual shareholder meeting call with

investors (the "December 2013 Call").  During the December 2013 Call, Defendant Adams falsely

assured investors that "Ambac's primary focus is on maximizing the value of our principal asset,

Ambac Assurance.  We do this through active asset liability management that seeks to reduce or

- 64 -

eliminate losses and improve returns. . . . We are actively working to: mitigate losses on poorly performing transactions."

168.    With respect to an investor inquiry concerning exposure to Puerto Rico, Defendant Adams responded:

> We have $2.5 billion in exposure to Puerto Rico. About a third of that is to the highly rated COFINA bonds; about 10% is to the general obligation bonds; and the remainder is to revenue bonds.
>
> ***We are actively reviewing our Puerto Rico exposure***. We are concerned about what is going on in the Commonwealth.
>
> We are happy with some of the very difficult measures that they have taken in terms of pension reform and in terms of additional revenue raising. We are also comfortable with their liquidity position in the short term.
>
> As I had mentioned on the earnings release call, we did take a small reserve against our Puerto Rico exposure in the third quarter and we're continuing to monitor it. ***We do not expect to have losses at this point.***

Emphasis added.

169.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion defendant Adams represented; (iii) none of the Company's Puerto Rican bonds were "highly rated"; (iv) Puerto Rico's fiscal situation was not improving at all and, in fact, was only getting worse; (v) the Company was failing to implement adequate mitigation strategies (*e.g.*, CDS); (vi) several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields indicated an imminent Puerto Rican default; and (vii) as a result of the foregoing, the Company's financial condition was much worse than represented.

E.    **Materially False and Misleading Statements in the 2013 Annual Report and Form 10K**

170.    On March 3, 2014, Ambac filed the 2013 Form 10-K with the SEC, which was signed by Defendants Trick, Adams, Tavakoli and Stein.

171.    The 2013 Form 10-K contained several categories of materially false and misleading statements concerning Ambac's: (i) credit risk management; (ii) losses and reserve for losses on Puerto Rican bonds; (iii) credit rating and risk exposure; and (iv) internal controls.

1.    **Materially False and Misleading Statements Concerning Ambac's Risk Management**

172.    In the 2013 Form 10-K and Annual Report, Defendants falsely represented that the Company was "proactively managing the insurance portfolio by reducing risk and maximizing recoveries" through "proactive management of our insurance and investment portfolios."

173.    Defendants further falsely claimed that they actively monitored and mitigated against potential losses in Ambac's guaranteed portfolio by "actively managing its assets and liabilities with a focus on . . . mitigating or remediating losses on poorly performing transactions."

174.    In addition, Defendants warned that Ambac may not be able to identify credit risk and that its failure to do so could result in inadequate reserves:

> ***Ongoing surveillance of credit risks in our insured portfolio is an important component of our risk management***. . . . If we are not able to identify significant risks, we may not be able to and/or timely remediate such risks, thereby increasing the amount of losses to which we are exposed. ***An inability to identify significant risks could also result in the failure to establish loss reserves that are sufficient in relation to such risks***.

(Emphasis added.)

175.    Defendants' assurances regarding Ambac's risk management were materially false and misleading at the time made because: (i) the Company was failing to implement adequate mitigation strategies (*e.g.*, CDS); and (ii) Defendants knew that Puerto Rico was likely to default

as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

### 2. Materially False and Misleading Statements Concerning Ambac's Loss Exposure and Reserves

176. Defendants false represented in the 2013 Form 10-K that Ambac's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ("GAAP")" and that the Company's "reserves for losses and loss expenses and unearned premium reserves are *adequate* to cover the ultimate net cost of claims":

> *In our experience, losses in the public finance portfolio have been contained, with most of our adversely classified credits resolving without loss to Ambac.* . . . . *High severity outcomes are unprecedented,* would represent a paradigm shift in the municipal bond market and have not been factored into our current loss reserves in most cases.
>
> \*       \*       \*
>
> *Our experience has shown that, for the majority of bond types, we have not experienced significant claims*. We have observed that, with respect to certain bond types, it is reasonably possible that a material change in actual loss severities and defaults could occur over time.

(Emphasis added).

177. Defendants further falsely claimed that when determining reserves, they "have attempted to identify reasonably possible additional losses using more stressful assumptions" which "considers the highest stress scenario . . . " and that their loss reserves are based on the "probability of default by the issuer."

178. In addition, in the 2013 Form 10-K Defendants represented that "all credits are assigned risk classifications by the Surveillance Group" and that "[o]ne of two approaches is then utilized to estimate expected losses to ultimately determine if a loss reserve should be established."

These approaches "consider[] the likelihood of all possible outcomes." According to the risk classifications, credits that are rated BBB- to B require "[p]rompt and sustained action . . . to execute a comprehensive loss mitigation plan and correct deficiencies." Credit ratings of B to CCC require "[f]ull exercise of all available remedial actions . . . to avert or minimize losses." Credits that have defaulted will have scheduled claim payments that are "known" and "reserves have been established to fully cover such claims, and no claim volatility is expected."

179.    Regarding Ambac's reserve policy, Defendants stated in the 2013 Form 10-K:

> Ambac establishes loss expense reserves based on our estimate of expected net cash outflows for loss expenses, such as legal and consulting costs.
>
> As the probability of default for an individual credit increases and/or the severity of loss given a default increases, our loss reserve for that insured obligation will also increase. Political, economic, credit or other unforeseen events could have an adverse impact on default probabilities and loss severities. The loss reserves for many transactions (such as many public finance exposures) are derived from the issuer's creditworthiness. . . . Loss reserves reflect our assessment of the transaction's overall structure, support and expected performance. Loss reserve volatility will be a direct result of the credit performance of our insured portfolio, including the number, size, bond types and quality of credits included in our loss reserves as well as our ability to execute commutations. The number and severity of credits included in our loss reserves depend to a large extent on transaction specific attributes, but will generally increase during periods of economic stress and decline during periods of economic stability.

180.    With respect to Puerto Rico, Defendants purported to warn that adverse market conditions could cause the Commonwealth to suffer from a liquidity crisis or default:

> From time to time the municipal bond market evidences heightened investor concerns overall or for select sectors or issuers, as has recently been the case with Puerto Rico. Such adverse market conditions may trigger a loss of market liquidity for affected issuers, which in turn may significantly raise their cost of alternative financing or cause a liquidity crisis and potential for default on debt service payments [Ambac] guarantee.

181.    Defendants further falsely reported in the 2013 Form 10-K total losses and loss expense for public finance for the eight months-ended December 31, 2013 of $100.4 million and total reserves for public finance of $338 million for the year-ended December 31, 2013, but intentionally did not disclose the specific reserves or loss expenses associated with the Puerto Rican bonds.

182.    The above statements were materially false and misleading when made because: contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Puerto Rico's bonds were rated below a BBB standard and, thus, Defendants should have, but did not, implement a prompt and comprehensive loss mitigation plan; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; (v) Defendants did not comply with Ambac's reserve policy; and (vi) as Defendants would ultimately admit, Ambac lacked adequate internal controls over financial reporting and specifically, its process for determining appropriate reserve levels.

**3.      Materially False and Misleading Statements Concerning the Credit Rating and Exposure of Ambac's Puerto Rican Bond Portfolio**

183.    In the 2013 Form 10-K, Defendants also misrepresented the credit quality of Ambac's Puerto Rican bond portfolio:

| ($ in millions) | Ambac Ratings[1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| California State—GO | A | $ 2,652 | 1.5% |
| New Jersey Transportation Trust Fund Authority—Transportation System | A+ | 1,915 | 1.1% |
| NYS Thruway Authority, Highway & Bridge Revenue | AA- | 1,246 | 0.7% |
| Massachusetts School Building Authority, MA, Sales Tax Revenue | AA | 1,230 | 0.7% |
| Massachusetts Commonwealth—GO | AA | 1,182 | 0.7% |
| Washington State—GO | AA | 923 | 0.5% |
| Los Angeles Unified School District, CA—GO | AA- | 895 | 0.5% |
| Sales Tax Asset Receivable Corporation, NY, Revenue | A | 846 | 0.5% |
| Puerto Rico Sales Tax Financing Corporation[2] | BBB- | 805 | 0.4% |
| Puerto Rico Highways & Transportation Authority, Transportation Revenue[2][3] | BIG | 733 | 0.4% |

| | | |
|---|---:|---:|
| Total | $ 12,427 | 6.9% |

184.  In addition, Defendants disclosed that "Ambac Assurance has total net par outstanding to Puerto Rico of $2,485 [million]."

185.  The above statements were materially false and misleading when made because, in reality, as discussed above, Moody's and S&P had downgraded all of the Puerto Rican bonds in Ambac's portfolio to Ba2, Baa1, or Ba3.  Moreover, the BIG internal credit rating that Ambac assigned was misleading because, as discussed above, it encompassed a breadth of credit ratings, ranging from Baa1 to Ca-C, and failed to capture or indicate the 224 times that Puerto Rico's bonds were downgraded during the Class Period.  In addition, Defendants failed to disclose that Ambac's true exposure to Puerto Rican bonds was not $2.5 billion, as represented.  Rather, it was approximately $10 billion, when properly including interest.

### 4. Materially False and Misleading Statements Concerning Ambac's Internal Controls

186.  In each of Ambac's annual and quarterly SEC filings, the Individual Defendants falsely assured investors that Ambac had designed the Company's internal controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP:

Item 9A.                    Controls and Procedures.

(a) Evaluation of Disclosure Controls and Procedures.  Ambac's management, with the participation of Ambac's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of Ambac's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of the end of the period covered by this report.

Disclosure controls and procedures are designed to ensure that information required to be disclosed by Ambac (including its consolidated subsidiaries) in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is

accumulated and communicated to Ambac's management, including its Chief Executive Officer and Chief Financial officer, to allow timely decisions regarding required disclosure.

*Based on this evaluation, Ambac's Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2013, Ambac's disclosure controls and procedures were effective at the reasonable assurance level.*

Emphasis added.

187.    Elsewhere in the 2013 Form 10-K, Defendants affirmatively stated that Ambac maintained such controls over financial reporting to ensure timely reporting to the SEC and that the Company's internal controls were found to be "effective:"

Management conducted an assessment of the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2013. In making this assessment, management used the framework set forth in Internal Control – Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, *management has determined that, as of December 31, 2013, the Corporation's internal control over financial reporting is effective.*

188.    The 2013 Form 10-K also included certification signed by Defendants Trick and Adams, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that Ambac's financial statements did not contain material misstatements or omissions, and that the Company employed adequate internal disclosure controls over financial reporting and related disclosures.

189.    In this regard, the 2013 Form 10-K contained a certification signed by defendant Trick, which stated

I, David Trick, certify that:

1.      I have reviewed this Annual Report on Form 10-K of Ambac Financial Group, Inc;

2.      **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the**

- 71 -

**circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a -15(e) and 15d − 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.   **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;**

   b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit

committee of the registrant's board of directors (or persons performing the equivalent function):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

By: /s/ David Trick
David Trick
Senior Managing Director, Chief
Financial Officer and Treasurer

(Emphasis added).

190.    The 2013 Form 10-K contained a separate certification signed by defendant Adams, which contained a verbatim reproduction of Trick's certification statements above.

191.    Moreover, the 2013 Form 10-K contained certifications pursuant to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Trick, which stated:

**Certification of CFO Pursuant to
18 U.S.C. Section 1350,
as Adopted Pursuant to
Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 10-K of Ambac Financial Group, Inc. (the "Company") for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), David Trick, as Chief Financial Officer of the Company, hereby certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

- 73 -

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ David Trick_____

Name:      David Trick

Title:       Senior Managing Director, Chief Financial Officer and Treasurer

Date:      March 3, 2014

192.　The 2013 Form 10-K contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Adams.

193.　The above certifications and statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented

194.　As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

195.　Also, on March 3, 2014, Ambac issued a press release concerning the Company's fourth quarter 2013 and year-end 2013 results (the "March 3 Press Release").  The March 3 Press Release contained substantially similar false statements with respect to Ambac's reserves and loss expense, compliance with GAAP and loss mitigation as the 2013 Form 10-K.

E. **Materially False and Misleading Statements in the March 4, 2014 Earnings Call**

196.    On March 4, 2014, Defendants held an earnings conference call for investors to discuss the Company's financial results for the fourth quarter and full year 2013 (the "March 2014 Call").  During the March 2014 Call, defendant Trick emphasized that Ambac "remains focused on our exposures to . . . Puerto Rico", is "actively monitor[ing] the situation [in Puerto Rico]" and Ambac "believe[s] that the Commonwealth is taking serious and aggressive steps to reform its fiscal situation towards a more sustainable path and continues to increase its disclosures and transparency."

197.    With respect to reserves, Defendant Trick assured investors that "in preparing our financial results we use what we believe to be reasonable assumptions to generate our best estimates for loss reserves and expected recoveries."

198.    When responding to an investor question about Puerto Rico, Defendant Adams assured investors that Puerto Rico was improving and, thus, Ambac was not expecting to have any losses related to its Puerto Rican exposure:

> Let me start by saying that we are very pleased with the difficult steps that the government of the Commonwealth has taken to improve their fiscal condition and also with the improved communications and we are following their plans to issue new debt which will eliminate liquidity issues for them in the short to medium-term.  So we think there's been some good progress on their front.
>
> During the fourth quarter we analyzed the strength of the GO, as David said, and the claw-back, and we determined that we thought it made the GO bonds a better credit than the revenue bonds that are subject to claw-backs, that is non-COFINA revenue bonds that we've wrapped, and this is not withstanding the fact that those funds have very robust coverage ratios.  ***We did lower our ratings on the non-COFINA revenue bonds to below investment grade and that does attract additional reserves.***
>
> ***However, there is no expectations of paying claims, especially not with this new financing coming up, but no expectations of paying claims in the***

- 75 -

*future and no expectations of actually incurring any losses.*  It's just by moving it to the category where it is now indicates that the conditions might deteriorate.  And depending on what happens in the future we need to be sort of on our toes about expecting future claims.

(Emphasis added).

199.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) Puerto Rico's fiscal situation was not improving at all and, in fact, was only getting worse; (iii) the Company was failing to implement adequate mitigation strategies (*e.g.*, CDS); (iv) several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields indicated an imminent Puerto Rican default; and (v) as a result of the foregoing, the Company's financial condition was much worse than represented.

### F.    Materially False and Misleading Statements in the March 27, 2014 Investor Day Presentation

200.    On March 27, 2014, Defendants held an Investor Day for the Company's public stockholders (the "March 27 Investor Presentation").  In the March 27 Investor Presentation, Defendants falsely stated that the Company was pursuing two paths "to create long-term shareholder value" consisting of: (i) "Maximiz[ing] the value of existing financial guarantee operations"; and (ii) increasing profitability by "grow[ing] and diversify[ing] through the acquisition and/or development of new business opportunities." According to Defendant Adams during a conference call that same day, this would take "months not years."

201.    During this call, defendant Matanle, Senior Managing director of Portfolio and Credit Risk Management, stated that the municipal bonds were "flag[ged] daily for news and for rating changes."  Matanle claimed Ambac had processes in place to mitigate potential losses:

> *Once identified, adversely classified credits in this portfolio are handled exactly the way we would handle any other adversely classified credits in our portfolio with an action plan designed around mitigating loss*.

(Emphasis added).

202.    With respect to Ambac's reserves, Matanle stated that the Company employed rigorous practices:

> We aim to use consistency, rigor and sound industry practices to set our reserves.  We believe them to be reasonable and neither conservative nor aggressive.  We've refined our approaches during this time period and even our models have changed during this time period, as you can imagine.

203.    With respect to Puerto Rico, Matanle stated **"we are actively monitoring the situation in the Commonwealth of Puerto Rico**." (Emphasis added).  Matanle indicated that Puerto Rico was resolving any issues: "[t]he governor and his team have done a very nice job communicating and delivering on expectations that they said in a very short period since the governor came on board in January 2013."

204.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) the Company was failing to implement adequate mitigation strategies; (iv) several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields indicated an imminent Puerto Rican default; and (v) as a result of the foregoing, the Company's financial condition was much worse than represented.

### G.    Materially False and Misleading Statements in the First Quarter Form 10-Q for the Period Ending March 31, 2014

205.    On May 12, 2014, Ambac filed its Form 10-Q for the period ending March 31, 2014 ("First Quarter 2014 Form 10-Q"), which was signed by Defendant Trick. The First Quarter 2014

- 77 -

Form 10-Q contained materially false and misleading statements regarding: (1) credit risk management; (2) losses and reserve for losses on Puerto Rican bonds; (3) credit rating and risk exposure; and (4) internal controls.

### 1. Materially False and Misleading Statements Concerning Credit Risk Management

206.    In the First Quarter 2014 Form 10-Q, Defendants made materially false and misleading statements concerning the Company's risk surveillance and loss mitigation, stating that Ambac's "primary goal" is "actively managing its assets and liabilities with a focus on . . . mitigating or remediating losses on poorly performing transactions."

207.    Ambac's assurances regarding its risk management were materially false and misleading at the time made because: (i) the Company was failing to implement adequate mitigation strategies; and (ii) Defendants knew that Puerto Rico was likely to default as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

### 2. Materially False and Misleading Statements Concerning Loss Exposure and Reserves

208.    The First Quarter 2014 Form 10-Q falsely represented that Ambac's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."

209.    The First Quarter 2014 Form 10-Q further misrepresented that Ambac's loss and loss expense reserves were "adequate":

> Ambac's management believes that ***the reserves for losses and loss expenses and unearned premium reserves are adequate to cover the***

> *ultimate net cost of claims* . . . . We have attempted to identify reasonably possible additional losses using more stressful assumptions.  The reasonably possible scenario considers the highest stress scenario that was utilized in development of our probability-weighted expected loss at March 31, 2014 and assumes an inability to execute commutation transactions with issuers and/or investors.

(Emphasis added).

210.    While the First Quarter 2014 Form 10-Q did not disclose the loss and loss expense reserves for Puerto Rico municipal bonds, it reported for Public Finance, total reserves of $338 million and loss and loss expense of $7 million for the period-ended March 31, 2014.

211.    In the First Quarter 2014 10-Q, Defendants also made materially false and misleading statements concerning the likelihood of default, stating "[m]anagement believes that the timely receipt of all principal and interest on these [municipal obligation] positions is probable" and that "[o]ur experience has shown that, *for* the *majority of bond types, we have not experienced significant claims.*"  (Emphasis added).

212.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

**3.      Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure**

213.    With respect to credit quality of Ambac's bond portfolio, Defendants falsely represented Ambac's total exposure to Puerto Rican bonds:

## Summary of Below Investment Grade Exposure

| Bond Type | Successor Ambac | | |
|---|---|---|---|
| ($ in millions) | March 31, 2014 | | December 31, 2013 |
| Public Finance: | | | |
| Tax-backed [1] | $ | 1,886 | $ 1,887 |
| Housing [2] | | 844 | 732 |
| Transportation | | 499 | 519 |
| General obligation | | 359 | 363 |
| Health care | | 30 | 30 |
| Other | | 1,351 | 1,291 |
| Total Public Finance | | 4,969 | 4,822 |
| Structured Finance: | | | |
| Residential mortgage-backed and home equity—first lien | | 7,833 | 8,092 |
| Residential mortgage-backed and home equity—second lien | | 6,235 | 6,440 |
| Student loans | | 4,130 | 4,223 |
| Structured Insurance | | 1,648 | 1,648 |
| Mortgage-backed and home equity—other | | 336 | 346 |
| Other | | 547 | 547 |
| Total Structured Finance | | 20,729 | 21,296 |
| International Finance: | | | |
| Other | | 3,679 | 3,702 |
| Total International Finance | | 3,679 | 3,702 |
| Total | $ | 29,377 | $ 29,820 |

(1)    Includes $1,430 of Puerto Rico net par at March 31, 2014 and December 31, 2013.

(2)    Includes $611 and $486 of military housing net par at March 31, 2014 and December 31, 2013, respectively.

214.    With respect to Puerto Rico, the First Quarter Form 10-Q falsely represents that the Company's total exposure to Puerto Rico was $2,485 million net par outstanding:

215.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion Defendants represented; (ii) Puerto Rico's bond ratings were rapidly being downgraded well below that represented by Defendants. Indeed, according to Moody's and S&P the Puerto Rican bonds insured by Ambac were rated Ba2, Ba3, or Baa1 as of March 31, 2014.

- 80 -

### 4. Materially False and Misleading Statements Concerning Internal Controls

216.    The First Quarter 2014 Form 10-Q also falsely claimed that "Ambac management is committed to maintaining an effective internal control environment over financial reporting. Based on its evaluation, Ambac's Chief Executive Officer and Chief Financial Officer have concluded that, as of March 31, 2014, Ambac's disclosure controls and procedures were effective."

217.    In addition, the First Quarter 2014 Form 10-Q contained nearly identical SOX Certifications signed by Defendants Adams and Trick as were included in the 2013 Form 10-K.

218.    The SOX certifications and above statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented.

219.    As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

### H. Materially False and Misleading Statements in the May 12, 2014 Press Release

220.    On May 12, 2014 Ambac issued a press release entitled "Ambac Announces First Quarter 2014 Results: Favorable Loss Reserve Development and Execution of Commutation Strategy Drive Results", reporting the Company's first quarter 2014 financial results (the "May 12

Press Release"). In the May 12 Press Release, Defendants touted Ambac's "strategy to pursue opportunities for loss mitigation through proactive management of [Ambac's] insurance and investment portfolio."

221.    According to the press release, Ambac's loss reserves for its domestic public finance bonds was $343 million as of March 31, 2014. Ambac reported a net benefit for loss and loss expense of $140 million. The press release further stated that Ambac's reporting of its financial results were "in accordance with GAAP."

222.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was failing to implement adequate mitigation strategies; (v) as a result of the foregoing, the Company's financial condition was much worse than represented; and (vi) Ambac failed to maintain adequate internal controls over financial reporting.

I.    **Materially False and Misleading Statements in the Second Quarter Form 10-Q for the Period Ending June 30, 2014**

223.    On August 11, 2014, Ambac filed its Form 10-Q for the second quarter-ending June 30, 2014 (the "Second Quarter 2014 Form 10-Q"), which was signed by Defendant Trick. In the Second Quarter 2014 Form 10-Q, Defendants made materially false and misleading statements with respect to: (i) credit risk management; (ii) losses and reserve for losses on Puerto Rican bonds; (iii) credit rating and risk exposure; and (iv) internal controls.

### 1.  Materially False and Misleading Statements Concerning Credit Risk Management

224.    The Individual Defendants made false and misleading statements concerning the Company's risk surveillance and mitigation teams, stating that Ambac's "primary goal" is "actively managing its assets and liabilities with a focus on . . . mitigating or remediating losses on poorly performing transactions."

225.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company failed to implement adequate mitigation strategies with respect to the Company's Puerto Rican bond portfolio; and (ii) Defendants knew that Puerto Rico was likely to default as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

### 2.  Materially False and Misleading Statements Concerning Losses and Loss Reserves

226.    In the Second Quarter 2014 Form 10-Q, Defendants falsely represented that Ambac's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP')" and that Ambac maintained adequate reserves: "***Ambac's management believes that the reserves for loss and loss expenses and unearned premium reserves are adequate to cover claims presented***."

227.    With respect to the public finance portfolio, Defendants assured investors that that losses were rare warranting a low level of reserves: "[w]e currently consider high severity

outcomes to be outlying and therefore implicitly assign low to remote probabilities to such outcomes into our current loss reserves unless the situation develops adversely."

228.   In the Second Quarter 2014 Form 10-Q, Ambac reported loss and loss expense for the second quarter and six months-ended June 30, 2014 of $175.3 million and $35.3 million, respectively.  The Company reported reserves for its domestic public finance portfolio of $409 million as of June 30, 2014.  Again, Ambac did not report the specific loss expense or reserves associated with Puerto Rico.

229.   The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure Puerto than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

### 3.   Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure

230.   In the Second Quarter 2014 Form 10-Q, Ambac represented its exposure to Puerto Rico as follows:

| *($ in millions)* | June 30, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
| Public Finance [(1)] [(2)] | $ | 108,449 | $ | 116,062 |
| Structured Finance | | 28,907 | | 31,412 |
| International Finance | | 30,358 | | 31,618 |
| Total net par outstanding [(3)] | $ | 167,714 | $ | 179,092 |

(1) Includes $6,115 and $6,165 of Military Housing net par outstanding at June 30, 2014 and December 31, 2013, respectively.

(2) Includes $2,485 of Puerto Rico net par outstanding at June 30, 2014 and December 31, 2013. Components of Puerto Rico net par outstanding includes capital appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

(3) Included in the above net par exposures at June 30, 2014 and December 31, 2013 are $2,203 and $2,776, respectively, of exposures that were executed in credit derivatives form.

231.    With respect to credit ratings on its bond portfolio, Defendants failed to disclose the true extent the Company's Puerto Rican bonds had been downgraded by assigning them the generic "BIG" classification.   As discussed above, the Company's internal BIG rating was ambiguous and highly misleading because it encompassed a broad spectrum of ratings widely varying in default rates:

### Summary of Below Investment Grade Exposure

| ($ in millions) | June 30, 2014 | December 31, 2013 |
|---|---|---|
| Public Finance: | | |
| Tax-backed [1] | $    2,660 | $    1,887 |
| Housing [2] | 843 | 732 |
| General obligation [1] | 584 | 363 |
| Transportation | 499 | 519 |
| Health care | 30 | 30 |
| Other | 1,345 | 1,291 |
| Total Public Finance | 5,961 | 4,822 |
| Structured Finance: | | |
| Residential mortgage-backed and home equity—first lien | 7,545 | 8,092 |
| Residential mortgage-backed and home equity—second lien | 6,000 | 6,440 |
| Student loans | 3,880 | 4,223 |
| Structured Insurance | 1,645 | 1,648 |
| Mortgage-backed and home equity—other | 323 | 346 |
| Other | 546 | 547 |
| Total Structured Finance | 19,939 | 21,296 |
| International Finance: | | |
| Other | 3,662 | 3,702 |
| Total International Finance | 3,662 | 3,702 |
| Total | $    29,562 | $    29,820 |

(1)   Tax-backed includes $2,235 and $1,430 of Puerto Rico net par at June 30, 2014 and December 31, 2013.  General obligation includes $250 and $0 of Puerto Rico net par at June 30, 2014 and December 31, 2013, respectively. Components of Puerto Rico net par outstanding includes capital

appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

(2)   Includes $611 and $486 of military housing net par at June 30, 2014 and December 31, 2013, respectively.

232.   The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion Defendants represented; and (iii) Puerto Rico's bond ratings were rapidly being downgraded well below that represented by Defendants ambiguous "BIG" rating.

### 4.   Materially False and Misleading Statements Concerning Internal Controls

233.   With respect to the Company's internal controls, Defendants represented in the Second Quarter 2014 Form 10-Q, that "Ambac management is committed to maintaining an effective internal control environment over financial reporting.  Based on its evaluation, Ambac's Chief Executive Officer and Chief Financial Officer have concluded that, as of June 30, 2014, Ambac's disclosure controls and procedures were effective."

234.   In addition, the Second Quarter 2014 Form 10-Q contained nearly identical SOX Certifications signed by Defendants Adams and Trick as was included in the 2013 Form 10-K.

235.   The SOX certifications and above statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies;

and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented.

236.   As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

### J.   Materially False and Misleading Statements in the August 12, 2014 Earnings Call and August 11, 2014 Press Release

237.   Ambac issued a press release on August 11, 2014 entitled "Ambac Announces Second Quarter 2014 Results: Amended Rehabilitation Plan Implementation Impacts Results" reporting on the Company's second quarter results (the "August 11 Press Release").  In the August 11 Press Release, Defendants falsely stated that Ambac's financial results were reported "in accordance with GAAP."

238.   In addition, Defendants reported loss and loss expense reserves for domestic finance of $409 as of June 30, 2014 and loss and loss expenses for public finance for the three months-ended June 30, 2014 of $175.3 million.

239.   On August 12, 2014, Defendants held an earnings conference call for investors (the "August 2014 Call").  During the August 12014 Call, defendant Adams assured investors that Ambac was "proactively involved in managing [its] exposures [to Puerto Rico]."  Defendant Adams also revealed that Ambac had "put in place a team of external advisor to complement [Ambac's] internal resources. [Ambac] believe[s] [it is] adequately reserved for the range of outcomes . . . currently identified."

240.   The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in

compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the failed to implement adequate mitigation strategies; and (v) as a result of the foregoing, the Company's financial condition was much worse than represented.

> **K.** **Materially False and Misleading Statements in the Third Quarter 2014 Form 10-Q for the Period Ending September 30, 2014**

241. On November 10, 2014, Ambac filed its third quarter Form 10-Q for the period ending September 30, 2014 (the "Third Quarter 2014 Form 10-Q") with the SEC, which was signed by Defendant Trick. The Third Quarter 2014 Form 10-Q contained the following categories of materially false and misleading statements concerning Ambac's: (i) credit risk management; (ii) losses and reserve for losses on Puerto Rican bonds; (iii) credit rating and risk exposure; and (iv) internal controls.

> **1.** **Materially False and Misleading Statements Concerning Credit Risk Management**

242. In the Third Quarter 2014 Form 10-Q, Defendants falsely stated that Ambac's "primary goal" is "actively managing its assets and liabilities with a focus on . . . mitigating or remediating losses on poorly performing transactions."

243. Ambac's assurances regarding its risk management were materially false and misleading at the time made because: (i) Defendants knew that Puerto Rico was likely to default as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

2.     **Materially False and Misleading Statements Concerning Loss Expense and Reserves**

244.    In the Third Quarter 2014 Form 10-Q, Defendants falsely represented that the Company's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."

245.    Defendants further assured investors that "Ambac's reserves were "adequate."

246.    In addition, Defendants falsely represented that the Company's portfolio would unlikely experience any default: "[m]anagement believes that the timely receipt of all principal and interest on these positions is probable" and that "[o]ur experience has shown that, for the majority of bond types, we have not experienced significant claims."  Defendants further misrepresented that with respect to Ambac's public finance portfolio, "[w]e currently consider high severity outcomes to be outlying and therefore implicitly assign low or remote probabilities to such outcomes in our current loss reserves unless the situation develops adversely."

247.    The Third Quarter 2014 Form 10-Q reported gross loss and loss expense reserves for domestic public finance of $389 million as of September 30, 2014.  The Company reported a benefit of losses and loss expenses of $28.7 million and $6.6 million for the three and nine-months ending September 30, 2014, respectively.

248.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

### 3.      Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure

249.    In the Third Quarter 2014 Form 10-Q, Defendants misrepresented Ambac's true exposure to Puerto Rico by only reporting the net par, without interest for which it was also on the hook in the event of a default:

| ($ in millions) | | September 30, 2014 | | December 31, 2013 |
|---|---|---|---|---|
| Public Finance [1][2] | $ | 101,663 | $ | 116,062 |
| Structured Finance | | 27,523 | | 31,412 |
| International Finance | | 28,206 | | 31,618 |
| **Total net par outstanding** [3] | $ | **157,392** | $ | **179,092** |

(1) Includes $6,103 and $6,165 of Military Housing net par outstanding at September 30, 2014 and December 31, 2013, respectively.

(2) Includes $2,437 and $2,485 of Puerto Rico net par outstanding at September 30, 2014 and December 31, 2013, respectively. Components of Puerto Rico net par outstanding includes capital appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

(3) Included in the above net par exposures at September 30, 2014 and December 31, 2013 are $1,959 and $2,776, respectively, of exposures that were executed in credit derivatives form.

250.    With respect to credit ratings on its bond portfolio, Defendants failed to disclose the true extent the Company's Puerto Rican bonds had been downgraded by assigning them the generic "BIG" classification.   As discussed above, the Company's internal BIG rating was ambiguous and highly misleading because it encompassed a broad spectrum of ratings widely varying in default rates.

#### *Summary of Below Investment Grade Exposure*

| ($ in millions) | | September 30, 2014 | | December 31, 2013 |
|---|---|---|---|---|
| Public Finance: | | | | |
| Tax-backed [1] | $ | 2,598 | $ | 1,887 |
| Housing [2] | | 842 | | 732 |
| General obligation [3] | | 588 | | 363 |
| Transportation | | 499 | | 519 |
| Health care | | 30 | | 30 |
| Other | | 1,344 | | 1,291 |
| Total Public Finance | | 5,901 | | 4,822 |
| Structured Finance: | | | | |
| Residential mortgage-backed and home equity—first lien | | 7,272 | | 8,092 |
| Residential mortgage-backed and home equity—second lien | | 5,753 | | 6,440 |
| Student loans | | 3,239 | | 4,223 |

| | | | |
|---|---|---|---|
| Structured Insurance | | 1,037 | 1,648 |
| Mortgage-backed and home equity—other | | 311 | 346 |
| Other | | 546 | 547 |
| Total Structured Finance | | 18,158 | 21,296 |
| International Finance: | | | |
| Other | | 3,458 | 3,702 |
| Total International Finance | | 3,458 | 3,702 |
| **Total** | $ | **27,517** | $ **29,820** |

(1) Tax-backed includes $2,186 and $1,430 of Puerto Rico net par at September 30, 2014 and December 31, 2013, respectively. General obligation includes $250 and $0 of Puerto Rico net par at September 30, 2014 and December 31, 2013, respectively. Components of Puerto Rico net par outstanding includes capital appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

    (2) Includes $610 and $486 of military housing net par at September 30, 2014 and December 31, 2013, respectively.

251.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion represented; and (iii) Puerto Rico's bond ratings were rapidly being downgraded well below that represented by Defendants.

### 4.    Materially False and Misleading Statements Concerning Internal Controls

252.    The Third Quarter 2014 Form 10-Q misled investors with respect to the Company's then-existing internal controls. Specifically, the Third Quarter 2014 Form 10-Q states that "Ambac management is committed to maintaining an effective internal control environment over financial reporting. Based on its evaluation, Ambac's Chief Executive Officer and Chief Financial Officer have concluded that, as of September 30, 2014, Ambac's disclosure controls and procedures were effective."

253.    In addition, the Third Quarter 2014 Form 10-Q contained nearly identical SOX Certifications signed by Defendants Adams and Trick as was included in the 2013 Form 10-K.

254.    The SOX certifications and above statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented.

255.    As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

**L.    Materially False and Misleading Statements in the November 10, 2014 Press Release**

256.    On November 10, 2014, Ambac issued a press release, entitled "Ambac Announces Third Quarter 2014 Results: Enhancing Shareholder Value by Pursuing Asset-Liability Management and Growth Opportunities", reporting the Company's financial results for the third quarter of 2014 (the" November 10 Press Release").  The November 10 Press Release falsely stated that Ambac's financial results were reported "in accordance with GAAP."

257.    In addition, in the November 10 Press Release, Ambac reported domestic public finance loss and loss expense reserves of $389 as of September 30, 2014 and loss and loss expense for the three and nine months-ended September 30, 2014 of $28.7 million and $6.6 million, respectively.

258.    Defendant Adams stated "[r]esults in the third quarter were driven by the ongoing disciplined execution of our strategy.  We are well positioned to pursue active asset-liability

management and we are continually assessing opportunities to maximize the value of Ambac Assurance.  Additionally, we are focused on Ambac's long-term growth and diversification . . . ."

259.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

### M.    Materially False and Misleading Statements in the November 11, 2014 Conference Call with Investors

260.    On November 11, 2014, Defendants held an earnings conference call for investors (the "November 11 Call").

261.    With respect to Puerto Rico, during the November 11 Call, defendant Adams assured investors that a default was not likely and, even if it were, the Company had adequate loss reserves:

> I'll now turn to Puerto Rico where *we are engaged in constructive discussions with the Commonwealth*, particularly as it relates to the Puerto Rico Highway and Transportation Authority, or HTA.  Legislation was recently introduced with the purpose of providing funding to operate Puerto Rico's highways and to put the HTA on a path toward long-term fiscal stability.  Ambac supported the Commonwealth's efforts to address HTA's financial, operating and capital needs, and we believe the proposed legislation advances these goals.
>
> Nevertheless, the situation in Puerto Rico remains dynamic with ongoing financial pressures and uncertainties.  *We believe our reserves are reasonably sized given the current situation, the overall size of our exposure to Puerto Rico, the interrelated nature of the credits, and the sluggishness of the economy.  We incorporate these considerations as well as a variety of positive outcomes in developing our reserves.*

(Emphasis added).

262.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) as a result of the foregoing, the Company's financial condition was much worse than represented; and (v) Ambac failed to maintain adequate internal controls over financial reporting.

263.    Moreover, while Defendant Adams assured investors that the Company's reserve was sufficient in relation to its overall exposure to Puerto Rico, Ambac failed to disclose that the true amount of its exposure was actually about $10 billion, rather than the $2.5 billion reported in Ambac's financial statements.

### N.    Materially False and Misleading Statements in the 2014 Form 10-K

264.    On March 2, 2015, Ambac filed its 2014 Annual Report on Form 10-K for the period-ended December 31, 2014 (the "2014 Form 10-K") with the SEC which was signed by Defendants Trick, Adams, Tavakoli and Stein.  The 2014 Form 10-K contained several categories of materially false and misleading statements concerning Ambac's: (i) credit risk management; (ii) losses and reserve for losses on Puerto Rican bonds; (iii) credit rating and risk exposure; and (iv) internal controls.

### 1.    Materially False and Misleading Statements Concerning Credit Risk Management

265.    In the 2014 Form 10-K, Defendants falsely represented that Ambac had little to no risk of default with respect to its guarantee business: "[Ambac has] historically experienced low

levels of defaults in [its] public finance insured portfolio" and "the timely receipt of all principal and interest on [municipal obligations] *is probable*."  (Emphasis added).

266.    Defendants falsely assured investors that, in the event of an unlikely default, the Company was actively monitoring or mitigating against such potential losses in its guaranteed portfolio: "[Ambac's] primary goal" is "actively managing its assets and liabilities . . . and mitigating or remediating losses on poorly performing insured transactions."

267.    Defendants purported to warn about the potential risk that Ambac's reserves could be insufficient if the Company failed to identify certain risks:

> *Ongoing surveillance of credit risks in our insured portfolio is an important component of our risk management*. . . . If we are not able to identify significant risks, we may not be able to and/or timely remediate such risks, thereby increasing the amount of losses to which we are exposed. *An inability to identify significant risks could also result in the failure to establish loss reserves that are sufficient in relation to such risks*.

(Emphasis added). Those purported warnings rang hollow because, as Defendants already knew, the Puerto Rican economy was in turmoil and all indicators pointed to a likely default of the bonds it issued.

268.    Defendants' assurances regarding Ambac's risk management were materially false and misleading at the time made because: (i) the Company was failing to implement adequate mitigation strategies (*e.g.*, CDS); and (ii) Defendants knew that Puerto Rico was likely to default as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

### 2. Materially False and Misleading Statements Concerning Ambac's Loss Expense and Reserves

269. Defendants also made materially false and misleading statements concerning the adequacy of Ambac's loss expense and reserves in the 2014 Form 10-K. Specifically, Defendants stated in the 2014 Form 10-K that Ambac's consolidated financial statements "have been prepared in accordance with GAAP."

270. With respect to Ambac's policy for setting reserves, Defendants falsely assured investors that "[l]oss reserves are established when management has observed credit deterioration, in most cases, when the underlying credit is considered below investment grade." Defendants further assured investors that, when determining reserves, they employed "more stressful assumptions" which "consider the highest stress scenario."

271. According to the 2014 Form 10-K, Ambac's loss reserves are based on the "probability of default by the issuer" and "[a]s the probability of default for an individual credit increases and/or the severity of loss given a default increases, [Ambac's] loss reserve for that insured obligation will also increase." Moreover, the 2014 Form 10-K represented that credit ratings indicating default will have scheduled claim payments that are "known" and "reserves have been established to fully cover such claims, and no claim volatility is expected."

272. With respect to the public finance portfolio, Defendants represented that "the reserves for loss and loss expenses and unearned premium reserves are *adequate* to cover claims presented":

> *In our past experience, losses in the public finance portfolio have been contained, with most of our adversely classified credits resolving without loss to Ambac*. . . .
>
> *We currently consider high severity outcomes to be outlying* and therefore implicitly assign low or remote probabilities to such outcomes in our current loss reserves unless the situation develops adversely.

\*      \*      \*

*Our experience has shown that, for the majority of bond types, we have not experienced significant claims*.  The bond types that have experienced significant claims and loss reserves are residential mortgage-backed securities ("RMBS") and student loan securities.

(Emphasis added).

273.   With respect to Puerto Rico, Defendants purported to warn that adverse market conditions could cause the Commonwealth to suffer from a liquidity crisis or default:

From time to time the municipal bond market evidences heightened investor concerns overall or for select sectors or issuers, as has recently been the case with Puerto Rico.  Such adverse market conditions may trigger a loss of market liquidity for affected issuers, which in turn may significantly raise their cost of alternative financing or cause a liquidity crisis and potential for default on debt service payments [Ambac] guarantee.

274.   The 2014 Form 10-K reported total reserves for the Company of $354 million for the year-ended December 31, 2014, but failed to disclose the specific reserves for Puerto Rico. Similarly, the 2014 Form 10-K disclosed loss and loss expenses for the public finance portfolio of $64.4 million for the year-ended December 31, 2014, but did not disclose loss expenses for Puerto Rico.

275.   The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was in violation of its own internal policy for setting reserves and loss expenses; (v) as a result of the foregoing, the Company's financial condition was much worse than represented; and (vi) Ambac failed to maintain adequate internal controls over financial reporting. Thus, receipt of timely payment on Puerto Rican bonds was anything but "probable."

### 3. Materially False and Misleading Statements Concerning Ambac's Credit Rating and Exposure

276. With respect to credit ratings on Ambac's bond portfolio, Defendants failed to disclose in the 2014 Form 10-K the true extent the Company's Puerto Rican bonds had been downgraded by assigning them the generic "BIG" classification. As discussed above, the Company's internal BIG rating was ambiguous and highly misleading because it encompassed a broad spectrum of ratings widely varying in default rates:

| in millions) | Ambac Ratings[1] | Net Par Outstanding | % of Total Net Par Outstanding |
|---|---|---|---|
| California State - GO | A | $ 2,090 | 1.4% |
| New Jersey Transportation Trust Fund Authority-Transportation System | A- | 1,868 | 1.3% |
| Massachusetts School Building Authority, MA, Sales Tax Revenue | AA | 1,224 | 0.8% |
| Massachusetts Commonwealth-GO | AA | 1,182 | 0.8% |
| NYS Thruway Authority, Highway & Bridge Revenue | AA- | 1,112 | 0.8% |
| Puerto Rico Sales Tax Financing Corporation[2] | BIG | 805 | 0.6% |
| Washington State - GO | AA | 764 | 0.5% |
| Puerto Rico Highways & Transportation Authority, Transportation Revenue[2] | BIG | 712 | 0.5% |
| New York Convention Center Development Corporation, Hotel Fee Revenue | A- | 650 | 0.4% |
| Chicago, IL - GO | BBB+ | 642 | 0.4% |
| **Total** | | **$ 11,049** | **7.6%** |

277. Moreover, Defendants claimed that Ambac's total exposure to Puerto Rico was a total par of $2,437.

278. In addition, the 2014 Form 10-K breaks down Ambac's Public Finance BIG exposures as follows:

### Summary of Below Investment Grade Exposure:

| Bond Type | Net Par Outstanding - December 31, | | | |
|---|---|---|---|---|
| ($ in millions) | 2014 | | 2013 | |
| **Public Finance:** | | | | |
| Tax-backed[1] | $ | 2,512 | $ | 1,887 |
| Housing[2] | | 841 | | 732 |
| General obligation[3] | | 564 | | 363 |
| Transportation | | 453 | | 519 |

| | | | |
|---|---|---:|---:|
| Health care | | 27 | 30 |
| Other | | 1,293 | 1,291 |
| Total Public Finance | | 5,690 | 4,822 |
| **Structured Finance:** | | | |
| Residential mortgage-backed and home equity—first lien | | 7,003 | 8,092 |
| Residential mortgage-backed and home equity—second lien | | 5,466 | 6,440 |
| Student loans | | 3,092 | 4,223 |
| Structured Insurance | | 1,037 | 1,648 |
| Mortgage-backed and home equity—other | | 299 | 346 |
| Other | | 536 | 547 |
| Total Structured Finance | | 17,433 | 21,296 |
| **International Finance:** | | | |
| Other | | 2,214 | 3,702 |
| Total International Finance | | 2,214 | 3,702 |
| **Total** | $ | 25,337 | $ 29,820 |

(1) Tax-backed includes $2,187 and $1,430 of Puerto Rico net par at December 31, 2014 and 2013, respectively. General obligation includes $250 and $0 of Puerto Rico net par at December 31, 2014 and 2013, respectively. Puerto Rico net par outstanding includes capital appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

(2) Includes $609 and $486 of military housing net par at December 31, 2014 and 2013, respectively.

279.  The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion defendant Defendants represented; (iii) Puerto Rico's fiscal situation was getting worse; and (iv) Puerto Rico's bond ratings were rapidly being downgraded well below that represented by Defendants ambiguous "BIG" rating.

### 4.  Materially False and Misleading Statements Concerning Internal Controls

280.  Finally, the 2014 Form 10-K misleadingly states that "as of December 31, 2014, Ambac's disclosure controls and procedures were effective at the reasonable assurance level." Defendants also falsely assured investors that Ambac had designed the Company's internal

controls over financial reporting to assure "the reliability of financial reporting" and compliance with GAAP:

Item 9A.        **Controls and Procedures.**

(a) <u>Evaluation of Disclosure Controls and Procedures</u>. Ambac's management, with the participation of Ambac's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of Ambac's disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), as of the end of the period covered by this report.

Disclosure controls and procedures are designed to ensure that information required to be disclosed by Ambac (including its consolidated subsidiaries) in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SECs rules and forms, and that such information is accumulated and communicated to Ambac's management, including its Chief Executive Officer and Chief Financial officer, to allow timely decisions regarding required disclosure.

*Based on this evaluation, Ambac's Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2014, Ambac's disclosure controls and procedures were effective at the reasonable assurance level*.

Emphasis added.

281.    Elsewhere in the 2014 Form 10-K, Defendants affirmatively stated that Ambac maintained such controls over financial reporting to ensure timely reporting to the SEC and that the Company's internal controls were found to be "effective:"

Management conducted an assessment of the effectiveness of the Corporation's internal control over financial reporting as of December 31, 2014. In making this assessment, management used the framework set forth in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, *management has determined that, as of December 31, 2014, the Corporation's internal control over financial reporting is effective.*

(Emphasis Added).

282.    In addition, the 2014 Form 10-K contained nearly identical SOX Certifications signed by Defendants Trick and Tavakoli as was included in the 2013 Form 10-K, which represented that Ambac's financial statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

283.    The SOX certifications and above statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented.

284.    As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

**O.    Materially False and Misleading Statements in the March 2, 2015 Earnings Conference Call and the March 2, 2015 Press Release**

285.    On March 2, 2015, Ambac issued a press release, entitled Ambac Announces Fourth Quarter 2014 Results", reporting on the Company's fourth quarter ending December 31, 2014 (the "March 2 Press Release").  The March 2 Press Release falsely represented that the Company's financial statements contained therein were prepared "in accordance with GAAP."

286.    In addition, the March 2 Press Release reported gross loss and loss expense reserves for domestic public finance of $354 million as of December 31, 2014 and a benefit for loss and

loss expenses of $552.2 million for the fourth quarter-ended December 31, 2014.  Again, the March 2 Press Release did not disclose reserves or loss expense for Puerto Rico.

287.    Defendants also held an earnings conference call for investors on March 2, 2015 (the "March 2 Call").  During the March 2 Call, Defendant Tavakoli complimented the Company on doing "a good job of reducing its outstanding and short exposure" and stated Ambac "intend[s] to continue to derisk the portfolio and mitigate potential losses across all fronts where such actions are economically advantageous."  Defendant Tavakoli later assured investors that Defendants were "confident that we're taking the right action to support our objectives of satisfying all of our policyholders and ultimately maximizing value for our shareholders."

288.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) Ambac did not employ adequate risk mitigation; (v) the Company was in violation of its own internal policy for setting reserves and loss expenses; (vi) as a result of the foregoing, the Company's financial condition was much worse than represented; and (vii) Ambac failed to maintain adequate internal controls over financial reporting.

### P.    Materially False and Misleading Statements in the First Quarter 2015 Form 10-Q

289.    On May 11, 2015, Ambac filed its first quarter Form 10-Q for the period ending March 31, 2015, which was signed by Defendant Trick (the "First Quarter 2015 Form 10-Q").  The First Quarter 2015 Form 10-Q contained several categories of materially false and misleading statements concerning Ambac's: (i) credit risk management; (ii) losses and reserve for losses on Puerto Rican bonds; (iii) credit rating and risk exposure; and (iv) internal controls.

1.      **Materially False and Misleading Statements Concerning Credit Risk Management**

290.    Defendants made false and misleading statements in the First Quarter 2015 Form 10-Q concerning the Company's loss mitigation practices stating that Ambac's "primary goal" is "actively managing its assets and liabilities with a focus on . . . mitigating or remediating losses on poorly performing transactions."

291.    Defendants' assurances regarding Ambac's risk management were materially false and misleading at the time made because: (i) the Company was failing to implement adequate mitigation strategies (*e.g.*, CDS); and (ii) Defendants knew that Puerto Rico was likely to default as a result of, among other things, several metrics, including rapidly declining credit ratings, sharp increases in CDS insurance, widening credit spreads and increased Puerto Rican bond yields, which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

2.      **Materially False and Misleading Statements Concerning Losses and Loss Reserves**

292.    The First Quarter 2015 Form 10-Q falsely misrepresented states that Ambac's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."

293.    With respect to reserves, Defendants falsely assured investors that Ambac's "*reserves for loss and loss expenses and unearned premium reserves are adequate to cover claims presented*."   The First Quarter Form 10-Q further claims that Defendants take a conservative approach to calculating reserves based upon "more stressful assumptions:"

> We have attempted to identify reasonably possible cash flows *using more stressful assumptions.* The reasonably possible net cash flows *consider the highest stress scenario* that was utilized in the development of our probability-weighted expected loss at March 31, 2015 and assumes an

> inability to execute commutation transactions with issuers and/or investors. ***Such stress scenarios are developed based on management's view about all possible outcomes***.

(Emphasis added).

294.    With respect to Ambac's public finance portfolio, the First Quarter 2015 Form 10-Q falsely assured investors that there was little to no likelihood of default:

> In our past experience, losses in the public finance portfolio have been contained, with most of our adversely classified credits resolving without loss to Ambac.
>
> *        *        *
>
> We currently consider high severity outcomes to be outlying and therefore implicitly assign low to remote probabilities to such outcomes into our current loss reserves unless the situation develops adversely.

295.    With respect to Puerto Rico in particular, Defendants reassured investors that, while Ambac's "loss reserves include scenarios designed to cover a range of possible outcomes," a default was not likely: "Management believes that the ***timely receipt of all principal and interest on these positions is probable***." (Emphasis added.)

296.    The First Quarter 2015 Form 10-Q also falsely reports loss and loss expense reserves for Ambac's domestic public finance portfolio of $381 million as of March 31, 2015 and loss expense for the first quarter of $151 million.

297.     The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was in violation of its own internal policy for setting reserves and loss expenses; (v) it was likely that Puerto Rico was going to default on its bonds and, thus timely

receipt of principal and interest payments was anything but probable; (vi) a result of the foregoing, the Company's financial condition was much worse than represented; and (vii) Ambac failed to maintain adequate internal controls over financial reporting.

### 3. Materially False and Misleading Statements Concerning Credit Rating and Risk Exposure

298. In the First Quarter 2015 Form 10-Q, Defendant reported Ambac's exposures to Puerto Rico are as follows:

| ($ in millions) | | March 31, 2015 | | December 31, 2014 |
|---|---|---|---|---|
| Public Finance [1][2][3] | $ | 88,059 | $ | 93,448 |
| Structured Finance | | 25,281 | | 26,334 |
| International Finance | | 23,507 | | 24,952 |
| **Total net par outstanding** [2] | **$** | **136,847** | **$** | **144,734** |

(1) Includes $6,060 and $6,089 of Military Housing net par outstanding at March 31, 2015 and December 31, 2014, respectively.

(2) Includes $2,437 of Puerto Rico net par outstanding at both March 31, 2015 and December 31, 2014. Components of Puerto Rico net par outstanding includes capital appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

(3) Included in the above net par exposures at March 31, 2015 and December 31, 2014 are $1,595 and $1,530, respectively, of exposures that were executed in credit derivatives form

299. In addition, with respect to credit ratings on Ambac's Puerto Rican bond portfolio, Defendants failed to disclose the true extent the bonds had been downgraded by assigning them the generic "BIG" classification. As discussed above, the Company's internal BIG rating was ambiguous and highly misleading because it encompassed a broad spectrum of ratings widely varying in default rates:

#### Summary of Below Investment Grade Exposure

| ($ in millions) | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Public Finance: | | |
| Tax-backed [1] | 2,362 | 2,512 |
| Housing [2] | 829 | 841 |
| General obligation [3] | 491 | 564 |
| Transportation | 437 | 453 |

| | | |
|---|---:|---:|
| Health care | 27 | 27 |
| Other | 1,290 | 1,293 |
| Total Public Finance | 5,436 | 5,690 |
| Structured Finance: | | |
| Residential mortgage-backed and home equity—first lien | 6,744 | 7,003 |
| Residential mortgage-backed and home equity—second lien | 5,215 | 5,466 |
| Student loans | 2,812 | 3,092 |
| Structured Insurance | 1,037 | 1,037 |
| Mortgage-backed and home equity—other | 286 | 299 |
| Other | 536 | 536 |
| Total Structured Finance | 16,630 | 17,433 |
| International Finance: | | |
| Other | 2,072 | 2,214 |
| Total International Finance | 2,072 | 2,214 |
| **Total** | **24,138** | **25,337** |

(1)Tax-backed includes $2,187 of Puerto Rico net par at March 31, 2015 and December 31, 2014. General obligation includes $250 of Puerto Rico net par at March 31, 2015 and December 31, 2014. Components of Puerto Rico net par outstanding includes capital appreciation bonds which are reported at the par amount at the time of issuance of the related insurance policy.

(2)Includes $608 and $609 of military housing net par at March 31, 2015 and December 31, 2014, respectively.

300.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) Ambac, in actuality, had approximately $10 billion in exposure to its Puerto Rican bonds, in contrast to the $2.5 billion defendant Adams represented; and (iii) Puerto Rico's bond ratings were rapidly being downgraded.

### 4.    Materially False and Misleading Statements Concerning Internal Controls

301.    In the First Quarter 2015 Form 10-Q, Defendants falsely stated that "as of March 31, 2015, Ambac's disclosure controls and procedures were effective."  In addition, the First Quarter 2015 Form 10-Q contained nearly identical SOX Certifications signed by Defendants Trick and Tavakoli as was included in the 2013 Form 10-K.

302.     The SOX certifications and above statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented.

303.     As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

## Q.     Materially False and Misleading Statements in the May 11, 2015 Press Release

304.     Ambac issued a press release on May 11, 2015, entitled "Ambac Announces First Quarter 2015 Results", announcing the Company's first quarter 2015 financial results (the "May 11 Press Release").  The May 11 Press Release falsely stated that the Company's financial statements were prepared "in accordance with GAAP."

305.     The May 11 Press Release further reported domestic public finance gross loss and loss expense reserves of $381 million as of March 31, 2015 and loss expense for the quarter of $151 million.  Ambac reported that during the quarter, "loss and loss expenses shifted among various Puerto Rico exposures resulting in a small net aggregate increase."

306.     The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to anticipated

defaults in its public finance bond portfolio, and Puerto Rico in particular, than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was in violation of its own internal policy for setting reserves and loss expenses; (v) as a result of the foregoing, the Company's financial condition was much worse than represented; and (vi) Ambac failed to maintain adequate internal controls over financial reporting.

> **R.   Materially False and Misleading Statements in the May 12, 2015 Earnings Conference Call**

307.   On May 12, 2015, the Individual Defendants held an earnings conference call for investors (the "May 12 Call").  During the May 12 Call, Defendant Tavakoli confirmed that Ambac was actively acting to mitigate potential losses:

> In risk and loss management, we're stressing the importance of early recognition of and intervention in problem exposures.  As we identify potential problems, we aggressively pursue plans to manage and mitigate any potential losses.  We're evaluating every area of our insured book to ensure we have not overlooked potential problems, and to optimize and de-risk our portfolio where possible.

308.   Tavakoli further assured investors that Ambac engaged in "early and active engagement in risk and loss management."

309.   The above statements were materially false and misleading when made because the Company was failing to implement adequate mitigation strategies. Indeed, Ambac was not doing any of the things one would expect the Company to have done in order to mitigate losses, such as hedging in CDO transactions.

310.   With respect to Puerto Rico, Defendant Tavakoli indicated that the situation was improving and led investors to believe Puerto Rico was not a concern and/or was adequately reserved for:

> Although *we are confident that our Puerto Rico positions are relatively solid*, want to be prepared for and involved in any outcome. Towards that

end we've assembled a world-class team of professionals in Washington, New York, and Puerto Rico to actively monitor the situation in Puerto Rico, and as a result we have a strong voice in the various discussions taking place toward a possible resolution of the common loss difficulties.

Our access to decision makers and involvement in possible outcomes is second to none.  For example, we were constructively and actively involved with legislators to favorably amend the petroleum tax, and *we want to be sure that we're aware of all the possible actions that could affect our exposures on the revenue streams attached to our bonds*.

We have made it very clear that we will not tolerate any actions that might impair our interests.  As many of you know, I've spent a good deal of my career in the restructuring and workout arena, and while our ability to ultimately control absolute outcomes in Puerto Rico may be limited, we will make every effort to ensure that from a relative perspective, will not be short-changed.

311.   In response to investor questions, Defendant Trick assured investors that Puerto Rico was not likely to default: "we think that the policymakers' will is not to default or restructure the balance of their debt."

312.   When asked about Ambac's loss reserves for Puerto Rico, Defendant Trick refused to provide specific detail on the dollar amounts recorded on Ambac's books and, instead, falsely assured investors that Ambac maintained adequate reserves for Puerto Rico: "we historically and right now don't have any expectations to break out loss reserves on a policy-by-policy or exposure-by-exposure basis, but *I will re-emphasize the fact that we do think we are very well reserved for our exposure to Puerto Rico.*" (Emphasis added).

313.   The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was in violation of its own internal policy for setting reserves and loss expenses; (v) as a result of the foregoing, the Company's financial

condition was much worse than represented; and (vi) Ambac failed to maintain adequate internal controls over financial reporting

## VI. THE TRUTH IS REVEALED

### A. Puerto Rico's Governor Reveals the Commonwealth Intended to Default on Its $70 Billion of Debt, Including the Bonds Ambac Insures

314. Investors would ultimately begin to learn the truth about the risk and quality of Ambac's guarantee portfolio when, on June 29, 2015, Puerto Rico's governor announced that the island's more than $70 billion in debt was "not payable" and Puerto Rico would likely default on upcoming interest payments. The governor of Puerto Rico, Alejandro Garcia Padilla, stated he needed to pull the island out of a "death spiral" and would probably seek significant concessions from many of Puerto Rico's creditors, which could include deferring some debt payments as long as five years or extending the timetable for repayment. He explained that the government could not burden its residents with further tax increases or pension cuts when they were already struggling with high rates of poverty. Instead, the creditors would "share the sacrifices." In other words, Ambac would not be receiving any payments due on its Puerto Rico insured bonds.

315. The Governor's June 29, 2015 announcement made Ambac's true exposure undeniably apparent: the Company was now potentially liable for up to $10 billion of the Commonwealth's debt it insures. Such news sent the Company's stock price careening downwards, falling roughly 29 percent, from a closing price of $22.38 per share on June 26, 2015, to a closing price of $15.91 per share on July 1, 2015.

316. Not surprisingly, as discussed below, since this announcement, Ambac has continued to record additional reserves and engage in buybacks to account for the substantial previously undisclosed losses related to Puerto Rican bonds. As discussed below, investors were

still largely kept in dark regarding how this pronouncement would affect Ambac insured Puerto Rican bonds.

### B.      Puerto Rico Announces It Only Paid A Fraction of Its $58 Million August 3 Payment

317.    On August 3, 2015, shortly after the June 29, 2015 announcement, Puerto Rico defaulted on its debt, paying only $628,000 of its $58 million debt payment due August 3, 2015. Upon the news, Ambac's stock dropped from a closing price of $16.04 per share on July 31, 2015 to $15.50 per share on August 3, 2015.

### C.      Ambac Continues to Materially Misrepresent Its Puerto Rican Exposure in the August 10, 2015 Press Release

318.    On August 10, 2015, Ambac issued a press release entitled "Ambac Announces Second Quarter 2015 Results" ("August 10 Press Release").  The August 10 Press Release falsely stated that the Company's financial statements were prepared "in accordance with GAAP."   In the August 10 Press Release, Defendant Tavakoli specifically noted that Ambac had – at the eleventh hour – finally increased the Company's loss reserves and assured investors that Ambac's long-term prospects with respect to Puerto Rico looked good because Ambac's and Puerto Rico's interests were "aligned:"

> With respect to our insured exposure to Puerto Rico, **we increased our reserves to reflect our updated views on probability weighted potential outcomes**.  At the same time, we have intensified our efforts to manage outcomes related to our Puerto Rico risk.  Given the long duration of much of our guaranteed exposure, Ambac's interests are naturally aligned with the long-term best interests of the Commonwealth and its people.  We believe that solutions for Puerto Rico's current debt situation and its long-term prosperity include structural changes to improve economic efficiency and growth, along with fiscal reforms and spending disciplines.  Ambac stands ready to help Puerto Rico in meaningful and productive ways.

(Emphasis added.)

- 111 -

319.    The August 10 Press Release further reported domestic public finance gross loss and loss expense reserves of $407 million as of June 30, 2015 and loss expense for the quarter of $37.8 million "including a net increase in reserves for Puerto Rico."

320.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was in violation of its own internal policy for setting reserves and loss expenses; (v) as a result of the foregoing, the Company's financial condition was much worse than represented; and (vi) Ambac failed to maintain adequate internal controls over financial reporting.

### D.    Continued Materially False and Misleading Statements in the Second Quarter 2015 Form 10-Q

321.    On August 10, 2015, Ambac filed its second quarter Form 10-Q for the period ending June 30, 2015, which was signed by Defendant Trick (the "Second Quarter 2015 Form 10-Q").  The Second Quarter 2015 Form 10-Q contained several categories of materially false and misleading statements concerning Ambac's: (i) losses and reserve for losses on Puerto Rican bonds; and (iv) internal controls.

### 1.    Materially False and Misleading Statements Concerning Losses and Loss Reserves

322.    The Second Quarter 2015 Form 10-Q falsely misrepresents that Ambac's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."

323.    With respect to reserves, Defendants falsely assured investors that Ambac's "*reserves for loss and loss expenses and unearned premium reserves are adequate to cover claims presented*." (Emphasis added.)  The Second Quarter 2015 Form 10-Q further claims that

- 112 -

Defendants take a conservative approach to calculating reserves based upon "more stressful assumptions:"

> We have attempted to identify reasonably possible cash flows ***using more stressful assumptions.*** The reasonably possible net cash flows ***consider the highest stress scenario*** that was utilized in the development of our probability-weighted expected loss at June 30, 2015 and assumes an inability to execute commutation transactions with issuers and/or investors. ***Such stress scenarios are developed based on management's view about all possible outcomes***.

(Emphasis added.)

324.    With respect to Ambac's public finance portfolio, the Second Quarter 2015 Form 10-Q falsely assured investors that there was little to no likelihood of default:

> In our past experience, losses in the public finance portfolio have been contained, with most of our adversely classified credits resolving without loss to Ambac.
>
> *            *            *
>
> We currently consider high severity outcomes to be outlying and therefore implicitly assign low to remote probabilities to such outcomes into our current loss reserves unless the situation develops adversely.

325.    With respect to Puerto Rico, despite the announcement of a Puerto Rican default, Defendants barely increased Ambac's reserves and continued to assure investors that Ambac anticipated Puerto Rico would meet its debt obligations: "Management believes that the ***timely receipt of all principal and interest on these positions is probable***." (Emphasis added.)  Moreover, Defendants still refused to disclose the specific dollar amounts that the Company had set aside for Puerto Rico reserves.

326.    The Second Quarter 2015 Form 10-Q also falsely reported loss and loss expense reserves for its domestic public finance portfolio of $407 million as of June 30, 2015 and loss

expense for the second quarter 2015 of $147.5 million and $298.4 million for the three and six months-ended June 30, 2015, respectively.

327.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) Ambac's financial statements were not in compliance with GAAP; (ii) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (iii) Ambac was exposed to a far greater risk of default on the bonds it insured than disclosed; (iv) the Company was in violation of its own internal policy for setting reserves and loss expenses; (v) timely receipt of principal and interest payments was anything but probable; (vi) a result of the foregoing, the Company's financial condition was much worse than represented; and (vii) Ambac failed to maintain adequate internal controls over financial reporting.

## 2.    Materially False and Misleading Statements Concerning Internal Controls

328.    In the Second Quarter 2015 Form 10-Q, Defendants falsely stated that "as of June 30, 2015, Ambac's disclosure controls and procedures were effective."  In addition, the Second Quarter 2015 Form 10-Q contained nearly identical SOX Certifications signed by Defendants Trick and Tavakoli as was included in the 2013 Form 10-K.

329.    The SOX certifications and above statements were materially false and misleading at the time they were made because Ambac's internal controls were deficient and, thus, allowed the Company to: (i) inaccurately state the credit ratings of Ambac's Puerto Rican bonds; (ii) maintain inadequate reserves for the Company's loss exposure on Puerto Rican bonds; (iii) understated expenses and overstated earnings; (iv) violate the Company's own internal policies; and (v) violate GAAP.  Accordingly, Ambac did not maintain a system of adequate controls, as represented.

330.    As Defendants would ultimately admit, Ambac did "not maintain[] effective internal control over financial reporting" and had "identified a material weakness in its internal control over financial reporting," including weaknesses related to the Company's "estimate of loss reserves[.]"

### 3.    Continued Materially False and Misleading Statements in the August 11, 2015 Earnings Call

331.    On August 11, 2015, Defendants held an earnings conference call for investors (the "August 2015 Call").  During the August 15 Call, Defendant Tavakoli emphasized that Ambac had benefited in the quarter from "the active management of our risk exposures and investment portfolios across the firm."  Tavakoli continued that the Company remains focused on "actively managing our Puerto Rico exposure…and positioning the Company more efficiently and strategically for future success."

332.    Defendant Tavakoli also falsely stated that Ambac's net par exposure to Puerto Rico "remains at about $2.4 billion" and assured investors that Ambac ***"believe[s] the government can support its debt and that the debt problem is a liquidity issue and not a leverage or a solvency issue.***  (Emphasis added).

333.    When asked about the amount of reserves set aside for Puerto Rico, Defendant Tavakoli refused to answer and claimed that Ambac was "***feeling that we are pretty well reserved"*** and ***"we're pretty well reserved."***  (Emphasis added.)

334.    The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions: (i) the Company had far greater losses and loss exposure to Puerto Rico than disclosed; (ii) the Company's credit risk surveillance strategies were inadequate; (iii) the Company was failing to implement mitigation strategies in a timely manner

to stabilize the residual value of its financial guarantee business; and (v) as a result of the foregoing, the Company's financial condition was much worse than represented.

> ### E.   Defendants Finally Admit that Puerto Rico is an "Overhang" on the Company's Guarantee Portfolio and, as a Result, Ambac was Forced to Take a $514.5 Million Goodwill Impairment Charge

335.    On November 9, 2015, Ambac issued a press release entitled "Ambac Announces Third Quarter 2015 Results" (the "November 9 Press Release").  In the November 9 Press Release, Defendants revealed that Ambac was working with the Puerto Rico Highways and Transportation Authority ("HTA") to cancel $228.5 million net part of Ambac's insured HTA bonds, i.e. its PRHTA bonds.  Ambac stated the cancellation amounts to approximately $493 million of lifetime principal and interest.  Ambac further characterized its Puerto Rico exposure as an "overhang."

336.    Defendants further disclosed in the November 9 Press Release that Ambac was forced to record a goodwill impairment charge of $514.5 million as a result of, among other things, a "substantial decrease in the Financial Guarantee reporting unit's fair value" driven by the decrease in Ambac's market capitalization and stock price and "wider Ambac credit spreads" relating at least in part to Puerto Rico.

337.    Upon this news, Ambac's stock price dropped $2.05 per share, from $16.84 per share on November 9, 2015 to $14.79 per share on November 17, 2016, or 12%

## VII.   POST CLASS PERIOD EVENTS

338.    Shortly after the Class Period, on November 30, 2015, the Governor of Puerto Rico issued an administrative bulletin directing the Puerto Rico Department of Treasury to withhold, or "clawback," its PRHTA Pledged Funds and the PRIFA Pledged Funds for application to the Commonwealth's "public debt" (including general obligation bonds) instead of releasing such Pledged Funds to PRHTA and to PRIFA bonds.  The Governor also directed the Puerto Rico Tourism Company to transfer the PRCCDA Pledged Funds to the Department of Treasury for

application to the public debt instead of releasing the PRCCDA Pledged Funds for application to the PRCCDA bonds. Thus, the Priority Debt Provision, or "clawback," was being utilized to prioritize General Obligation bonds before all other expenses.

339.   In response, on December 29, 2015, Ambac announced it had issued a letter to the Governor and other top officials of Puerto Rico, regarding the Commonwealth's purported illegal clawback of revenues pledged to PRIFA. The clawback meant Ambac would invariably have to pay out when the Puerto Rico Infrastructure Financing Authority failed to cover its obligations.

340.   The Company's position in Puerto Rico further deteriorated and became increasingly dire on January 4, 2016, when *Puerto Rico defaulted for a second time on approximately $37.3 million in bond payments of an estimated $1 billion owed that day*. Commenting on the default, Melba Acosta Febo, head of Government Development Bank for Puerto Rico, reiterated the Commonwealth's precarious financial condition, explaining: "No amount of lobbying can change the math or the facts -- there isn't enough money to provide essential services to the people of Puerto Rico, repay our existing obligations and grow our economy, which is the only way the Commonwealth will ever be able repay our creditors." (Emphasis added). The Governor of Puerto Rico separately warned on the day of the default that, unless bondholders negotiated new terms, Puerto Rico would default on even its public debt. As a result of the default, *Ambac paid $10.3 million in interest due*.

341.   The letter issued in late December precipitated a subsequent lawsuit by the Company filed against Puerto Rico, announced on January 7, 2016. The lawsuit sought declaratory and injunctive relief to prevent the clawback of revenues pledged to the Puerto Rico Highways and Transportation Authority, the Puerto Rico Convention Center District Authority, and the Puerto Rico Infrastructure Financing Authority. The litigation remains ongoing.

342.    On May 2, 2016, Puerto Rico announced it would ***once again be unable to make a $422 million debt payment due the same day***.  This was the third time the island had defaulted on its bond payments.  While the Commonwealth was able to pay the interest due, it was unable pay the principal amount, resulting in a default of approximately $370 million, the largest Puerto Rican default yet.  Governor Padilla reiterated that he was choosing to focus on providing essential services rather than pay creditors.  The default was not surprising, as Moody's warned as early as April 22, 2016 to "[m]ake no mistake about it: Puerto Rico will default in May on some of the $470 million it owes."[22]

343.    On February 29, 2016, Defendants filed the Company's Annual Report on Form 10-K for the year-ended December 31, 2015 (the "2015 Form 10-K"), disclosing that Ambac had increased its reserves for its domestic public finance due to Puerto Rico by $116 million, or 33%, to $470 million.

344.    On May 11, 2016, Defendants filed an amendment to the Company's 2015 Form 10-K, reporting that the Company had "identified a material weakness in its internal control over financial reporting."   The material weaknesses identified include weaknesses related to the Company's "estimate of loss reserves and subrogation recoverables, investment income and assessing other than temporary impairment for purchased residential mortgage backed securities." Accordingly, the Individual Defendants concluded that "the Company has not maintained effective internal control over financial reporting as of December 31, 2015."

345.    The 2015 Form 10-K included a letter from the Company's auditor which stated in relevant part:

---

[22] Brian Chappatta, *Make No Mistake: Puerto Rico Will Default on May 2, Moody's Says,* Bloomberg (Apr. 22, 2016), http://www.bloomberg.com/news/articles/2016-04-22/make-no-mistake-puerto-rico-will-default-on-may-2-moody-s-says.

The Board of Directors and Stockholders
Ambac Financial Group, Inc.:

We have audited Ambac Financial Group, Inc.'s (the "Company" or "Ambac") internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

\*       \*       \*

In our report dated February 29, 2016, we expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting. As described in the following paragraph, the Company subsequently identified a material weakness in its internal control over financial reporting. Accordingly, management has revised its assessment about the effectiveness of the Company's internal control over financial reporting, and our present opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2015 as expressed herein, is different from that expressed in our previous report.

*A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness associated with design of controls over the estimate of loss reserves and subrogation recoverables, investment income and assessing other than temporary impairment for purchased residential mortgage backed securities has been identified and included in management's assessment.*

This material weakness was considered in evaluating the nature, timing and extent of audit tests applied in our audit of the consolidated financial statements for the year ended December 31, 2015, and this report does not affect our report dated February 29, 2016, which expressed an unqualified opinion on those consolidated financial statements.

*In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*

\*     \*     \*

/s/ KPMG LLP
New York, New York
February 29, 2016 (May 11, 2016 as to the effects of the material weakness)

(Emphasis added).

346.    In addition to admitting to material internal control weaknesses, Ambac also recognized the severity of its loss exposure and began belatedly mitigating against such losses through buybacks.  As of the third quarter ending September 30, 2016, Ambac had spent a total of $63 million to extinguish about $300 million of likely pay-outs (mostly zero-coupon bonds) through five different buybacks.  The buybacks occurred on March 10, 2014 ($6,422,000), October 20, 2015 ($4,998,000), December 4, 2015 ($3,984,800), January 21, 2016 ($4,166,530) and May 2, 2016 ($62,050).

347.    By this time, however, Puerto Rico had already announced it was defaulting or likely to default on its debt payments which alerted Defendants to the fact that they needed to do something to mitigate against potential losses.  While Defendants participated in these buybacks, it was a façade designed to assure investors that Ambac was sufficiently mitigating against loss when really the buybacks only protected against a small fraction of Ambac's losses.[23]  Specifically,

---

[23] Had the Individual Defendants adequately mitigated against loss by participating in buybacks during the Class Period, the cost to do so would have been significantly less.  During the Class Period, the cost of buybacks was often a fraction of the par value of the deeply distressed

the dollar value of Ambac's purchases of the buybacks came to a total current value of $14.78 million at the end of the third quarter 2016.  Put another way, Ambac's buyback program covered $14.78 million of the $2.2 billion par value of the Puerto Rican municipal bond portfolio.  This reduced Ambac's Puerto Rican exposure by less than 0.7% of cost verses the par value of the Puerto Rico portfolio and 4% of the par value of Puerto Rico exposures.  These mitigation efforts were simply insufficient to cover the losses Ambac faced.  Furthermore, while Ambac could have implemented loss mitigation strategies earlier in the Class Period to mitigate such risks, it failed to do so, in direct contradiction of Defendants' public statements that Ambac was "actively . . . mitigating or remediating losses on poorly performing transactions."   Ambac's schedule of buybacks are illustrated below:

| Financial Guarantees / Investment Portfolio Buybacks | Issue | CUSIP | Gross Par Value/ Net Par Value 000% of Issue buyback | Yield @ 6/30/ 2016 | Rate | Investment Portfolio – Date Purchased |
|---|---|---|---|---|---|---|
| Financial Guarantees | Puerto Rico Commonwealth Highway & Transit Muni Bond | 745190ES3 | 290 290 | | Zero | |
| Investment Portfolio Buyback 21% of the Issue | Puerto Rico Commonwealth Highway & Transit Muni Bond | 745190ES3 | 75 21 % | 6.101 | Zero | 5/2/2016 |

guaranteed Puerto Rico municipal bonds.  By 2015, when yields for some of Ambac's bonds soared to 40% to 50%, the cost of those bonds were less than half the par value of the bonds.

| Financial Guarantees | Puerto Rico Commonwealth Highway & Transit Muni Bond | 74590ZJ0 | 28,545 27,966 | | 1.973 | |
| Investment Portfolio Buyback 18% of the Issue | Puerto Rico Commonwealth Highway & Transit Muni Bond | 74590ZJ0 | 6,120 18% | 4.901 | 1.973 | 1/21/2016 |
| Financial Guarantees | Puerto Rico Commonwealth Highway & Transit Muni Bond | 745190ZK7 | 29,420 28,823 | | 1.973 | |
| Investment Portfolio Buyback 17% of the Issue | Puerto Rico Commonwealth Highway & Transit Muni Bond | 745190ZK7 | 5,860 17% | 4.446 | 1.973 | 12/4/2015 |
| Financial Guarantees | Puerto Rico Commonwealth Highway & Transit Muni Bond Rum Tax | 745220FS7 | 57,815 56,484 | | 5.5 | |
| Investment Portfolio Buyback 3% of the Issue | Puerto Rico Commonwealth Highway & Transit Muni Bond Rum Tax | 745220FS7 | 1,705 3% | 6.422 | 5.5 | 3/10/2014 |
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 102,859 102,382 | | Zero | |
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 101,983 103,510 | | Zero | |
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 101,103 100,634 | | Zero | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 10,0217 99,753 | | Zero | |
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 99,329 98,868 | | Zero | |
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 98,439 97,982 | | Zero | |
| Financial Guarantees | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 97,545 97,093 | | Zero | |
| Investment Portfolio Buyback 9% of the issue | Puerto Rico Commonwealth Sales Tax Financing Muni Bond COFINA | 74529JAP0 | 78,400 9% | 7,227 | Zero | 10/20/201 5 |
| | | | | | | |
| | | | FINANCI AL GUARAN TEES  TOTAL GROSS PAR  TOTAL NET PAR | | | |

| TOTAL BUYBACKS OF PUERTO RIO FINANCIAL GUARANTEES 0.7% COST VS. PAR | | $2.196 BILLION $2.163 BILLION | | | |
|---|---|---|---|---|---|

348.   Typically, when an obligor defaults on a payment the insurer can seek legal remedies.  This is not the case here.  Instead, on June 30, 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which enabled Puerto Rico to enter a bankruptcy-like restructuring process and halt litigation in case of default.  This is the largest federal intervention into the U.S. municipal bond market ever. Even with potential help from Congress, however, Melba Acosta Febo, the head of Government Development Bank for Puerto Rico, was dubious as to any benefit that could result from lawmaking: "No amount of lobbying can change the math or the facts – there isn't enough money to provide essential services to the people of Puerto Rico, repay our existing obligations and grow our economy, which is the only way the Commonwealth will ever be able [to] repay our creditors."[24]

349.   PROMESA established an oversight board, a process for restructuring debt, and expedited procedures for approving critical infrastructure projects in order to combat Puerto Rico's debt crisis.  The oversight board consists of seven members appointed by the President and its purpose is to facilitate negotiations or, if negotiations are unsuccessful, bring about a court-supervised process akin to bankruptcy.  The oversight board has significant control over the

---

[24]  Heather Long, *Puerto Rico Will Default AGAIN,* CNN Money (Dec. 30, 2015), http://money.cnn.com/2015/12/30/investing/puerto-rico-default-january/?iid=E.

development and enforcement of fiscal plans and is responsible for overseeing and monitoring a sustainable budget.  The governor of Puerto Rico serves *ex officio* as an eighth member of the oversight board, but does not have voting rights.

350.    PROMESA contains a number of additional provisions as well, including freezing bond payments until 2017, a mandate to continue funding pensions, a lower minimum wage for young workers in Puerto Rico, and a limitation of special restructuring authority to the island.

351.    While PROMESA comes at no cost to taxpayers, it leaves insurers and creditors with no relief.  PROMESA imposed an automatic stay that took effect immediately upon its enactment which prevents creditors from taking action against Puerto Rico to collect its debts.  This provision remains in effect until February 15, 2017 and is intended to give Puerto Rico a "breathing spell" from creditors by stopping collection efforts relating to debt obligations.  Section 405(j) of PROMESA explicitly prohibits bondholders and other holders of debt issued by Puerto Rico from exercising their contractual remedy provided by law.  Thus, while defaults such as this normally lead to lawsuits, PROMESA prevents bondholders from suing Puerto Rico.  For Ambac, this meant it was left with no recourse and would be responsible for paying the balance due on its Puerto Rican insured bonds.

352.    Accordingly, within hours of the bill passing, Puerto Rico's governor issued an executive order saying Puerto Rico would stop making PR General Obligation bond payments, among other types of bond payments.  This includes payment on bonds that are supposed to be backed by the Priority Debt Provision in the Commonwealth Constitution, namely its general obligation bonds.  This announcement also meant that Puerto Rico was set to register its largest default to date.

353.    Consequently, things got worse for the Commonwealth on July 1, 2016, when $2 billion in principal and interest was due and Puerto Rico skipped $911 million of its bond payments.  As a result, PRIFA defaulted on $77.8 million of principal and interest due July 1, 2016, which resulted in Ambac paying out $41.7 million to PRIFA bondholders.  Similarly, PR Commonwealth General Obligation defaulted on its payments, resulting in Ambac paying out $11.3 million to bond holders for the interest payments.   This default marked the first time that a state or state-like entity had failed to pay general obligation bonds since the Great Depression.  The Puerto Rican government characterized its financial position as "dire" with only about $350 million in cash on hand.  While Ambac only insured about $1 million in general obligation debt due that day, Defendant Tavakoli stated that the Company expected to pay between $45 million and $50 million in claims as other Puerto Rican issuers defaulted.

354.    The deteriorating credit quality in the Puerto Rico municipal bond market became so extreme that, as mentioned IV.D.3 *supra*, ISDA announced a "credit default event" on July 18, 2016, triggering the pay-out of all Puerto Rico bond CDS contracts. In support of its declaration, ISDA specifically resolved "that a failure to pay credit event occurred in respect of the Commonwealth of Puerto Rico." To settle the claims on the Puerto Rico bond CDS contracts, a credit event auction was held on August 17, 2016 and settled on August 22, 2016 – an auction being the functional equivalent of an insurance payout when the insured against risk eventually materialized.

355.    Meanwhile, Defendant Adams, who "resigned" in December 2014, was not the only high ranking Ambac executive to be pushed out as a result of the Company's Puerto Rico exposure at this time.  Joan Allman had been Ambac's Managing Director of Public Finance Credit Oversight Team beginning in May 2005.  However, after PROMESA was passed and the Governor

of Puerto Rico announced that Puerto Rico would stop making payments on its bonds, Joan Allman was abruptly terminated, or abruptly resigned, sometime in July 2016.

356.    In addition, shortly after the Commonwealth defaulted for the fourth time, on August 9, 2016, the Company announced that defendant Matanle, the Senior Managing Director and Head of Portfolio and Credit Risk Management, would retire by mutual agreement with Ambac, effective September 30, 2016. As the Senior Managing Director and Head of Portfolio and Credit Risk Management, Matanle was responsible for monitoring distressed credits, like the Company's Puerto Rico exposure, and directly reporting updates regarding such distressed credits to the CEO of Ambac, the Audit Committee, and the Board. No rationale was provided for her "retirement," although Ambac employees interviewed during an ongoing investigation of this case by Plaintiff's counsel have revealed that her retirement was forced by the Individual Defendants – less than one month after the Commonwealth defaulted on its constitutionally-backed general obligation bonds.

357.    The press release announcing Matanle's purported retirement further announced Ambac's intention to consolidate its risk management groups from three teams into one.  Thus, with the retirement of Matanle, Ambac would consolidate its PRM function, combining portfolio surveillance, credit and, risk and loss mitigation for both the Ambac Segregated Account and Ambac Assurance.  Unfortunately for Ambac investors, however, this type of post hoc redress of the Company's credit monitoring failures would come too late.

## VIII.   AMBAC'S ACCOUNTING VIOLATIONS

358.    As alleged above, during the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP.  The SEC requires that publicly-traded companies such as Ambac present their financial statements in accordance

with GAAP.  GAAP are a set of criteria used to determine measurement, recognition, presentation, and disclosure of all material items appearing in the financial statements.[25]

359.    SEC regulation S-X (17 C.F.R. § 210.4-01 (a)(1)) provides that financial statements filed with the SEC, which are not presented in accordance with GAAP "***will be presumed to be misleading***, despite footnotes or other disclosures." (Emphasis added).  Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.01-01(a).

360.    The responsibility for preparing financial statements (which include the footnotes to the financial statements) in conformity with GAAP rests with corporate management, as set forth in the Preface to the AICPA's Clarified Auditing Standards:

> management and, when appropriate, those charged with governance, have responsibility[:]
>
> a. for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework;
>
> b. for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error…[26]

361.    Each of the improper accounting practices in which the Company engaged, as well as Defendants' misrepresentations and omissions, standing alone, was a material breach of GAAP, Company policy, and/or SEC regulations.

---

[25] American Institute of Certified Public Accountants ("AICPA") Auditing Standards Board ("ASB"), Auditing Standards – Clarified, Section ("AU-C") *Glossary of Terms.*
[26] AU-C Preface – *Principles Underlying an Audit Conducted in Accordance with Generally Accepted Auditing Standards.*

362.     As discussed below, Ambac's Third Quarter 2013 Form 10-Q, 2013 Form 10-K, First Quarter 2014 Form 10-Q, Second Quarter 2014 Form 10-Q, Third Quarter 2014 Form 10-Q, 2014 Form 10-K, First Quarter 2015 Form 10-Q and Second Quarter 2015 Form 10-Q (collectively, the "False and Misleading Financial Statements") violated GAAP by failing to: (i) adequately reserve for losses on the Company's insured Puerto Rican bond portfolio; (ii) disclose the risks associated with the Company's Puerto Rican bonds and failure to mitigate risk; and (iii) maintain sufficient internal controls over the financial reporting process to ensure the Company's financial statements were reported in compliance with GAAP.

363.     GAAP requires an entity to restate previously filed quarterly and annual financial statements to correct material errors in those previously reported financial statements.[27] According to ASC 250, Accounting Changes and Error Corrections ("ASC 250"), an error in previously issued financial statements is:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.[28]

364.     A Company is required to restate its previously issued financial statements by "*restating the prior-period financial statements*."[29]  Specifically, GAAP states the following:

> Any error in the financial statements of a prior period discovered after the financial statements are issued or are available to be issued … shall be reported as an error correction, by restating the prior-period financial statements. Restatement requires all of the following:

---

[27] ASC 250.
[28] ASC 250-10-20, *Glossary*.
[29] ASC 250.

a. The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

b. An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

c. Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.[30]

365.    Thus, Defendants also violated GAAP by failing to correct prior material errors in the Company's publicly-filed financial statements.

## A.    Applicable Accounting Standards Under GAAP

366.    The accounting literature addresses, specifically, the manners in which a company must both record and disclose liabilities (or possible liabilities) that emanate from guarantees.  As the language provides:

> The objective of the Guarantees Topic [in the accounting literature] is to achieve transparency in a guarantor's financial reporting about the obligations and risks arising from issuing guarantees in the following two ways: a. To provide informative disclosures about the nature and amount of guarantees in the financial statements of guarantors, b. To help ensure comparability of financial reporting for guarantees issued with a separately identified premium and guarantees issued without a separately identified premium by requiring recognition of a liability for the obligation incurred by a guarantor in issuing a guarantee.

367.    According to GAAP, "[a]t the inception of a guarantee, a guarantor shall recognize in its statement of financial position a liability for that guarantee."[31]  With respect to the amount of that liability, the standard continues:

---

[30] ASC 250-10-45-23.
[31] ASC 450-25-4.

In the event that, at the inception of the guarantee, the guarantor is required to recognize a liability under [ASC 450-20-25] for the related contingent loss, the liability to be initially recognized for that guarantee shall be the greater of the following:

    a.    The amount that satisfies the fair value objective as discussed in the preceding paragraph

    b.    The contingent liability amount required to be recognized at inception of the guarantee by [ASC 450-20-30].[32]

368.    Separately, an entity has an obligation to make certain disclosures beyond the recognition of the foregoing amounts in its financial statements.  GAAP states the following in that regard:

An entity shall disclose certain loss contingencies even though the possibility of loss may be remote. The common characteristic of those contingencies is a guarantee that provides a right to proceed against an outside party in the event that the guarantor is called on to satisfy the guarantee.  Examples include the following:

    a.    Guarantees of indebtedness of others, including indirect guarantees of indebtedness of others

    b.    Obligations of commercial banks under standby letters of credit

    c.    Guarantees to repurchase receivables (or, in some cases, to repurchase the related property) that have been sold or otherwise assigned

    d.    Other agreements that in substance have the same guarantee characteristic.[33]

The disclosure shall include the nature and amount of the guarantee. Consideration should be given to disclosing, if estimable, the value of any recovery that could be expected to result, such as from the guarantor's right to proceed against an outside party.[34]

369.    Separately, ASC 460 states:

---

[32] ASC 450-30-3.
[33] ASC 460-50-3.
[34] ASC 460-50-3.

A guarantor shall disclose all of the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote:

a.     The nature of the guarantee, including all of the following:

     1.     The approximate term of the guarantee
     2.     How the guarantee arose
     3.     The events or circumstances that would require the guarantor to perform under the guarantee
     4.     The current status (that is, as of the date of the statement of financial position) of the payment/performance risk of the guarantee (for example, the current status of the payment/performance risk of a credit-risk-related guarantee could be based on either recently issued external credit ratings or current internal groupings used by the guarantor to manage its risk)
     5.     If the entity uses internal groupings for purposes of item (a)(4), how those groupings are determined and used for managing risk.

b.     All of the following information about the maximum potential amount of future payments under the guarantee:

     1.     The maximum potential amount of future payments (undiscounted) that the guarantor could be required to make under the guarantee, which shall not be reduced by the effect of any amounts that may possibly be recovered under recourse or collateralization provisions in the guarantee (which are addressed under (d) and (e))

     2.     If the terms of the guarantee provide for no limitation to the maximum potential future payments under the guarantee, that fact

     3.     If the guarantor is unable to develop an estimate of the maximum potential amount of future payments under its guarantee, the reasons why it cannot estimate the maximum potential amount.

c.     The current carrying amount of the liability, if any, for the guarantor's   obligations under the guarantee (including the amount, if any, recognized under [ASC 450-20-30]), regardless of whether the guarantee is freestanding or embedded in another contract

d.     The nature of any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee

e. The nature of any assets held either as collateral or by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee

f. If estimable, the approximate extent to which the proceeds from liquidation of assets held either as collateral or by third parties would be expected to cover the maximum potential amount of future payments under the guarantee.

370. Defendants violated GAAP by failing to adhere to the disclosure obligations set forth within GAAP with respect to guarantees, as well as consider at least the following factors in calculating reserves reported in the False and Misleading Financial Statements, resulting in significant losses to the Company and investors: (i) rapidly declining credit ratings; (ii) sharp increases in CDS insurance; (iii) widening credit spreads; (iv) increased Puerto Rican bond yields; (v) actual defaults that occurred; and (vi) the declining Puerto Rican economy, all of which indicated an imminent Puerto Rican default, but failed to mitigate against its losses by setting aside adequate reserves (as discussed below).

371. As discussed above, Ambac was aware of the imminent default by Puerto Rico and, thus, losses caused by the above factors were probable, requiring Ambac to record appropriate losses and reserves.

**B.     Defendants Misstated The Company's Loss Expense and Reserves for Puerto Rican Bonds Arising From the Imminent Default of Puerto Rico**

372. When an entity determines that a loss has occurred and, as a result, an asset is impaired, ASC 450 requires the entity to record an estimated loss from a loss contingency, by way of a charge against income (often in an allowance for loan loss) if, as of the balance sheet date, the losses are both "probable" and "reasonably estimable."[35]

---

[35] ASC 450-20-25.

373.    In the False and Misleading Financial Statements, Defendants falsely represented that, with respect to Ambac's reserves, the Company "attempt[s] to identify reasonably possible additional losses using more stressful assumptions" which "considers the highest stress scenario" and that loss reserves are based on the "probability of the issuer's default."   According to Defendants, "[a]s the probability of default for an individual credit increases and/or the severity of loss given a default increases, [Ambac's] loss reserve for that insured obligation will also increase."  Defendants further represented in the Company's public filings that Ambac's "reserves for losses and loss expenses and unearned premium reserves are adequate to cover the ultimate net cost of claims."

374.    As alleged herein, prior to and throughout the Class Period, Ambac guaranteed the payment of principal and interest on the Company's Puerto Rican bonds in the event of default. At the time Defendants made the above statements, the Puerto Rican economy was in turmoil and numerous key metrics (credit rating, yield, CDS insurance) pointed to an imminent Puerto Rican default.

375.    Defendants, however, failed to adequately reserve for losses on Ambac's guarantee Puerto Rican bond portfolio and represented that Ambac's False and Misleading Financial Statements were "prepared in accordance with U.S. generally accepted accounting principles ("GAAP")."

376.    As discussed below, Defendants violated GAAP by failing to consider at least the following factors in calculating reserves reported in the False and Misleading Financial Statements, resulting in significant losses to the Company and investors: (i) the significant decline in the Puerto Rican economy, including skyrocketing debt levels; (ii) rapidly declining credit ratings on Puerto Rican bonds; (iii) sharp increases in CDS insurance; (iv) widening credit spreads;

(v) increased Puerto Rican bond yields; and (vi) actual defaults by the Puerto Rican government. Thus, losses caused by the above factors were likely and a Puerto Rican default was imminent.

377.    Despite the above risks, Defendants concealed Ambac's exposure to Puerto Rico by explicitly declining to tell investors of the Company's loss exposure and assuring investors the Company's reserves were "adequate." At the same time the bond credit ratings were declining, yields were increasing and the Puerto Rican economy was worsening, Defendants represented that full payment on the bonds it insured was "probable," and continued these representations even after Puerto Rico defaulted.

378.    Based on Ambac's public filings with the SEC in 2015 and after the Class Period, Ambac belatedly recorded a more than 33% increase in reserves, in direct violation of both the Company's internal policies and information of which it was aware or should have been aware with respect to probable losses, which required Defendants to consider in determining an appropriate reserve, among other things, specific bond defaults and industry and market factors.[36]

379.    In addition, Defendants misstated the Company's reserves and expenses in the False and Misleading Financial Statements by failing to adequately accrue for losses of which

---

[36] The accounting rules and related practice generally do not permit the establishment of allowances that are not supported by appropriate analyses. *See, e.g.,* Audit and Accounting Guide ("AAG") – Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies ("AAG – Depository and Lending Institutions"); Other Technical Matters of the Emerging Issues Task Force - Appendix D - 80: Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio ("EITF D-80"); SEC Staff Accounting Bulletin ("SAB") No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*. The SEC, in SAB 102, requires the application and documentation of a systematic methodology applied consistently from period to period to determine the provision and allowance for loan losses. SAB 102 further describes the common elements that should be included in any allowance for loan loss methodology for it to be effective, including consideration of: *(i) "all known relevant internal and external factors that may affect loan collectibility;" (ii) "[b]e applied consistently, but when appropriate, be modified for new factors affecting collectibility;" (iii) "the particular risks inherent in different kinds of lending;" and (iv) "[b]e based on current and reliable data*." (Emphasis added.).

Defendants were, or should have been, aware of. Thus, the Defendants knew losses related to the Company's Puerto Rican bond portfolio were "probable."

380.    Defendants' failure to adequately reserve for losses on Puerto Rican bonds caused reserves to be understated and net income and earnings to be overstated, in violation of GAAP.

### C.    Defendants' Failure To Disclose The True Risk Arising From The Company's Guaranteed Puerto Rican Bond Portfolio

381.    Defendants' failure to disclose the Company's true risk and loss exposure to the Puerto Rican bonds Ambac insures during the Class Period and refusal to inform investors of the dollar amount of expenses and reserves recorded for Puerto Rico resulted in a violation of the most fundamental principles of financial reporting articulated by GAAP and SEC Regulations. Specifically, in addition to the accounting violations noted above, the Company presented its financial statements in a manner that also violated at least the following provisions of GAAP:

- The concept that the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."

- "The objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (*FASCON 8, OB2*).

- "Investors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of (the prospects for) future net cash inflows to the entity," and that, "[c]onsequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity." (FASCON 8, OB3).

- In order to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders and other creditors need information about the resources of the entity, claims against the entity." (FASCON OB4).  Investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources," examples such responsibilities including "protecting the entity's resources from [unfavorable]

effects of economic factors such as price and technological changes and ensuring that the entity complies with applicable laws, regulations and contractual provisions." (FASCON 8, OB4).

- "Many existing and potential investors, lenders and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed." (FASCON 8, OB5).

- For financial information to be useful, "it must be relevant and faithfully represent what it purports to represent. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). In that context, the framework states: "[r]elevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources." (FASCON 8, QC6).

- Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. (FASCON 8, QC12).

- Financial statements (including footnote disclosures) are a central feature of financial reporting and are a principal means of communicating accounting information to parties external to an entity, such as investors.[37]

- The concept that "the usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable."

382.    In addition, SEC Regulation S-K required CCCR to disclose in the *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") section of its filing with the SEC "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303.

---

[37] FASCON No. 1, *Objectives of Financial Reporting by Business Enterprises*, ¶ 6; FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 5.

383.    Regulation S-K also required Defendants to disclose in the Company's MD&A section, a discussion of "significant economic changes," "unusual or infrequent events or transactions" and "known trends or uncertainties," such as major changes in the credit quality of guaranteed bonds, Puerto Rican defaults or a decline in the Puerto Rican economy that would materially affect the Company's financial statements:

> i.    [A]ny unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> ii.   [A]ny known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations . . . the change in the relationship shall be disclosed. 17 C.F.R. § 229.303(a)(3)(i)-(ii).

384.    In violation of these principles, during the Class Period, Defendants reassured investors that the Company that payment on the Puerto Rican bonds was "probable" and, thus, the minimal reserves recorded were "adequate."

385.    In addition to the above principles concerning financial statement disclosure, GAAP also provides specific guidance on required disclosures concerning loss contingencies and exposure to risk, including credit risk. Specifically, ASC 450, beyond requiring charges to income for probable losses identified by a company, requires separate disclosure in the financial statements if/when there is a reasonable possibility that a loss, or additional loss, may have been incurred, in order for the financial statements to not be misleading.

386.    ASC 450 states, specifically, the following:

Disclosure of the contingency shall be made if there is at least a reasonable possibility that a loss or an additional loss may have been incurred and either of the following conditions exists:

a. An accrual is not made for a loss contingency because any of the conditions [pertaining to the measures of "reasonable" and/or "estimable"] are not met.

b. An exposure to loss exists in excess of the amount accrued pursuant to the provisions [pertaining to the measures of "reasonable" and/or "estimable"].[38]

387.    Along those lines, GAAP also provides that, "[t]he disclosure in the preceding paragraph shall include both of the following: a. [t]he nature of the contingency [and] b. [a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made,[39] while also stating that [d]isclosure is preferable to accrual when a reasonable estimate of loss cannot be made.[40]

388.    GAAP also references SEC Regulation S-X Rule 9-03, which outlines the following obligations for public filers:

Loans. Disclose separately (1) total loans, (2) the related allowance for losses and (3) unearned income.

(a)    Disclose on the balance sheet or in a note the amount of total loans in each of the following categories:
(1)    Commercial, financial and agricultural.
(2)    Real estate—construction.
(3)    Real estate—mortgage.
(4)    Installment loans to individuals.
(5)    Lease financing.
(6)    Foreign.
(7)    Other (State separately any other loan category regardless of relative size if necessary to reflect any unusual risk concentration).

---

[38] ASC 450-20-50-3.
[39] ASC 450-20-50-3.
[40] ASC 450-20-50-4.

(b) A series of categories other than those specified in (a) above may be used to present details of loans if considered a more appropriate presentation.

(c) The amount of foreign loans must be presented if the disclosures provided by [SEC] § 210.9–05 are required.

(d) For each period for which an income statement is required, furnish in a note a statement of changes in the allowance for loan losses showing the balances at beginning and end of the period provision charged to income, recoveries of amounts charged off and losses charged to the allowance.

389.    Defendants also failed to disclose the Company's true risk and loss exposure to a Puerto Rican default in either Ambac's MD&A section or in the footnotes to the False and Misleading Financial Statements, reflecting known trends related to the Company's guaranteed Puerto Rican bonds, as well as the concentration of credit risk and loss contingencies. Defendants' failure to make such disclosures violated the most basic principles of financial reporting under GAAP and SEC Regulations.

## IX.    AMBAC'S INTERNAL CONTROL VIOLATIONS

390.    Throughout the Class Period, Defendants falsely represented that Ambac maintained internal controls over financial reporting to ensure the accuracy and reliability of the Company's financial reporting.

391.    In reality, Defendants concealed a chronic and systematic breakdown of Ambac's internal controls throughout the Class Period, thereby allowing the Company to, among other things, conceal the Ambac's true loss exposure relating to the bonds it insures, including its Puerto Rican bonds.  The Company's high risk guarantee portfolio resulted in Ambac being liable for potentially $10 billion of the Commonwealth's debt it insures.

392.    Defendants admit that Ambac lacked the necessary internal controls during the Class Period.  Specifically, on May 11, 2016, Defendants filed an amendment to the Company's

Annual Report on Form 10-K for the year-ended December 31, 2015, reporting that the Company "identified a material weakness in its internal control over financial reporting." Accordingly, management concluded that "the Company has not maintained effective internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)." The material weaknesses identified include weaknesses related to the Company's "estimate of loss reserves and subrogation recoverables, investment income and assessing other than temporary impairment for purchased residential mortgage backed securities." On the news, Ambac's stock dropped from $16.03 to $15.38 per share.

393.   As a result of Defendants' failure to maintain effective internal controls over financial reporting, they were able to conceal the Company's true loss exposure to the Puerto Rican bonds it insured. Ambac's inadequate internal controls caused the Company to issue the False and Misleading Financial Statements in violation of GAAP.

394.   As the SEC has explained, internal controls are fundamental and critical for summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2).[5] Indeed, a lack of fundamental internal controls, as here, constitutes a "material weakness" that should be immediately disclosed to investors under GAAP.

395.   Generally accepted auditing standards ("GAAS") set forth the role of a Company's management in an audit of an entity's financial statements. Specifically:

> [M]anagement and, when appropriate, those charged with governance, have responsibility

---

[5] Specifically, the SEC requires a public company to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2).

a. for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework;

b. for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error…[6]

396.    The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the company's internal controls over financial reporting in the False and Misleading Financial Statements.

397.    Additionally, Section 302 of the Sarbanes-Oxley Act of 2002 required Defendants to maintain, assess and report on the effectiveness of the Company's internal control over financial reporting.  The language provides the following, in relevant part:

(a)  REGULATIONS  REQUIRED.—The  Commission  shall,  by  rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—

(1) the signing officer has reviewed the report;

(2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4) the signing officers—

(A)      are responsible for establishing and maintaining internal controls;

---

[6] AU-C Preface – *Principles Underlying an Audit Conducted in Accordance with Generally Accepted Auditing Standards*.

(B)      have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

(C)      have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

(D)      have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date...

(Emphasis added).

398.    Auditing standards established and adopted by the Public Company Accounting Oversight Board (the "PCAOB"), specifically Auditing Standard ("AS") No. 5, *An Audit of Internal Control over Financial Reporting that is Integrated with an Audit of Financial Statements and Related Independence Rules and Conforming Amendments* ("AS 5"), defines internal controls over financial reporting as follows:

Internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that –

(1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.[7]

----

[7] AS 5, Appendix A, A-5.

399.    Professional accounting standards recognize that a company's control environment sets the tone of an organization, and is the foundation for all other components of internal control, providing discipline and structure. The Committee of Sponsoring Organizations of the Treadway Commission framework also discusses a Company's control environment as being one of five interrelated components of internal control, stating:

> Control environment. Senior management must set an appropriate "***tone at the top***" that positively influences the control consciousness of entity personnel. The control environment is the foundation for all other components of internal control and provides discipline and structure.

400.    The Company's most senior executive management, comprised in substantial part of the Individual Defendants herein, embraced a "tone at the top" of ignoring and/or concealing Ambac's risk and loss exposure on its Puerto Rican bonds. Thus, while the Puerto Rican economy was struggling and climbing in debt, Defendants concealed material information concerning the Company's loss exposure and risk of default on the $10 billion of Puerto Rican bonds Ambac insured.

401.    Moreover, Defendants' failure to identify such risk exposures (e.g., material weaknesses) within the Company rendered Defendants' Sarbanes Oxley reports in the False and Misleading Statements section materially false and misleading in turn, and contributed to the Company's issuance of materially false and misleading financial statements in violation of GAAS.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

402.    As alleged herein, each of the Individual Defendants acted with scienter in that the they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or

acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

403.   The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Ambac and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings.  As a result, each could falsify the information that reached the public about the Company's business and performance.

404.   Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's risk and loss exposure to Puerto Rican bonds.  Such actions allowed Ambac to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Ambac as the Individual Defendants were among Ambac's most senior management and were acting within the scope of their employment.

### A.   The Individual Defendants Knowingly and Recklessly Misrepresented Ambac's Loss Exposure and Default Risk Related to its Puerto Rican Bonds

405.   The Individual Defendants knew that Ambac had significant risk and loss exposure to the Puerto Rican bonds the Company insured and that the bonds were suffering from deteriorating credit quality and imminently going to default, as evidenced by:  (1) the Individual Defendants' own admissions prior to and throughout the Class Period that Ambac actively monitored the Company's exposure to Puerto Rico; (2) Defendants' discussions with the Puerto Rican government; (3) the Company's admitted internal control violations with respect to financial reporting and calculating loss reserves; (4) the Individual Defendants' admitted close monitoring of credit risk and loss exposure on the ALCO and other credit committees; (5) numerous market

factors indicating an imminent default on Puerto Rican bonds; (6) Ambac's buyback of Puerto Rican bonds to reduce the Company's substantial risk; (8) the Individual Defendants' significant industry and financial experience; and (9) the terminations of Defendant Adams and other key management.

> **1.     The Individual Defendants Admittedly, Actively Monitored the Company's Exposure to Puerto Rico Throughout the Class Period**

406.     The Individual Defendants admitted as early as November 2013, the beginning of the Class Period, that they were actively monitoring the Company's exposure to Puerto Rico by, among other ways, monitoring the Puerto Rican economy and governmental actions.  For example, during a November 14, 2013 Earnings Call, defendant Trick stated:

> In recent months, we have spent ***a considerable amount of time focusing on*** our exposure to Detroit and ***Puerto Rico***. We are ***actively monitoring the situation in Puerto Rico***, and are continuously analyzing our position, along with developments in the market and within the Commonwealth.

(Emphasis added).

407.     As demonstrated in the chart below, Defendants made similar representations throughout the Class Period, while at the same time, numerous economic indicators pointed to an imminent default:

| Date and Source | Statement | Metric (According to Moody's) |
|---|---|---|
| November 13, 2013 Earnings Call | Defendant Trick stated: "We believe the Commonwealth has taken serious steps to reform its fiscal situation towards a more sustainable path and has substantially increased its disclosures and transparency." | • Credit downgrades on 12-13-12 to Baa3, Ba1, and A2.<br><br>• Cost of CDS to insure against default of Puerto Rican bonds was approximately $719,000, showing a 78% likelihood of default. |

| | | |
|---|---|---|
| | | • Puerto Rico bond yield of approximately 10%, or about 2.5 to 6.7 times the yields of U.S. Treasury bonds. |
| December 18, 2013 Earnings Call | Defendant Adams stated: "We are actively reviewing our Puerto Rico exposure. We are concerned about what is going on in the Commonwealth. We are happy with some of the very difficult measures that they have taken in terms of pension reform and in terms of additional revenue raising. We are also comfortable with their liquidity position in the short term." | • Credit spread on PR Gen Oblig. Bonds with 2014 maturity and 5.75 coupon over 6%, or 600 basis points, indicative of junk status. |
| March 3, 2014 | 2013 Annual Report and Form 10-K stated: "we are assessing developments in Puerto Rico as they occur." | • Credit downgrade2 on 2-2-2014 to Ba2, Ba3, and Baa1. |
| March 4, 2014 Earnings Call | Defendant Trick stated "[w]e remain focused on our exposures to Detroit and Puerto Rico…. Regarding Puerto Rico, we have approximately $2.5 billion of net par exposure, consisting of approximately 90% revenue backed debt and 10% GO exposure, and we continue to actively monitor the situation there." | • Credit downgrades on 2-2-2014 to Ba2, Ba3, and Baa1.  • PR Sales Tax Financing Bonds trading at yields of 8%, or 2-5.3 times U.S. Treasuries. |
| March 27, 2014 Investor Day Call | Defendant Matanle stated "we are actively monitoring the situation in the Commonwealth of Puerto Rico." | • Credit downgrades on 2-2-2014 to Ba2, Ba3, and Baa1.  • PR Sales Tax Financing Bonds trading at yields of 8%, or 2-5.3 times U.S. Treasuries. |
| August 14, 2014 Earnings Call | Defendant Adams stated "we are proactively involved in managing our exposures [to Puerto Rico]. We have put in place a team of external advisor to complement our internal resources. We believe we are adequately reserved for the range of outcomes we have currently identified." | • Credit downgrade of PRHTA on 6-27-2014 to Ba3.  • Credit downgrades on 7-1-2014 to Caa1, B3, B2, Ba3.  • Credit spread on PR Gen. Oblig. Bonds averaged 627 basis points. |

| November 11, 2014 Earnings Call | Defendant Adams stated: "*we are engaged in constructive discussions with the Commonwealth*, particularly as it relates to the Puerto Rico Highway and Transportation Authority, or HTA. . . . *We believe our reserves are reasonably sized given the current situation, the overall size of our exposure to Puerto Rico, the interrelated nature of the credits, and the sluggishness of the economy. We incorporate these considerations as well as a variety of positive outcomes in developing our reserves*." | • Credit spread on PR Gen. Oblig. Bonds averaged 695 basis points. <br><br> • Credit spreads on 10-year and 30-year maturities stood at 700 basis and 475 basis points, respectively. |
|---|---|---|
| March 2, 2015 Earnings call | Defendant Tavakoli stated: "we've made no material changes to our reserves related to our exposure to Puerto Rico, though *we evaluate the situation dynamically*" <br><br> Defendant Tavakoli stated: "In the last few weeks, we've taken on a more active and prominent role in the discussions and legislation related to a framework for restructuring the HTA debt, including the restructuring of the Puerto Rico government development bank's loans thereto as a part of a new proposed funding for the GDB." | • Credit downgrades on 2-19-2015 to Caa2, Caa1, and B3. <br><br> • Cost of CDS to insure against default of Puerto Rican bonds was approximately $1.3 million, showing a 95% likelihood of default. |
| May 12, 2015 Earnings call | Defendant Tavakoli stated "[a]lthough we are confident that our Puerto Rico positions are relatively solid, want to be prepared for and involved in any outcome. Towards that end, *we've assembled a world-class team of professionals in Washington, New York, and Puerto Rico to actively monitor the situation in Puerto Rico, and as a result we have a strong voice in the various discussions taking place toward a possible resolution of the common loss difficulties. Our access to decision makers and involvement in possible outcomes is second to none*. . . . *we want to be sure that we're aware of all the possible actions that could affect our exposures on the revenue streams attached to our bonds*." | • PR Sales Tax Financing bonds trading at yields of 12%, or 3 to 8 times more than U.S. Treasuries. |
| August 10, 2015 Press Release | Defendant Tavakoli stated: "With respect to our insured exposure to Puerto Rico, *we increased our reserves to reflect our updated views on probability weighted potential outcomes*. At the | • Credit downgrade on 5-21-2015 to Ca and Caa2. |

| | | |
|---|---|---|
| | same time, we have intensified our efforts to manage outcomes related to our Puerto Rico risk." | • Cost of CDS to insure against default of Puerto Rican bonds was approximately $1.75 million, showing a nearly guaranteed default.<br><br>• Credit spread on PR Gen. Oblig. bonds yields of 13%, or 3.3 to 8.7 times U.S. Treasuries. |
| August 11, 2015 Earnings Call | Defendant Tavakoli stated: "We're actively managing our Puerto Rico exposure…and positioning the Company more efficiently and strategically for future success." | • Credit downgrades on 5-21-2015 to Ca and Caa2.<br><br>• Cost of CDS to insure against default of Puerto Rican bonds was approximately $1.75 million, showing a nearly guaranteed default.<br><br>• Credit spread on PR Gen. Oblig. bonds yields of 13%, or 3.3 to 8.7 times U.S. Treasuries. |

408.    Accordingly, because Defendants admitted that prior to and throughout the Class Period that they were actively monitoring Ambac's risk and loss exposure, they admittedly knew, or must have known that the statements described above (Section V, *supra*) were false at the time made.

### 2.    The Individual Defendants Were Aware of Puerto Rico's Credit and Loss Exposure Through Their Direct Discussions With the Puerto Rican Government

409.    The Individual Defendants' knowledge is further evident by the fact they were holding discussions directly with the Puerto Rican government itself regarding Puerto Rico's

ability to meet bond payments at least as early as November 2014. Indeed, during a November 11, 2014 conference call, Defendant Adams admitted that Ambac was already "engaged in constructive discussions with the Commonwealth, particularly as it relates to the Puerto Rico Highway and Transportation Authority, or HTA." Moreover, according to Ambac's 2014 Annual Report, Defendants admitted that the Company had "been actively involved in the development surrounding the restructuring of the revenues and obligations of the Puerto Rico Highways and Transportation Authority."

410.    By March of 2015, Ambac had "taken on a more active and prominent role in the discussions and legislation related to a framework for restructuring the HTA debt, including the restructuring of the Puerto Rico government development bank's loans thereto as a part of a new proposed funding for the GDB." According to Defendant Tavakoli, Ambac's "proactive approach" was "constructive and productive for all involved, . . . [and Ambac is] hopeful that through our involvement [we] will not only mitigate a potential negative outcome as it relates to HTA, but develop a good working relationship with the GDB and the Commonwealth going forward."

411.    Accordingly, Ambac's direct involvement with the Puerto Rican government indicates that not only did the Individual Defendants have undisclosed inside knowledge of the dire situation in Puerto Rico, but they attempted to act by pleading with the government to effectuate change.

3.    **Defendants Admitted That the Company's Internal Controls with Respect to Financial Reporting and Calculating Loss Reserves Were Inadequate**

412.    The Individual Defendants eventually admitted that Ambac lacked the necessary internal controls for accurate financial reporting for at least 2015 in the Company's 2015 Amended

Form 10-K: reporting that Ambac had "identified a material weakness in its internal control over financial reporting" and that:

> [T] he Company has not maintained effective internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

413.    The material weaknesses identified include weaknesses related to the Company's "estimate of loss reserves and subrogation recoverables, investment income and assessing other than temporary impairment for purchased residential mortgage backed securities."

414.    Defendants' admissions in the 2015 Amended Form 10-K are corroborated by confidential sources who explained that Ambac lacked the necessary systems in place to adequately estimate loss reserves. For example, according to CW2, during the first half of 2014, Defendants were concerned that Ambac did not have the necessary tools to estimate losses because historically, Ambac did not have a good model or the tools to do it because it had not happened before.   Moreover, according to CW3, the Company's Puerto Rican bond portfolio was "convoluted" and it was difficult to gather data because, among other reasons, there were so many different bonds and policies involved.

415.    Accordingly, as Defendants eventually admitted, Ambac lacked the necessary internal controls to appropriate assess and estimate Ambac's risk and loss exposure to Puerto Rico. Yet, throughout the Class Period, Defendant continually assured investors that Ambac's internal controls were "effective" and the Company maintained "adequate reserves" and actively surveilled and managed credit risk, with no reasonable basis for making such statements.

    **4.**     **The Individual Defendants Were Aware That the Credit Quality of Ambac's Puerto Rican Bonds Were Deteriorating Because They Closely Monitored Credit Risk Through Membership on Credit Committees**

416.    Defendants stated repeatedly, including in every quarterly and annual report that the Company filed during the Class Period, that the Individual Defendants actively surveyed and managed credit risk.

417.    To this end, Ambac maintained at least five separate committees – each of which the Individual Defendants were members or were headed by senior managers reporting to the Individual Defendants. The purpose of the committees was to monitor credit risk and closs exposure on a frequent and ongoing basis.

418.    *First*, the Special Situations Group was created in August 2014 to "mitigate losses on over $2.2 bn of financial guarantees on municipal bonds of Puerto Rico" and was comprised of a "world-class team of professionals" from Washington, New York and Puerto Rico. Accordingly, Defendants identified the significant risk exposure in Ambac's Puerto Rican bonds, created a group specifically designed to mitigate against any future losses as a result of the dire situation, and enlisted the aid of the most qualified individuals to match the severity of the situation. The formation of this group and foresight in creating the group strongly supports an inference that Defendants were aware of Ambac's exposure to Puerto Rican bonds well in advance of any default.

419.    *Second*, ALCO, which included defendants Trick, Adams/Tavakoli and Matanle, as well as senior managers from investment management, capital markets and risk management, was established to consider, among other things, the commutation of distressed financial guarantee exposures. ALCO met monthly and also on an ad hoc basis.

420.    According to CW1 and CW2, defendants Adams, Trick and Matanle were members of ALCO and attended ALCO meetings. CW2 confirmed that there were concerns about the

Puerto Rican bond portfolio raised during an ALCO committee meeting this witness attended with defendants Adams, Trick and Matanle. According to CW2, at these ALCO meetings, defendant Matanle would have recommended the Puerto Rico bond portfolio reserves that should be taken. CW2 stated that recommendation regarding reserves for Puerto Rico were directly under the supervision of Matanle.   Moreover, ALCO, including the Individual Defendants, would have approved the reserves taken on Puerto Rico, bond buybacks and other commutations.

421.   *Third*, the CRM committee was responsible for all material matters that affected credit exposure within the insured portfolio, including material amendments, waivers and consents, remediation plans, credit review scheduling, adverse credit classification and below investment grade rating designations, adversely classified credit reviews, sector reviews, and overall portfolio review. When a credit, like the Company's Puerto Rico exposure, is either in default or develops problems that eventually could lead to a default, CRM is required to hold frequently scheduled meetings with PRM to discuss, among other solutions, corrective actions and a reassessment of the credit's rating and credit classification. To this end, CRM generally meets with the relevant parties to the transaction – here, the Puerto Rican issuers.  The senior managers within CRM *report directly to the CEO of Ambac and regularly update the Audit Committee and the Board*.  In addition, a summary of developments regarding the adversely classified credits and credit trends is also provided to Ambac's Board on a quarterly basis.  Ambac's Puerto Rican exposure was added as an adversely classified credit during the third quarter of 2013 and as such, the Board would have received quarterly reports on Ambac's Puerto Rico exposure throughout the Class Period.

422.   *Fourth*, the PRM committee, of which defendant Matanle was the Senior Managing Director and head, performed "periodic surveillance reviews of exposures…based on the risk

profile of the guaranteed obligations or as necessitated by specific credit events or other macro-economic variables." With respect to those credits, like the Company's Puerto Rico exposure, which were either in default or had developed problems that eventually could lead to a default or claim payment, such credits were "tracked closely" by PRM and "discussed at regularly scheduled meetings." Thus, in accordance with their own internal practices and policies, PRM would have met to discuss the Company's distressed Puerto Rico exposure repeatedly throughout the Class Period. The senior managers within PRM *report directly to the CEO of Ambac and regularly update the Audit Committee and the Board*.

423. *Finally*, the RRG committee focuses on "analysis, implementation and execution of commutation and related claims reduction or defeasance strategies." Although it primarily focuses on the Segregated account, RRG evaluates the estimated timing and severity of projected policy claims as well as the potential impact of other loss mitigation strategies in order to target and prioritize policies, or portions thereof, for commutation, refinancing, bond purchase (of securities guaranteed by Ambac Assurance) or other claims reduction or defeasance strategies. Accordingly, RRG would analyze loss mitigation strategies related to the insurance of Ambac's Puerto Rican bonds.

424. As a result of the Individual Defendants' membership on the above committees or information they received from their direct reports on the committees, Defendants were aware of the Company's risk and loss exposure to Puerto Rico prior to and throughout the Class Period

### 5. The Individual Defendants Admitted that the Company Was Aware of Market Factors Indicating an Imminent Likelihood of Defaults on Ambac's Puerto Rican Bonds

425. Defendants also admitted that they monitored market factors reflecting the deteriorating credit quality of Ambac's Puerto Rican exposure. Indeed, as Defendant Trick

admitted at the beginning of the Class Period during a November 14, 2013 Earnings Call, Ambac

was "continuously analyzing our position, along with developments in the market."

426.    Defendant Matanle similarly stated on a March 27, 2014 Investor Day Call that

Ambac looks to "market data" in evaluating the risk of its portfolio and setting adequate reserves.

On the same call, Matanle admitted that the Company monitored credit ratings and market

information regarding Ambac's municipal bond portfolio, stating, in relevant part:

> We have about 4,000 of these [municipal bond] credits. We survey
> them on a so-called exception basis because they have a propensity
> to perform and they tend to pay off. ***We flag the portfolio daily for
> news and for rating changes***. That serves up the credits that warrant
> further attention which we then look at and decide whether it is an
> abnormal type of attention that will warrant further concern or if it
> can go back into the portfolio to await further news development.

(Emphasis added).

427.    Later in the Class Period, on a November 10, 2015 earnings call with analysts,

Defendant Trick similarly admitted that Ambac was "in the market all the time, looking at

opportunistically for ways to commute our obligations."   This market data – including credit

ratings, CDS insurance costs, and credit spreads and yields – forecasted the widespread defaults

that would ultimately materialize as a consequence of the Company's mounting risks in its Puerto

Rico municipal bond guarantees, including:

- Deteriorating Credit Quality - Every single Puerto Rican issuer that Ambac insured deteriorated significantly over the course of the Class Period, with the overwhelming majority of issuers rated Ca or C by mid-2015 according to Moody's.

- CDS Cost Increase – The cost of a CDS to insure against the default of Puerto Rican bonds increased from 718.77 basis points, or a cost of $719,000 to insure $10 million of Puerto Rican bonds at the beginning of the Class Period, to 1,759 basis points by June 2015, implying a cost of $1.76 million to insure $10 million of the same bonds. This spread and implied cost virtually bespoke the certainty that Puerto Rico would default on its municipal bonds, as a purchaser of the Puerto Rican CDS paid, with a present valuing of the $10 million, nearly the entirety of the principal amount insured.

- 155 -

- Puerto Rican Bond Yields – Puerto Rican bond yields as of November 2013 were 10%, or 2.5 to 6.7 times that of U.S. Treasury bonds and increased to 42%, or 10.6 to 28 times that of the U.S. Treasury bonds by December 2015. Because a yield reflects a specific bond's risk level, the rising yields on Puerto Rico municipal bonds were harbingers of default.

- Credit Spread – By December 31, 2013, the credit spreads of the insured Puerto Rico General Obligation Bonds were already showing credit spreads of 600 basis points, indicating the substantial likelihood of default. This spread made Puerto Rico the most likely sovereign credit to default in the world by December 2013, according to S&P.

428.    As demonstrated above, Defendants conceded that they were actively monitoring market factors such as those described above. Thus, the Individual Defendants, by their own admission, were aware throughout the Class Period that an imminent default of Puerto Rico's bonds was likely.

> **6.    Defendants Were Aware That the Credit Quality of Ambac's Puerto Rican Bonds Were Deteriorating as a Result of Their Unique Industry Knowledge And Experience**

429.    The Individual Defendants are well-educated and experienced in the fields of monoline insurance, credit risk monitoring, and distressed debt, and have extensive backgrounds relating to these field. Thus, they had the ability to, and did, understand and analyze the rapidly deteriorating credit quality of the Company's Puerto Rico exposure.

430.    Defendant Tavakoli has a wealth of experience with distressed debt, as he is currently the CEO, Chief Investment Officer, Principal, and Chairman of EagleRock Capital Management, LLC, a hedge fund specializing in distressed debt and high yield securities of companies which are undergoing bankruptcy, reorganization, or corporate restructuring. Prior to founding EagleRock in 2002, Defendant Tavakoli was the Managing Director and Senior Portfolio Manager at Highbridge Capital Management LLC and also managed high yield, special situation, and event driven investment portfolios at Odyssey Partners and Cowen and Co. Thus, according

to the Company's website, Defendant Tavakoli has "substantial experience" in asset management, including municipal finance.

431.    Defendant Stein is similarly well-versed when it comes to distressed debt like the Company's Puerto Rican exposure.  Indeed, according to Ambac's website, Defendant Stein has "over 22 years of experience in the high yield, distressed debt and special situations equity asset classes."  To this end, Defendant Stein is the Founder and Managing Partner of Stein Advisors LLC, a financial advisory firm that provides consulting services, primarily through corporate board representation, to institutional investors focused on distressed debt and special situations equity investments.  Previously, Defendant Stein was Co-Founder and Principal of Durham Asset Management LLC, a global event-driven distressed debt and special situations equity asset management firm.

432.    Defendant Adams, prior to her resignation, served in various high-ranking positions at Ambac since 2000 and was responsible for Ambac's Structured Finance and International businesses. Prior to joining Ambac, Defendant Adams served at JP Morgan first in the Capital Markets division and in the Structured Products division from 1993 to 1999, at Mitsubishi Bank in Leveraged and Acquisition Finance from 1990 to 1993, and at Merrill Lynch in the Investment Banking division from 1990 to 1993.

433.    Defendant Trick has been employed in various finance positions at Ambac and Ambac Assurance since October 2005, where has been primarily responsible for Ambac's capital markets activities, including conduits sponsored by Ambac, corporate finance, bank relations, liquidity management, and operations. Prior to joining Ambac, Defendant Trick held a variety of finance positions including as a Senior Credit Analyst at the Global Insurance and Financial Institutions Risk Management Divisions.

434.    Defendant Matanle served as Senior Managing Director and Head of Portfolio and Credit Risk Management of Ambac from February 2012 until her resignation on September 30, 2016. As the Senior Managing Director and Head of Portfolio and Credit Risk Management, Matanle was responsible for monitoring distressed credits, like the Company's Puerto Rico exposure, and directly reporting updates regarding such distressed credits to the CEO of Ambac, the Audit Committee, and the Board.  Her areas of responsibility comprised the credit oversight and remediation of structured and public finance exposures as well as management of the firm's senior credit function, loss reserving, model governance, quantitative strategies and risk operational functions. From January 2003 to January 2012 she was also Managing Director with risk management responsibilities across the insured portfolio.

435.    Thus, the Individual Defendants knew and understood that the credit quality of the Company's Puerto Rico exposure was rapidly deteriorating and the Company had significant exposure risk and loss exposure from the Puerto Rican bonds the Company insured, requiring Ambac to recognize an appropriate loss reserve.   In fact, the Defendants' education and employment backgrounds are so unique to the highly specialized fields of monoline insurance, credit risk monitoring, and distressed debt that it would defy their proven professional capabilities absent fraud.

**7.      Defendants Were Aware of Ambac's Credit Risk and Loss Exposure As Evidenced By Ambac's Belated Buyback of Puerto Rican Bonds**

436.    The Individual Defendants recognized the severity of Ambac's loss exposure and attempted to mitigate against any losses by conspicuously buying back the bonds.  Of Ambac's five buybacks thus far, only one occurred prior to the Puerto Rican governor's June 28, 2015 announcement: a 3% buyback of the issue of PRIFA on March 10, 2014.

437.    The buyback early in the Class Period demonstrates Defendants understood the Company's significant risk and loss exposure from Puerto Rico.  Rather than publicly admit there was exposure in Ambac's portfolio, especially as significant as Puerto Rico, and jeopardize Ambac's pursuit to regain its AAA credit rating, Defendants sought to conspicuously mitigate against losses on the Company's Puerto Rican insured bonds by engaging in various buybacks.

438.    As discussed above, the Individual Defendants in their capacities as officers and as members of ALCO would have, admittedly, approved these buybacks.

439.    Realizing the March 2014 buyback was not sufficient to conceal the Company's true risk and loss exposure in light of Puerto Rico's worsening economic position, the Individual Defendants executed the following four additional buybacks (which would have had to have been approved by ALCO): (i) $4,998,000 on October 20, 2015; (ii) $3,984,800 on December 4, 2015; (iii) $4,166,530 on January 21, 2016; and (iv) $62,050 on May 2, 2016.  The remaining four buybacks, which occurred between October 2015 through May 2016 and, together with the March 10, 2014 buyback, were entirely insufficient to cover Ambac's losses on its bonds, covering only $14.78 million of Ambac's $2.2 billion par value.  Regardless, the Individual Defendants' decision to approve the buybacks indicates they knew Ambac had significant loss exposure to Puerto Rico and half-heartedly attempted to mitigate against such exposure to appease investors and conceal the Company's true financial position.

### 8.    The Curiously Timed Resignation of Defendant Adams and Matanle Support an Inference of Scienter

440.    The terminations or resignations of defendant Adams in December 2014, Joan Allman, the Managing Director of Public Finance Credit Oversight Team in July 2016, and defendant Matanle in August 2016, further give rise to a strong inference of scienter.

441.   On December 23, 2014, the Company announced that Defendant Adams had "resigned" from her positions as President, CEO, and member of the Board of Ambac "by mutual agreement with the Board of Directors effective as of the close of business on December 31, 2014." No reason was provided for her "resignation," and her sudden departure is highly inconsistent with her historical employment history in high-ranking positions.

442.   After PROMESA was passed and the Governor of Puerto Rico announced that Puerto Rico would stop making payments on its bonds, Joan Allman was abruptly terminated, or abruptly resigned in July 2016.  Allman's departure was similarly suspicious as she retired after spending over eleven years with Ambac.

443.   Later, shortly after the Commonwealth defaulted for the fourth time, on August 9, 2016, the Company announced that Matanle would retire by mutual agreement with Ambac, effective September 30, 2016.  Matanle similarly suddenly determined to retire "in mutual agreement with Ambac" after fifteen years of employment with Ambac.  No reason was provided for her "retirement," Ambac forced her to retire – less than one month after the Commonwealth defaulted on its constitutionally-backed general obligation bonds.

444.   The sudden, suspicious departures of the Company's key executive, managing director and the most senior credit risk manager at Ambac, provides strong additional support that they knew of the Company's pervasive fraud during their tenure with the Company.

### B.   Defendants Had Motive to Make Material Misrepresentations and Conceal Material Information from Investors

445.   Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to: (1) conceal the Company's true credit risk and loss exposure related to Puerto Rico so that Ambac could regain

its AAA credit rating and start writing new business; and (2) preserve the Individual Defendants'
excessive compensation.

> ### 1. Defendants Had Motive to Commit the Alleged Fraud In Order to Conceal Ambac's Risk and Loss Exposure so that Ambac Could Regain its AAA Credit Rating and Write New Business Again

446.   As Ambac admits, "[a]n inability to write new business has and will continue to
negatively impact Ambac's future operations and financial results."  Ambac lost its credit rating
in November 2010 after being forced into Chapter 11 bankruptcy as a result of substantial losses
incurred in in connection with underwriting highly-risky mortgaged backed securities during the
2007 subprime crisis.

447.   After November 2010, Ambac has been unable to write any new guarantees and
has been simply running off its current portfolio. Ambac's ability to write new business is critical
to the Company's long-term viability and ability to compete. Accordingly, the Individual
Defendants were motivated to conceal Ambac's true risk and loss exposure in order to regain the
Company's coveted AAA credit rating. Unless and until Ambac regains a credit rating and "de-
risks" the Company's portfolios, it will not be able to write new financial guarantee business.

448.   Moreover, in connection with the Company's Chapter 11 bankruptcy, it was
required to establish a Segregated Account, which houses Ambac's risky securities that are in run-
off.  The OCI has control over, and oversees the Segregated Account. While Ambac has every
incentive to redeem or repurchase these risky securities in the Segregated Account before they
reach full maturity, claims on policies allocated to the Segregated Account are not permitted to be
paid until approved by the OCI.  One factor the OCI examines before approving repayment is ***the
credit quality*** of the Company's portfolio.

449.    Accordingly, throughout the Class Period, Ambac had every incentive to paint the Company's Puerto Rico exposure through rose-colored glasses, or at the very least downplay its loss exposure, because the Company's ability to redeem the most risky securities in its portfolio and regain its credit rating was dependent on Ambac's continued financial and credit strength.

450.    However, as the economic situation in Puerto Rico continued to deteriorate, the OCI began disapproving such purchases. For instance, the Company announced on April 28, 2015, that the OCI had disapproved its request to pay accrued unpaid interest on surplus notes on their next scheduled interest payment date of June 8, 2015.  Later, the OCI revealed it was particularly concerned about Ambac's Puerto Rico exposure, with the Special Deputy Commissioner of the Segregated Account stating on a July 12, 2016 listening session that the OCI's loss projections "were higher than those of the Company" and further stating as follows:

> ***Puerto Rico is one of the Company's largest General Account exposures***. Given the undeniable uncertainty about the timing, composition or viability of a comprehensive re-structuring in the Commonwealth, and the long-term impact on Ambac, the Rehabilitator is taking a deliberate and conservative approach to these exposures. Ambac has made policy payments aggregating approximately $43 million (net of a small amount of reinsurance) on its Puerto Rico exposures in July to-date and is anticipating an additional policy payment shortly on Puerto Rico GO-guaranteed Public Buildings Authority bonds (although no claim had been received as of yesterday). And, ***without positive developments for these exposures, Ambac may be required to pay materially greater amounts over the next several years***.

(Emphasis added.)

451.    Accordingly, throughout the Class Period, despite Ambac's risk exposure in insuring Puerto Rican bonds, Defendants were careful not to divulge the true nature of its exposure risk so that it could regain its credit rating and eventually its status as an underwriter.    These

dreams were dashed when the true condition of Ambac's Puerto Rico exposure was revealed to investors.

> **2.      Defendants Had Motive to Commit the Alleged Fraud to Preserve Their Excessive Compensation**

452.    The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to maximize their individual profits through excessive performance-based compensation and bonuses.  Throughout the Class Period, the Individual Defendants were paid massive salaries and bonuses, received excessive perks and were granted considerable stock options—all while ensuring the public did not understand or appreciate the level of mismanagement and deception related to Ambac's Puerto Rico exposure.

453.    In particular, the Defendants reaped millions of dollars from incentive-based compensation tied to the Company's performance, particularly to the Company's risk management.  According to the Company's 2016 Proxy Statement filed with the SEC on Schedule 14A on April 20, 2016 ("2016 Proxy Statement"), Ambac maintains a "Pay for Performance Philosophy," pursuant to which the Defendants are eligible to receive short-term performance-based compensation in the form of cash bonuses. Specifically, according to the 2016 Proxy Statement, the Defendants' "annual cash bonus opportunity is based on Company and individual performance…reflecting the Company's financial results."

454.    These performance bonuses were purportedly awarded in amounts based upon the achievement of certain corporate and individual goals and objectives approved by the Compensation Committee.  For instance, in justifying the Individual Defendants' 2015 compensation, the 2016 Proxy Statement specifically noted the Company's handling of its "most troubled exposures," including Puerto Rico.  In addition, the Individual Defendants' 2015

corporate highlights cited to justify the excessive compensation described herein were, in relevant

part, as follows:

- Throughout the year we capitalized on the value creation opportunities in our operations through the active and opportunistic management of our assets and liabilities.

- For calendar year 2015, we generated net income of $493.4 million, or $10.72 per diluted share, a 4% per share increase compared to 2014.

- For the calendar year 2015, we generated operating earnings of $1.165 billion, or $25.32 per diluted share, a 74% per share increase compared to 2014.

- Total Ambac Financial Group, Inc. stockholders' equity at December 31, 2015 was $37.41 per share up 20% compared to December 31, 2014.

- In 2015, we reduced the net par outstanding of our insured portfolio by 25%, from $144.7 billion to $108.3 billion; importantly, we reduced our adversely classified credits by 23% from $26.5 billion to $20.4 billion. A significant amount of this reduction was the result of active management and effective negotiation by Ambac. During the year, we directly commuted almost $500 million of our most troubled exposures. ***In addition we reduced our Puerto Rico exposure by $229 million, or 9% of our Puerto Rico exposure.***

455.    Yet, notwithstanding the extremely poor financial and operational condition of

Ambac during the Class Period, the compensation and bonuses received by the Individual

Defendants and the Board during the Class Period were materially excessive when compared to

compensation opportunities available to the highest paid executives and board members at

Ambac's self-identified peers.

456.    Indeed, when Defendant Adams was summarily ousted from the Company at the

end of the 2014 fiscal year, Defendants Tavakoli, Stein, and Trick, exploited their new-found

promotions to award themselves significant pay raises.  Despite that the credit quality of Ambac's

Puerto Rico exposure and the Company's stock price were rapidly deteriorating.  Meanwhile, the

Ambac Board and Compensation Committee – which should have been responsible for allocating reasonable compensation to the CEO and other high ranking executives – were inherently conflicted by their own receipt of clearly excessive compensation.

457.    For example, for the 2015 fiscal year – while the majority of the Company's Puerto Rico exposure was downgraded to "Ca" or "C", by Moody's – Defendant Tavakoli received compensation amounting to $4,943,310, consisting of $1.8 million in base salary and $1.3 million in performance bonuses.  As compared to the Company's self-selected peer group, the $1.8 million base salary was more than $775,000 (or roughly 73 percent) above the 90th percentile of 2015 base salaries earned by CEOs:

| Peer Group | Market Capitalization (in millions) | Compensation |
|---|---|---|
| Assured Guaranty Ltd. | $3,530 | $10,152,000 |
| MGIC Investment | $2,310 | $6,582,543 |
| Virtus Investment Partners | $661.84 | $6,413,704 |
| National Western Life Insurance | $709.47 | $6,317,910 |
| Montpelier Re Holdings Ltd. | $1,870 | $6,103,785 (2013) |
| Radian Group Inc. | $2,630 | $6,065,537 |
| Platinum Underwriters Holdings | $1,900 | $5,623,287 |
| **AMBAC** | **$918.05** | **$4,943,310** |
| Employers Holdings, Inc. | $971.70 | $4,572,740 |
| Selective Insurance Group | $2,080 | $4,537,635 |
| The Navigators Group | $1,290 | $4,224,368 |
| OneBeacon Insurance Group | $1,240 | $3,283,118 |
| MBIA Insurance Corp. | $1,010 | $2,692,578 |
| Horace Mann Educators Corp. | $1,340 | $2,647,729 |
| Safety Insurance Group | $904.40 | $2,247,132 |
| Provident Financial Services | $1,310 | $2,125,152 |
| American Equity Investment Life Holding Company | $1,290 | $1,948,144 |

458.    When Defendant Tavakoli's compensation is compared to a peer group with a more appropriate market capitalization range of $900 million to $2 billion, Ambac ranks second to last in terms of market capitalization, but remarkably, third highest in CEO compensation for the 2015 fiscal year.  Moreover, within this modified peer group, Defendant Tavakoli's compensation was approximately 40 percent higher than the median and 30.6 percent higher than the average:

| Peer Group | Market Capitalization (in millions) | Compensation |
|---|---|---|
| Montpelier Re Holdings Ltd. | $1,870 | $6,103,785 (2013) |
| Platinum Underwriters Holdings | $1,900 | $5,623,287 |
| **AMBAC** | **$918.05** | **$4,943,310** |
| Employers Holdings, Inc. | $971.70 | $4,572,740 |
| The Navigators Group | $1,290 | $4,224,368 |
| OneBeacon Insurance Group | $1,240 | $3,283,118 |
| MBIA Insurance Corp. | $1,010 | $2,692,578 |
| Horace Mann Educators Corp. | $1,340 | $2,647,729 |
| Safety Insurance Group | $904.40 | $2,247,132 |
| Provident Financial Services | $1,310 | $2,125,152 |
| American Equity Investment Life Holding Company | $1,290 | $1,948,144 |
| **MEDIAN** | **2,988** | |
| **AVERAGE** | **3,431** | |

459.    The compensation received by Defendant Tavakoli was also excessive when compared to the compensation received by Defendant Adams in non-Class Period years. Defendant Tavakoli received approximately 149 percent more in compensation in 2015 – a year in which the Company's stock price declined 42.5 percent – than Defendant Adams received in 2013, her last full year of employment.  What is more, following Defendant Adams' resignation, the CEO compensation at Ambac increased dramatically and included: (i) a 125 percent increase in base salary; (ii) a 174 percent increase in bonuses; and (iii) a 159 percent increase in stock awards (stock and options included) between 2013 and 2015:

| Year | Total Compensation | Breakdown |
|---|---|---|
| 2012 (Adams) | $1,310,000 | • $750,000 base salary<br>• $550,000 bonus<br>• $0 stock awards<br>• Remainder other. |
| 2013 (Adams) | $1,989,608 | • $800,000 base salary<br>• $475,000 bonus<br>• $700,000 stock awards<br>• Remainder other. |
| 2014 (Tavakoli) | $2,724,776 | • $800,000 base salary<br>• $0 bonus<br>• $0 stock awards<br>• Remainder other. |
| 2015 (Tavakoli) | $4,943,310 | • $1.8 million base salary<br>• $1.3 million bonus<br>• $859,250 stock<br>• $955,900 options<br>• Remainder other. |
| 2016 (Tavakoli) | $5.2 – 6.625 million | • At least $950,000 base salary<br>• $1.425 million target bonus but up to $2.85 million allowable<br>• $1.425 million annual RSU award<br>• $1.4 million annualized RSU award. |

460.     As such, the Individual Defendants had a considerable incentive to take steps to see that the stock price remained high, including concealing the true risk and condition of the Company's Puerto Rican exposure. Indeed, it was only when Puerto Rico's governor announced that the island's more than $70 billion in debt was "not payable" and Puerto Rico would likely default on upcoming interest payments that the truth could no longer be concealed and Defendants began to reveal the truth of the dire situation.

## XI.     LOSS CAUSATION

461.     The market for Ambac common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Ambac stock traded at artificially inflated prices during the Class period.

Plaintiff and other members of the Class purchased or otherwise acquired Ambac stock relying upon the integrity of the market of Ambac and market information related to the Company, and have been damaged thereby.

462.    During the Class Period, Defendants named in this Action materially misled the investing public, thereby inflating the price of Ambac stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading.  These material misstatements and omissions created the false impression that Ambac had little to no loss exposure related to the Company's Puerto Rican bonds, that the Company maintained adequate loss reserves and was well on its way to reclaiming a AAA credit rating.

463.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Ambac's Puerto Rican bond loss exposure and the true nature of the financial condition of the Company. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by the Defendants named in this Action during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.  For example:

- November 13, 2013 Press Release and November 14, 2013 Call - In response to the November 13, 2013 Press Release and November 14 Call

announcing the Company's third quarter results in which Defendants assured investors that "our expectations continue to be that we will have no losses on those [Puerto Rican] exposures" the Company's stock price increased 12.44% from $20.65 per share on November 12, 2013 to $23.22 per share on November 19, 2013.

- December 18, 2013 Call - In response to the December 18, 2013 Call in which Defendants stated that Ambac was "actively working to mitigate losses on poorly performing transactions" and that Ambac did "not expect to have losses at this point" on its Puerto Rican exposure, the Company's stock price increased 11.94% from $20.68 per share on December 18, 2013 to $23.15 on December 23, 2013.

- 2013 Form 10-K, filed on March 3, 2014 and March 4, 2014 Call - In response to the 2013 Form 10-K and March 4 Call stating, among other things, that the Company: (i) was actively managing and identifying its credit risks; (ii) had sufficient reserves to cover any net cost of claims; (iii) had adequate reserves; and (iv) had "no expectations of actually incurring any loses," the Company's stock price increased 4.77% from $33.10 per share on March 3, 2014 to $34.68 per share on March 5, 2014.

- Second Quarter 2014 Form 10-Q and August 12, 2014 Call - In response to a Second Quarter 2014 Form 10-Q, filed on August 11, 2014, announcing that "as of June 30, 2014, Ambac's disclosure controls and procedures were effective," and that the Company's "management believes that the reserves for loss and loss expenses and unearned premium reserves are adequate to cover claims presented," and an August 12 Call announcing that Ambac was "proactively involved in managing [its] exposures [to Puerto Rico]," the Company's stock price increased 6.62% from $23.86 per share on August 8, 2014 to $25.44 per share on August 18, 2014.

- Third Quarter 2104 Form 10-Q and November 11, 2014 Call- In response to the Third Quarter 2014 Form 10-Q, filed on November 10, 2014, announcing "[m]anagement believes that the timely receipt of all principal and interest on these positions is probable" and that "[o]ur experience has shown that, for the majority of bond types, we have not experienced significant claims," and the November 11 Call announcing that "[w]e believe our reserves are reasonably sized given the current situation, the overall size of our exposure to Puerto Rico, the interrelated nature of credits, and the sluggishness of the economy," the Company's stock price increased 13.35% from $23.37 per share on November 10, 2014 to $26.49 per share on November 12, 2014.

- In response to the May 12 Call held on May 12, 2015, announcing that management was committed to its belief that the Company was still "very well reserved for [its] exposure to Puerto Rico" and that the Company was

still "confident that our Puerto Rico positions are relatively solid," the Company's stock price increased 11.29% from $22.75 per share on May 11, 2015 to $25.32 per share on May 15, 2015.

464.     During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that caused the price of Ambac stock to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were gradually disclosed and became apparent to the market, the artificial inflation in the price of Ambac's stock was removed, and the price of Ambac stock fell.  For example:

- In response to the June 29, 2015, announcement by Puerto Rico's governor that the Commonwealth's debt was "not payable" and that Puerto Rico would likely default on its upcoming interest payments, the Company's stock price lost almost a third of its value when it decreased a tremendous 28.87% from $22.38 per share on June 26, 2015 to a low of $15.91 per share on July 1, 2015.

- In response to the Third Quarter Results released on November 9, 2015, for the fiscal year 2014 announcing a $514.5 million charge to goodwill as a result of, among other things, a "substantial decrease in the Financial Guarantee reporting unit's fair value" driven by the decrease in Ambac's market capitalization and stock price and "wider Ambac credit spreads" relating at least in part to Puerto Rico, the Company's stock price decreased 12% from $16.84 per share on November 9, 2015 to $14.79 per share on November 17, 2015.

465.     As a result of their purchases of Ambac stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

466.     The timing and magnitude of the price decline in Ambac stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

XII.    **CLASS ACTION ALLEGATIONS**

467.    Plaintiff bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Ambac common stock during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

468.    Excluded from the Class are Ambac and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

469.    Because Ambac had millions of common shares outstanding during the Class Period, and because its shares were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by Ambac or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

470.    Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

471.    Plaintiff will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

472.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

      a.    Whether Defendants violated the federal securities laws as alleged herein;

     b.   Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Ambac's business and operations;

     c.   Whether the price of Ambac stock was artificially inflated during the Class Period; and

     d.   The extent to which members of the Class have sustained damages and the proper measure of damages.

473.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.  <u>NO STATUTORY SAFE HARBOR</u>

474.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading,

and/or the forward-looking statement was authorized or approved by an executive officer of Ambac who knew that the statement was false when made.

## XIV.   APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE

475.    The market for Ambac stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Ambac stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of the market price of Ambac and market information relating to the Company, and have been damaged thereby.

476.    During the Class Period, the artificial inflation of Ambac stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Ambac's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Ambac and its business, operations, and prospects, thus causing the price of the Company's stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. The Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

477.    At all relevant times, the market for Ambac stock was an efficient market for the following reasons:

>    a. Ambac stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Exchange, a highly efficient and automated market;

b. As a regulated issuer, Ambac filed periodic public reports with the SEC and the NASDAQ;

c. Ambac communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. During the class period, on average, over several hundreds of thousands Ambac shares were traded on a weekly basis.  On news days, the Company's trading volume increased into the millions, reflecting an active trading market for Ambac stock and investors' expectations being impounded into the stock price; and

e. The proportion of statistically significant stock price movement days for Ambac stock on news days is significantly over the proportion of non-news days and, thus, Ambac shares are more likely to have a statistically significant return on a day with news than no-news, consistent with an informationally efficient market.

## <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Ambac and the Defendants

478. Plaintiff realleges each allegation as if fully set forth herein.

479. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Ambac and the Defendants (the "Count I Defendants").

480. The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the

statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

481.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

482.    The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

483.    As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

484.    Ambac is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of Ambac in taking the actions alleged herein.

485.    Plaintiff and the Class purchased Ambac common stock, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In so doing, Plaintiff and the Class relied directly or indirectly on false

and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiff and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

486.    At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiff and the Class were unaware of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have purchased Ambac common stock had they known the truth about the matters discussed above.

487.    By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

488.    As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Ambac common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Ambac and the Individual Defendants

489.    Plaintiff realleges each allegation as if fully set forth herein.

490.    This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Ambac and the Individual Defendants (the "Count II Defendants").

491.    Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Ambac, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.   The Count II Defendants directly or indirectly controlled the content of the

Company's SEC statements and press releases related to Plaintiff and the Class' investments in Ambac common stock within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

492.     The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

493.     The Count II Defendants knew or recklessly disregarded the fact that Ambac's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

494.     By virtue of their high-level positions and their participation in and awareness of Ambac's operations and public statements, the Count II Defendants were able to and did influence and control Ambac's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

495.     The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

496.     As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Defendants are also liable pursuant to §20(a) of the Exchange Act.

497.     As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Ambac common stock

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class;

B.     Awarding Plaintiff and the members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated:  November 23, 2016                                   /s/ *Shannon L. Hopkins*

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins (SH-1887)
Sebastiano Tornatore (SH-0304)
Stephanie A. Bartone
Meghan Daley
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email:  shopkins@zlk.com
Email: stornatore@zlk.com
Email:  sbartone@zlk.com
Email: mdaley@zlk.com

*Counsel for Plaintiff*