USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/5/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORI WILBUSH, Individually and on behalf of all others similarly situated,

Plaintiff,

-against-

AMBAC FINANCIAL GROUP, INC., DIANA N. ADAMS, DAVID TRICK, JEFFREY S. STEIN, NADER TAVAKOLI, and CATHY MATANLE,

Defendants.

16 Civ. 5076 (RMB)

**DECISION & ORDER**

## I. Background

On November 23, 2016, lead plaintiff Ori Wilbush ("Plaintiff"), on behalf of all other similarly situated individuals, filed a 241-page Amended Complaint ("Amended Complaint") against Ambac Financial Group, Inc. ("the Company" or "Ambac"), Ambac's President and CEO Nader Tavakoli ("Tavakoli"); Chairman of the Board of Directors Jeffrey S. Stein; CFO David Trick ("Trick"); former President and CEO Diana N. Adams ("Adams"); and former Senior Managing Director and Head of Portfolio and Credit Risk Management Cathy Matanle ("Matanle") (collectively, "Individual Defendants," and, with Ambac, "Defendants"). (Am. Complaint ¶¶ 1-2, 20-27.)[1] Plaintiff, who purchased Ambac common stock between November 13, 2013 and November 17, 2015 ("Class Period"), alleges violations by Defendants of Section

[1] The original Complaint was far less extensive than the Amended Complaint and was filed on June 28, 2016 by plaintiff Joseph Pirinea. On October 11, 2016, the Court granted Wilbush's unopposed motion to appoint him lead plaintiff (see Order, filed Oct. 11, 2016), and on October 21, 2016, Plaintiff's counsel was directed to file an Amended Complaint (Order, filed Oct. 21, 2016, at 1). The Amended Complaint is 497 paragraphs long and spans 241 pages, including exhibits. It contains materially more factual allegations compared to the original Complaint (which contained 77 paragraphs and 29 pages).

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). (Am. Complaint at 174-178.) The Amended Complaint states that this "securities fraud class action is based upon an extensive and pervasive fraud, orchestrated by Defendants, who sought to conceal Ambac's true credit risk and loss exposure to the more than $10 billion in Puerto Rican bonds the Company insured." (Id. ¶ 1.)[2] The Amended Complaint alleges defaults on Puerto Rican bonds occurred on or about August 3, 2015 (Am. Complaint ¶ 317); January 4, 2016 (id. ¶ 340); May 2, 2016 (id. ¶ 342); July 1, 2016 (id. ¶ 353); and August 9, 2016 (id. ¶ 356). It also alleges that Ambac has paid $63.3 million to cover these defaults. (Id. ¶ 109.)

Ambac is a holding company whose subsidiaries "provide financial guarantee products and other financial services to clients in both the public and private sectors around the world." (Id. ¶ 2.) Among other services, Plaintiff offers insurance, including monoline insurance which "guarantees the timely repayment of bond principal and interest when a bond issuer defaults." (Id.) Most relevant here, Ambac provided insurance covering $2.5 billion of Puerto Rican-related debt ("Puerto Rican bond portfolio" or "PRBP"). (Id. ¶ 37.)[3]

Plaintiff alleges that, during the Class Period, Defendants were aware of Ambac's "significant loss exposure on its Puerto Rican bond portfolio" (id. ¶ 78) owing to "the downturn in the Puerto Rican economy, rapidly declining credit ratings of the individual Puerto Rican

---

[2] Puerto Rico announced on June 29, 2015 that it "would likely default on upcoming interest payments." See infra p. 5.

[3] The $2.5 billion in Puerto Rican bonds are "net par" which "refers to the total principal value ([or] face value at the time of issuance), net of any reinsurance." (Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Complaint, filed Feb. 27, 2017 ("Br."), at 6.) "[T]he majority of Ambac's Puerto Rican exposure . . . are . . . zero coupon, or capital appreciation bonds ('CABs')," which do not pay interest until they mature and can cost municipalities more in interest than regular bonds. (Complaint ¶ 59.)

bonds insured, significant increase in the cost of credit default risk insurance, and widening yields and credit spreads on Puerto Rican bonds" (id. (list numbers removed)). According to the Amended Complaint, Ambac's Asset and Liability Committee ("ALCO") met monthly and also held ad hoc meetings when necessary to discuss "distressed financial guarantee exposures, such as Ambac's exposure to Puerto Rican bonds." (Id. ¶ 66.) The Amended Complaint discusses a "confidential witness" ("CW2") who worked as an Ambac Assurance Management Director, Head of Quantitative Strategy/Analytics Group from May 2009 until September 2014 and who attended ALCO meetings with Defendants Adams, Trick, and Matanle. (Id. ¶ 65.) According to Plaintiff, CW2 "recalled internal discussions at the [ALCO] meetings . . . during the first half of 2014 about the validity of the [Puerto Rican] portfolio, including 'do we have the tools, do we have the capabilities . . . , how do we assess the losses, how do we project the losses.'" (Id. ¶ 66.) Plaintiff alleges that at meetings in 2014 and 2015 ALCO members "discussed whether Ambac could capture all of the exposure related to the [Puerto Rican bond] portfolio." (Id. ¶ 67.)

Ambac's Third Quarter 2013 Form 10-Q, filed with the SEC on November 14, 2013, stated, "Ambac's management believes that the reserves for losses and loss expenses and unearned premium reserves are adequate to cover the ultimate net cost of claims . . . ." (Id. ¶ 149 (emphasis removed).)[4] In its SEC filings during the Class Period, "Ambac only reported net par outstanding for the Company's Puerto Rican bonds of approximately $2.4 billion, exclusive of nearly $8 billion of additional exposure the Company had for these bonds related to interest." (Id. ¶ 51; see also ¶¶ 214, 232, 249, 326, 332.)

Plaintiff alleges that Ambac's "Puerto Rico exposure deteriorated fifteen ratings on . . . Moody's scale and the individual series [bonds] Ambac insured were downgraded no less than

[4] Each of Ambac's quarterly SEC filings during the Class Period used similar language. (See Am. Complaint ¶¶ 209, 226, 245, 293, 323.)

224 times over the course of the Class Period." (Id. ¶ 87.) "Throughout the Class Period, . . . the Company's Puerto Rico [bond] exposure . . . was assigned an ambiguous internal rating of 'BIG' – meaning below investment grade," which Ambac's "public filings defined . . . as anything below BBB on a S&P rating scale, or the equivalent of below Baa on Moody's rating scale." (Id. ¶ 86.)[5]

During the Class Period, Defendants' statements in conference calls and Ambac's SEC filings included cautionary language. (See, e.g., Akram Decl., filed Feb. 27, 2017, Exs. A-E.) For example, during an Earnings Conference Call on November 14, 2013, Michael Fitzgerald, Managing Director of Ambac, said the "presentation may contain forward-looking statements which are based on management's current expectations and are subject to uncertainty and changes in circumstances. Any forward-looking statements are not guarantees of future performance or events. Actual performance and events may differ, possibly materially, from such forward-looking statements." (Akram Decl., Ex. B at 2.) During the same call, Defendant Trick mentioned "the addition of our Puerto Rico exposure to the adversely classified credit list." (Id. at 4.) Defendant Adams stated that the PRBP was "vulnerable to downgrade. . . . As a result of our analysis, we did take some small reserves on Puerto Rico." (Id. at 12; see also Akram Decl., Ex. C at 1, 6; Akram Decl., Ex. E at 2, 6, 8.)

During an Earnings Conference Call on March 4, 2014, Adams stated that the PRBP bonds "are subject to claw-backs," which caused management to "lower [its] ratings on the . . .

[5] On the S&P rating scale, "An obligation rated 'BBB' exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to weaken the obligor's capacity to meet its financial commitments on the obligation." S&P Global Ratings Definitions, S&P Global Ratings (June 26, 2017, 9:35 AM), https://www.standardandpoors.com/en_US/web/guest/article/-/view/sourceId/504352. On Moody's rating scale, a rating of Baa is defined as "Medium quality, moderate credit risk. Obligor has adequate capacity to meet its financial commitments but adverse economic conditions are likely to weaken capacity." (Complaint, Ex. B.)

bonds to below investment grade." (Id. at 8.) She also said, "depending on what happens in the future we need to be sort of on our toes about expecting future claims." (Id.) Ambac's Third Quarter 2013 Form 10-Q stated:

> Loss of market access is a risk embedded in our municipal exposures. From time to time the municipal bond market evidences heightened investor concerns overall or for select sectors or issuers, as has been the case with Puerto Rico. Such adverse market conditions may trigger a loss of market liquidity for affected issuers, which in turn may significantly raise their cost of alternative financing or cause a liquidity crisis and potential for default on debt service payments we guarantee.

(Akram Decl., Ex. A at 116.) Similar language appeared in subsequent SEC filings. (See, e.g., Akram Decl., Ex. D at 37; Akram Decl., Ex. G at 104.)

On June 29, 2015, Puerto Rico's governor, Alejandro Garcia Padilla, announced that "the island's more than $70 billion in debt was 'not payable' and Puerto Rico would likely default on upcoming interest payments." (Id. ¶ 314.) According to Plaintiff, Governor Padilla "stated he needed to pull the island out of a 'death spiral' and would probably seek significant concessions from many of Puerto Rico's creditors, which could include deferring some debt payments as long as five years or extending the timetable for repayment. He explained that the government could not burden its residents with further tax increases or pension cuts when they were already struggling with high rates of poverty. Instead, the creditors would 'share the sacrifices.'" (Id.) Ambac's stock price declined "roughly 29 percent, from a closing price of $22.38 per share on June 26, 2015, to a closing price of $15.91 per share on July 1, 2015." (Id. ¶ 315).[6]

---

[6] On June 30, 2016, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which enabled Puerto Rico to enter a bankruptcy-like restructuring process and halt litigation in case of default. (Am. Complaint ¶ 348.) "PROMESA established an oversight board," The Financial Oversight and Management Board for Puerto Rico (the "Board"), which "consists of seven members appointed by the President and its purpose is to facilitate negotiations or, if negotiations are unsuccessful, bring about a court-supervised process akin to bankruptcy. . . . The governor of Puerto Rico serves ex officio as an eighth member of the oversight board, but does not have voting rights." (Id. ¶ 349.)

On November 9, 2015, Ambac issued a press release announcing, among other things, a $514.5 million "goodwill impairment charge." (Akram Decl., Ex. N at 2.) According to the Amended Complaint, "Ambac was forced to record [the] goodwill impairment charge . . . as a result of, among other things, a 'substantial decrease in the Financial Guarantee reporting unit's fair value' driven by the decrease in Ambac's market capitalization and stock price and 'wider Ambac credit spreads' relating at least in part to Puerto Rico." (Am. Complaint ¶ 336.) According to Plaintiff, "[u]pon this news, Ambac's stock price dropped $2.05 per share, from $16.84 per share on November 9, 2015 to $14.79 per share on November 17, 2016, or 12%." (Id. ¶ 337.)

On February 27, 2017, Defendants jointly moved to dismiss the Amended Complaint, arguing, among other things, that: **(1)** Plaintiff fails to allege actionable misstatements or omissions because he has not "allege[d] facts showing why the statements [complained of] were fraudulent." (Br. at 10.) An example cited by Defendants is the statement alleged in the Amended Complaint that "Ambac's management believes that the reserves for losses and loss expenses and unearned premium reserves are adequate to cover the ultimate net cost of claims"

---

On May 3, 2017, the Board filed a bankruptcy petition on behalf of the Commonwealth of Puerto Rico. See Title III Petition for Covered Territory or Covered Instrumentality, Dkt. No. 17-bk-3283 (Bankr. D.P.R. May 3, 2017). United States District Judge Laura Taylor Swain presides over that proceeding.

On June 8, 2017, Ambac's subsidiary, Ambac Assurance Corp., filed an Adversary Complaint against the Commonwealth of Puerto Rico, the Board, and other Puerto Rican entities and officials. See Adversary Complaint, Dkt. No. 17-ap-159 (Bankr. D.P.R. June 8, 2017). The Adversary Complaint alleges that "the Oversight Board created by Congress to restore fiscal responsibility to the Commonwealth has . . . giv[en] its imprimatur to an ongoing scheme of constitutional and statutory violations that can only be called theft." Id. ¶ 1. On July 28, 2017, the Commonwealth, the Board, and other defendants in Ambac Assurance Corp.'s adversary proceeding filed a notice of motion to dismiss the Adversary Complaint. See Notice of Mot. to Dismiss Pl.'s Compl. Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), Dkt. No. 17-ap-519 (Bankr. D.P.R. July 28, 2017). The motion will be fully briefed by October 12, 2017. Id. at 2.

(Am. Complaint ¶ 149 (emphasis removed)); **(2)** Plaintiff has not adequately pled scienter because "[t]he Second Circuit and other courts have repeatedly rejected as insufficient the type of motives alleged in the [Amended Complaint], i.e., that Defendants were incentivized to improve Ambac's credit rating, increase Ambac's profitability, or to maintain their compensation." (Id.) Plaintiff's attempt to plead scienter through recklessness are, according to Defendants, insufficient because "there are no facts alleged that Defendants had specific, non-public information that was contrary to their public statements" (id.); **(3)** Plaintiff fails adequately to allege loss causation because he has not pled "that the market reacted negatively to a corrective disclosure of the fraud, or that the loss was foreseeable and caused by the materialization of the risk concealed by the [alleged] fraudulent statement" or omission (id. at 24 (internal quotation marks omitted)); and **(4)** Plaintiff's claim under Section 20(a) of the Exchange Act against Individual Defendants should be dismissed because Plaintiff "fails to allege a primary violation of the Exchange Act," and because "Plaintiff fails to plead scienter for an[y] Individual Defendant" (id. at 25).[7]

On April 25, 2017, Plaintiff submitted its opposition brief, arguing, among other things, that: **(1)** Plaintiff has alleged actionable misrepresentations or omissions in that he has "alleged contemporaneous facts demonstrating Defendants' statements . . . were false when made" (Opp. at 9), such as "[O]ur expectations continue to be that we will have no losses on those [PRBP] exposures" (Am. Compl. ¶ 165 (emphasis removed)), and "[W]e do think we are very well reserved for our exposure to Puerto Rico" (id. ¶ 312 (emphasis removed)); **(2)** Plaintiff has adequately alleged scienter in that he has alleged that "Defendants had the motive and

---

[7] Defendants do **not** argue that Plaintiff has inadequately pled other elements of securities fraud under § 10(b) and Rule 10b-5, including reliance upon the misrepresentations or omissions or economic loss. (See Br. at 10.)

opportunity to conceal Ambac's true risk and loss exposure in order to . . . regain the Company's coveted AAA credit rating," and "Defendants were also motivated to conceal Ambac's true loss exposure to the PRBP to reap substantial bonuses." (Opp. at 22-23 nn.22-23.) Plaintiff also argues that he has "alleg[ed] facts . . . constituting strong circumstantial evidence of conscious misbehavior or recklessness," including that Defendants allegedly admitted that they "actively reviewed Ambac's Puerto Rico exposure" (id. at 17-18 (brackets and internal quotation marks omitted)); **(3)** Plaintiff has pled loss causation because he "alleges a series of partially corrective disclosures between June 29, 2015 and November 9, 2015 in which the price of Ambac's common stock fell immediately following the disclosure of information revealing the nature, amount and scope of the Company's true loss exposure to Puerto Rico" (id. at 24); and **(4)** "[b]ecause the [Amended Complaint] adequately pleads primary liability, the Court must also sustain the control person claims" (id. at 25).

On May 9, 2017, Defendants submitted their reply memorandum ("Reply").[8]

**For the reasons stated herein, Defendants' motion to dismiss [#31] is granted.**

## II. Legal Standard

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014).

[8] The Court deemed oral argument unnecessary in view of the fullness of the presentations contained in the parties' briefs and the Court's familiarity with the issues. See Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2000 WL 33665340, at *1 (S.D.N.Y. Nov. 14, 2000).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act ("PSLRA")] and [Federal Rule of Civil Procedure] 9(b) by stating with particularity the circumstances constituting fraud. Under the PSLRA, the complaint must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. Therefore, while we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).

A securities fraud complaint based on misstatements and omissions cannot survive a motion to dismiss where the complaint fails to explain why those statements and omissions were fraudulent. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Where a plaintiff claims that a company's financial statements were misleading but fails to allege that the company violated "a single Generally Accepted Accounting Principle ('GAAP')" or industry standard, the plaintiff falls short of plausibly alleging a misstatement or omission. Harris v. AmTrust Fin. Servs., Inc., 135 F. Supp. 3d 155, 160 (S.D.N.Y. 2015), aff'd, 649 F. App'x 7 (2d Cir. 2016).

"[I]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 F. App'x 32, 38-39 (2d Cir. 2012). "Accurate statements about past performance are self-evidently not actionable . . . ." Nadoff v. Duane Reade, Inc., 107 F. App'x

250, 252 (2d Cir. 2004). "[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect." Tongue v. Sanofi, 816 F.3d 199, 212 (2d Cir. 2016).

"To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted." Olkey v. Hyperion 1999 Term Tr., Inc., 98 F.3d 2, 8 (2d Cir. 1996). "[A] defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language . . . or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

Where a plaintiff cites statements that were merely generalizations regarding the company's business practices, "[s]uch generalizations are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." ECA, 553 F.3d at 206.

"[T]o be adequate, scienter allegations must give rise to a strong inference of fraudulent intent." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). Where a plaintiff endeavors to plead scienter by alleging motive and opportunity, "[m]otives that are generally possessed by most corporate directors and officers do not suffice." Id. at 139. "Insufficient motives . . . include . . . the desire to keep stock prices high to increase officer compensation." Id. "We do not agree that a company's desire to maintain a high . . . credit rating qualifies as a sufficient motive for fraud . . . because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 814 (2d Cir. 1996).

Where a plaintiff seeks to plead scienter by alleging conscious misbehavior or recklessness, the complaint must "allege[] that defendants . . . had access to non-public

information contradicting their public statements." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008).

If information provided by a confidential witness does not support plaintiffs' allegations, the court is "preclude[d] . . . from concluding that an inference of scienter is cogent and at least as compelling as [an] opposing inference." Campo v. Sears Holdings Corp., 371 F. App'x 212, 216-17 (2d Cir. 2010). "[A]llegations of a company's core operations . . . and removal of its executives . . . cannot establish scienter independently." New Orleans Employees Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 n.3 (2d Cir. 2011).

To plead loss causation, the complaint must give defendants "some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015) (internal quotation marks omitted). "The requirement . . . to plead a causal link does not place on [p]laintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations." Id. at 189.

Where a plaintiff fails to allege any primary violation, he cannot establish control person liability under Section 20(a). ATSI Commc'ns, 493 F.3d at 108.

## III. Analysis

### (1) Plaintiff Has Not Adequately Pled Actionable Misstatements or Omissions

The Amended Complaint pleads six categories of allegedly false misstatements or omissions made by Defendants:

i. In its SEC filings during the Class Period, "Ambac only reported net par outstanding for the Company's Puerto Rican bonds of approximately $2.4 billion,

exclusive of nearly $8 billion of additional exposure the Company had for these bonds related to interest." (Am. Complaint ¶ 51; see also ¶¶ 214, 232, 249, 326, 332.)

ii. Ambac's quarterly SEC filings stated "In our experience, losses in the public finance portfolio have been contained, with most of our adversely classified credits resolving without loss to Ambac." (E.g., id. ¶¶ 176, 272, 294.)

iii. "Throughout the Class Period, . . . the Company's Puerto Rico [bond] exposure . . . was assigned an ambiguous internal rating of 'BIG' – meaning below investment grade," which Ambac's "public filings defined . . . as anything below BBB on a S&P rating scale, or the equivalent of below Baa on Moody's rating scale." (Id. ¶ 86.)

iv. Ambac's Third Quarter 2013 Form 10-Q, filed with the SEC on November 14, 2013, stated, "Ambac's management believes that the reserves for losses and loss expenses and unearned premium reserves are adequate to cover the ultimate net cost of claims . . . ." (Id. ¶ 149 (emphasis removed).) Each of Ambac's quarterly SEC filings during the Class Period used similar language. (See id. ¶¶ 209, 226, 245, 293, 323.)

v. During an Earnings Conference Call on November 14, 2013, Adams stated, "[W]e did take some small reserves on Puerto Rico. But our expectations continue to be that we will have no losses on those exposures." (Id. ¶ 165 (emphasis removed).) During a Shareholder Meeting Call on December 18, 2013, Adams stated, "We are actively reviewing our Puerto Rico exposure. . . . We do not expect to have losses at this point." (Id. ¶ 168 (emphasis removed).) During an Earnings Conference Call on March 4, 2014, Adams stated, "[T]here is no expectation[] of paying claims, . . . and no expectation[] of actually incurring any los[s]es." (Id. ¶ 198 (emphasis removed).)

vi. Ambac's quarterly SEC filings stated that Ambac's "primary goal" was "actively managing its assets and liabilities with a focus on mitigating or remediating losses on poorly performing transactions." (Id. ¶ 146 (ellipsis omitted); accord id. ¶ 206; id. ¶ 224; id. ¶ 242; id. ¶ 266; id. ¶ 290.)

Defendants argue persuasively that Plaintiff has failed to allege actionable misstatements or omissions. (Br. at 10.)[9] As to category (i), Defendants contend that "Plaintiff does not, and

---

[9] This Decision & Order does not address certain alleged misstatements which Plaintiff does **not** discuss in his opposing brief, such as "management believes that the timely receipt of all principal and interest on these . . . positions is probable." (E.g., Am. Complaint ¶ 151.) Defendants point out that "[t]his statement concerned Ambac's investment portfolio, which . . . does not concern its insurance obligations on the Puerto Rico Bonds." (Br. at 12.) Where a plaintiff fails to raise claims in opposition to dismissal in the district court, "any such claims

cannot, allege that this disclosure was false," and that "Plaintiff makes no allegations that Ambac's presentation was inconsistent with an applicable accounting standard or the industry standard." (Id. at 10-11.) As to category (ii), Defendants argue that the Amended Complaint "contains no facts showing that these statements were false." (Id. at 12.) As to category (iii), Defendants argue that "it is not the court's job to second guess methodologies as long as [the] issuer truthfully discloses the methodology." (Id. at 13-14.) As to category (iv), Defendants argue that statements regarding the adequacy of loss reserves are opinions, which "are not actionable unless Plaintiff alleges that there were material omissions regarding the basis for these opinions or facts showing that Defendants did not believe the opinions." (Reply at 2-3.) "Plaintiff does not allege any facts supporting either proposition." (Id. at 3.) As to category (v), Defendants argue that "these statements are paradigmatic forward-looking statements," which "were accompanied by meaningful cautionary language," and "Plaintiff has not alleged facts showing that the Defendants . . . had actual knowledge that the statements were false or misleading." (Br. at 15-17 (internal quotation marks omitted).) As to category (vi), Defendants argue that these statements were "puffery" and were "too general to cause a reasonable investor to rely upon them." (Id. at 17.)

Plaintiff responds that he has "alleged contemporaneous facts demonstrating Defendants' statements . . . were false when made." (Opp. at 9.) As to category (i), Plaintiff argues that whether Defendants' statement "was misleading is a factual dispute not to be resolved on a motion to dismiss." (Id. at 16.) As to category (ii), Plaintiff argues that, "[w]hile Defendants'

---

[are] forfeited." Collins v. Saratoga Cty. Support Collection Unit, 528 F. App'x 15, 17 (2d Cir. 2013); see also In re UBS AG Sec. Litig., 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) ("Lead Plaintiff . . . concedes through silence that [the defendant] did not make an actionable material misstatement[]" because "an argument not addressed in an opposition brief [is] waived . . . ." (citations omitted)), aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014).

historical statements regarding Ambac's public finance bonds (which includes Puerto Rico) having no losses may be literally true, a reasonable investors would view them to mean that Ambac would have no losses on the PRBP because Ambac's past experience was indicative of future performance." (Id. at 14 (emphasis removed) (footnote and citation omitted).) As to category (iii), Plaintiff argues "[w]here, as here, the Defendants' classification is so broad as to imply little risk exposure, such statements are actionable." (Id. at 15.) As to category (iv), Plaintiff argues that "Defendants failed to disclose the specific amount reserved for the Company's Puerto Rico exposure," and "Defendants' purported belief was not reasonable in light of known contradicting facts." (Id. at 12-13.) As to category (v), Plaintiff argues that "numerous contradictory facts exist[ed] at the time the statements were made," including public information such as "rising yields on Puerto Rican Bonds," and internal information such as "confidential sources inform[ing] Defendants as early as October 2013 that the credit quality of the Company's PRBP was deteriorating." (Id. at 9.) Plaintiff also argues that any cautionary language was "boilerplate and fail[ed] to warn of specific risks." (Id. at 10 (emphasis removed).) As to category (vi), Plaintiff argues that "[m]isstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery' where they are misrepresentations of existing facts." (Id. at 17 (ellipsis and brackets omitted).)

**i. Net Par**

Plaintiff's claim is that Defendants' failure to disclose the amount of the interest owed on the bonds—approximately $8 billion—was misleading. (Id. at 16.) Defendants say that the disclosure of "net par"—approximately $2.5 billion—was in accordance with industry standards. (See Br. at 11.) A review of public SEC filings of insurers during the Class Period other than Ambac indicates that other bond insurers reported par value for their insured bonds, excluding

interest owed. See, e.g., Radian Group Inc., First Quarter 2014 Report (Form 10-Q) at 85 (filed on May 6, 2014); Assured Guaranty Ltd., 2013 Annual Report (Form 10-K) at 47 (filed on Feb. 28, 2014); MBIA Inc., Third Quarter 2013 Report (Form 10-Q) at 92 (filed on Nov. 12, 2013). And, the Amended Complaint cites a news article from *Bloomberg Business* which states, "The companies [i.e. Ambac, MBIA Inc., and other bond insurers] typically use the price at which the bonds were issued when disclosing the potential payouts they face." Brian Chappatta, Puerto Rico Balloon Payments Seen as Risk for Some Bond Insurers, Bloomberg Business, https://www.bloomberg.com/amp/news/articles/2015-09-04/puerto-rico-balloon-payments-seen-as-risk-for-some-bond-insurers (Sept. 4, 2015 9:02 AM).

Where, as here, a plaintiff claims that a company's financial statements are misleading but fails to allege that the company violated a single Generally Accepted Accounting Principle ("GAAP") or industry standard, the plaintiff "falls short of plausibly alleging a misstatement or omission." See Harris, 135 F. Supp. 3d at 160 (where the plaintiff alleged that the defendant's financial statements were misleading because they did not properly classify and record the $289.9 million in losses but "fail[ed] to allege that [the defendant] violated a single Generally Accepted Accounting Principle" or industry standard (brackets and internal quotation marks omitted)); Fraternity Fund, 376 F. Supp. 2d at 447 (where plaintiffs alleged that defendants had misrepresented the value of certain assets but did "not allege that the differences in valuations were outside the range of what was considered normal in the industry").

In addition, the Amended Complaint alleges that Defendants did disclose accrued interest. (Am. Complaint ¶ 51.) "[I]n July 2014, Ambac began providing principal and interest exposure on its Puerto Rican bonds in presentations conspicuously located on its website." (Id.) Plaintiff's opposing brief concedes, "[I]n July 2014[,] . . . Ambac disclosed its total exposure to

Puerto Rico." (Opp. at 15; see also Akram Decl., Ex. F.) Defendants disclosed that: Ambac Puerto Rico Exposure Net Par was $2,485,200,000, and Net Principal & Interest was $10,570,400,000. (Id.) The website also included an amortization chart that indicated the amount of interest due on the Puerto Rican bonds up to the year 2054. (Id.) Defendants updated the disclosures on its website for each Quarter from July 2014 until the end of the Class Period. (See Am. Complaint ¶¶ 53-54.) The website also explained that "Net Par include[s] capital appreciation bonds . . . which are reported at the par amount at the time of issuance of the insurance policy." (Akram Decl., Ex. F.) These "conspicuous" public disclosures of Ambac's exposure, inclusive of interest undermines Plaintiff's allegation that "Defendants failed to disclose that Ambac's true exposure to Puerto Rican bonds was not $2.5 billion" (Am. Compl. ¶ 185). See In re AIG Advisor Grp. Sec. Litig., 309 F. App'x 495, 498 (2d Cir. 2009) (where plaintiff alleged misstatements or omissions in defendant's SEC filings, "website disclosures made by the [defendant] that detailed the allegedly undisclosed [information] . . . rendered inactionable the alleged misrepresentations or omissions"); In re Delcath Sys., Inc. Sec. Litig., 36 F. Supp. 3d 320, 329 (S.D.N.Y. 2014) (alleged omissions were not actionable where public "[d]ocuments submitted by Defendants . . . contradict[ed] the Complaint and show[ed] that the Company did disclose" the information allegedly omitted); Foley v. Transocean Ltd., 861 F. Supp. 2d 197, 210-11 (S.D.N.Y. 2012) (where alleged omissions were not actionable because the "Lead Plaintiff [wa]s suggesting that [the defendant] should have disclosed" certain information, and the defendant "did disclose such concerns to the market at various points in time").

**ii. Historical Losses**

Plaintiff has not adequately pled that Defendants' statement that, "[i]n our [historical] experience, losses in the public finance portfolio have been contained, with most of our

adversely classified credits resolving without loss to Ambac" (Am. Complaint ¶¶ 176, 272, 294) was false and misleading. See Boca Raton, 506 F. App'x at 38-39 (where the company's "statements about its earnings were . . . literally true"); Nadoff, 107 F. App'x at 252 (where the plaintiffs alleged that the defendants had accurately "announced sales results for the first quarter of 2002"). Plaintiff concedes that "Defendants' historical statements regarding Ambac's public finance bonds (which includes Puerto Rico) having no losses may be literally true." (Opp. at 14.)

Plaintiff's argument that Defendants' statements implied that "Ambac would have no losses on the PRBP because Ambac's past experience was indicative of future performance" (id. (emphasis removed)) is unpersuasive. See Boca Raton, 506 F. App'x at 38-39; Nadoff, 107 F. App'x at 252. "[I]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." Boca Raton, 506 F. App'x at 38-39 (where the company's "statements about its earnings were . . . literally true," but "did not acknowledge the [alleged] long-term unsustainability of [the company's] business model"). "Accurate statements about past performance are self evidently not actionable . . . ." Nadoff, 107 F. App'x at 252.

Plaintiff also fails to explain how a reasonable investor would have thought "Ambac's past experience was indicative of future performance" (Opp. at 14) in light of Defendants' disclosures in Ambac's quarterly SEC filings during the Class Period, including, e.g., its 2013 Form 10-K, filed with the SEC on March 3, 2014. (Akram Decl., Ex. D at 57.) "[F]uture experience may differ from our past experience." (Id.) The United States Court of Appeals for the Second Circuit has held that similar cautionary language, such as "the company's past performance [i]s not necessarily indicative of future results," is "sufficient . . . to bespeak caution and trigger the safe harbor provision of the PSLRA." Rombach v. Chang, 355 F.3d 164, 176 (2d

Cir. 2004).[10] Ambac's quarterly SEC filings later in the Class Period, including its 2014 Form 10-K, filed on March 2, 2015, stated that "Our exposures to the Commonwealth of Puerto Rico are under stress arising from the Commonwealth's poor financial condition, low ratings and limited access to capital. . . . **[W]e believe there is a possibility of incurring a loss that could be higher than our current reserves.**" (Akram Decl., Ex. I at 40 (emphasis added).)

**iii. Describing Bonds as BIG (Below Investment Grade)**

Plaintiff argues that Defendants' categorizing the Puerto Rican bonds as BIG (Below Investment Grade) was misleading because the category was "so broad as to imply little risk exposure." (Opp. at 15.) Defendants contend persuasively that "it is not the court's job to second guess methodologies." (Br. at 13-14.) In fact, Defendants' definition of BIG "as anything below BBB on a S&P rating scale, or the equivalent of below Baa on Moody's rating scale" reflects industry-wide usage (Am. Complaint ¶ 86). See In re Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 442 (S.D.N.Y. 2013) (also defining BIG as below BBB on the S&P rating scale and below Baa on Moody's rating scale); In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 752 n.5 (S.D.N.Y. 2012) (also defining BIG as below BBB on the S&P rating scale and below Baa on Moody's rating scale); New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Supp. 2d 254, 260 (S.D.N.Y. 2010) (also defining BIG as below BBB on the S&P rating scale and below Baa on Moody's rating scale). Moody's own ratings system describes ratings below BBB as "non-investment grade." (Am. Compl., Ex. B.)

Where, as here, a defendant's description of its "bond portfolio was in line with industry norms," the plaintiff has not stated a claim for securities fraud. See In re Aegon N.V. Sec. Litig.,

---

[10] Under the safe harbor provision, "a defendant is not liable if [a] forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton, 604 F.3d at 766 (emphasis removed).

2004 WL 1415973, at *9 (S.D.N.Y. June 23, 2004); see also O'Brien v. Price Waterhouse, 740 F. Supp. 276, 283 (S.D.N.Y. 1990) (dismissing plaintiffs' claims where the complaint failed to "discussed in detail" how defendant's statements "contraven[ed] . . . the standards and codes of its industry"), aff'd sub nom. O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674 (2d Cir. 1991).

**iv. Loss Reserves**

Plaintiff has not adequately pled that Defendants' characterization of Ambac's loss reserves as "adequate" was fraudulent. See Tongue, 816 F.3d at 212. "Determining the adequacy of . . . loss reserves is not a matter of objective fact. Instead, . . . loss reserves reflect management's opinion or judgment about what, if any, portion of amounts due . . . ultimately might not be collectible." Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011); City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015) ("While . . . estimates [of loss reserves] involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief, not of fact." (footnote and internal quotation marks omitted)).

The parties agree that statements about the adequacy of loss reserves can be actionable for a § 10(b) claim "not only if the speaker did not hold the belief she professed but also if the supporting fact[s] . . . were untrue," Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015). (See Reply at 2-3; Opp. at 13 n.11.) Such statements must "fairly align[] with the information in the issuer's possession at the time." See Omnicare, 135 S. Ct. at 1329. Plaintiff has not adequately alleged that Ambac "did not hold the belief [it] professed." See Omnicare, 135 S. Ct. at 1327. One of Plaintiff's confidential witnesses ("CW4") "recalled attending a quarterly staff meeting in 2013 or 2014 where defendant Tavakoli

acknowledged that Ambac had some exposure to Puerto Rico." (Am. Complaint ¶ 68.) But, Tavakoli's acknowledgement does not mean or suggest that Tavakoli (or other Defendants) did not believe Ambac's loss reserves were inadequate. See Fait, 655 F.3d at 113.

Nor has Plaintiff adequately alleged that Defendants' opinion about the adequacy of Ambac's loss reserves did not "fairly align[] with the information in [Defendants'] possession at the time," Omnicare, 135 S. Ct. at 1329. Plaintiff argues that Defendants' statement(s) were "materially false and misleading when made because . . . Ambac's 'small' reserves for Puerto Rico were **not** adequate to cover [the] losses on its . . . Puerto Rico exposure." (Opp. at 12 (emphasis added).) Defendants respond persuasively that Plaintiff has not alleged any facts "in [Defendants'] possession at the time" would have shown that loss reserves were inadequate. See Omnicare, 135 S. Ct. at 1329. It is not enough for Plaintiff to point out that Defendants' loss reserves were ultimately less than the losses Ambac allegedly suffered. See Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) (where the plaintiff argued that "[m]anagement's optimism . . . [wa]s shown . . . after the fact to have been unwarranted," the plaintiff's claims "amount[ed] to allegations of 'fraud by hindsight,' which th[e] Court ha[d] rejected as a basis for a securities fraud complaint"); Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp., 2016 WL 1261135, at *11 (S.D.N.Y. Mar. 30, 2016) (plaintiff could not rely on a "subsequent substantial increase in [loss reserves]" to show that earlier loss reserves were inadequate).

**v. Management Expectations**

Plaintiff has not adequately alleged that Adams' statements during conference calls on November 14, 2013, December 18, 2013, and March 4, 2014, that Defendants "d[id] not expect to have losses on [Ambac's PRBP] exposures," were false or misleading. See SRM Glob. Fund Ltd. P'ship v. Countrywide Fin. Corp., 448 F. App'x 116, 118 (2d Cir. 2011). Plaintiff contends

that these statements cannot be considered forward-looking absent "cautionary language [that] was not boilerplate." (Opp. at 10 (emphasis removed).) Defendants argue that "these statements are paradigmatic forward-looking statements." (Br. at 15.)

"People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future . . . ." Rombach, 355 F.3d at 174. Optimistic statements, such as Adams' statement about future profitability "constitute non-actionable forward-looking statements." SRM Glob. Fund, 448 F. App'x at 118 (where the plaintiffs alleged that the company had stated in a press release that it "anticipated that the company will be profitable in the fourth quarter" (brackets omitted)); see also Rombach, 355 F.3d at 173 (where the plaintiffs alleged that the company had stated that it was "optimistic about the future performance of . . . newly acquired facilities" (internal quotation marks omitted)); San Leandro, 75 F.3d at 811 (where the plaintiffs cited "general announcements by [the company] that it was 'optimistic' about its earnings and 'expected' [its products] to perform well"); Perez v. Higher One Holdings, Inc., 2016 WL 6997160, at *12 (D. Conn. Sept. 13, 2016) (where defendants stated "we do not expect any . . . losses"); Beecher v. Able, 435 F. Supp. 397, 414 (S.D.N.Y. 1975) (where the defendant stated that "it would not have substantial losses for [the] fiscal [year]").

Adams' conference call statements cited above also are not actionable because they were accompanied by meaningful cautionary language. See Slayton, 604 F.3d at 766. Each of the conference calls began with the statement that the ensuing "presentation may contain forward-looking statements which are based on management's current expectations and are subject to uncertainty and changes in circumstances. Any forward-looking statements are not guarantees of future performance or events. Actual performance and events may differ, possibly materially, from such forward-looking statements." (Akram Decl., Ex. B at 2; accord Akram Decl., Ex. C at

1; Akram Decl., Ex. E at 2.) Ambac's calls and filings also repeatedly included cautionary comments about the PRBP:

- During the Shareholder Meeting Call on December 18, 2013, Adams stated: "We are actively reviewing our Puerto Rico exposure. We are concerned about what's going on in the Commonwealth." (Akram Decl., Ex. C at 6.) She also reiterated that Ambac "did take a small reserve against [its] Puerto Rico exposure in the third quarter and [Defendants] [we]re continuing to monitor it." (Id.)

- During the Earnings Conference Call on March 4, 2014, Adams stated: "We did lower our rating on [certain PRBP] bonds to below investment grade and that does attract additional reserves. . . . [M]oving it to the category where it is now . . . indicates that the conditions might deteriorate. And depending on what happens in the future we need to be sort of on our toes about expecting future claims." (Id. at 8.)

- During the Earnings Conference Call on November 14, 2013, Trick referred to "the addition of our Puerto Rico exposure to the adversely classified credit list." (Akram Decl., Ex. B at 4.) He said that "more progress [wa]s needed" for "the Commonwealth . . . to reform its fiscal situation." (Id.) Adams acknowledged that the PRBP was "vulnerable to downgrade," and that Ambac had "take[n] some small reserves on Puerto Rico." (Id. at 12.)

- Ambac shareholders were also advised that "the factors described in [Ambac's] . . . third quarter 2013 Form 10-Q" could cause "[a]ctual performance and events [to] differ . . . materially from . . . forward-looking statements." (Id. at 1.) Ambac's Third Quarter 2013 Form 10-Q, filed with the SEC on November 14, 2013, stated, among other things, that "[l]oss of market access is a risk embedded in our municipal exposures. From time to time the municipal bond market evidences heightened investor concerns overall or for select sectors or issuers, as has been the case with Puerto Rico. Such adverse market conditions may trigger a loss of market liquidity for affected issuers, which in turn may significantly raise their cost of alternative financing or cause a liquidity crisis and potential for default on debt service payments we guarantee." (Akram Decl., Ex. A at 116.)

- During the Earnings Conference Call on March 4, 2014, Trick stated: "We remain focused on our exposure[] to . . . Puerto Rico. . . . [W]e continue to actively monitor the situation there. Following an analysis of the credits in the fourth quarter 2013 we downgraded [certain PRBP] bond exposures to below investment grade . . . ." (Akram Decl., Ex. E at 6.) He also said "more progress [wa]s needed" for "the Commonwealth . . . to reform its fiscal situation." (Id.)

Plaintiff's argument fails for two interrelated reasons. First, "when defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will

manifest themselves." Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC, 2010 WL 4642554, at *18 (S.D.N.Y. Nov. 17, 2010). Defendants' cautionary language is similar to language approved by courts in this Circuit. See Rombach, 355 F.3d at 176 ("there was 'no assurance' [defendant] would be able to raise enough" funding); id. ("the company's past performance [i]s 'not necessarily indicative of future results'"); Charter Twp., 2010 WL 4642554, at *18 ("a decline in asset values could cause [the company's] financial condition to deteriorate rapidly" (brackets and internal quotation marks omitted)); In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 212 (S.D.N.Y. 2004) (where the defendant's statement "specifically indicate[d] that advertising rates may be lower in the future"). "[A] defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by . . . meaningful cautionary language . . . ." Slayton, 604 F.3d at 773.

Second, Plaintiff failed to plead that Defendants "knew of [a] major and specific risk . . . , and yet did not warn of it." Slayton, 604 F.3d at 770. The risk identified by Plaintiff that Puerto Rico faced "the risk of default" (Am. Complaint ¶¶ 28, 77, 144) was common public knowledge. See Felix Salmon, Why Puerto Rico's Bonds Are Moving to New York, Reuters, http://blogs.reuters.com/felix-salmon/2014/03/03/why-puerto-ricos-bonds-are-moving-to-new-york/ (Mar. 3, 2014) ("[D]efault is a very real risk . . . ."); Moody's Investors Service, Moody's Downgrades Puerto Rico GO and Related Bonds to Ba2, Notched Bonds to Ba3 and COFINA Bonds to Baa1, Baa2; Outlook Negative, https://www.moodys.com/research/Moodys-downgrades-Puerto-Rico-GO-and-related-bonds-to-Ba2--PR_292399 (Feb. 7, 2014) ("The outlooks for ratings on the [General Obligation] and the related bonds, as well as the [Puerto Rico Urgent Interest Fund Corporation] bonds, are negative."); Michael Corkery, $2 Billion Deal in Works for Puerto Rico, N.Y. Times Dealbook, https://dealbook.nytimes.com/2014/01/21/2-

billion-deal-in-works-for-puerto-rico/?mcubz=3 (Jan. 21, 2014, 8:15 PM) ("[I]nvestors have grown more skittish about the prospect of a default by Puerto Rico . . . ."); Richard Finger, Default: Puerto Rico's Inevitable Option, Forbes, https://www.forbes.com/sites/richardfinger/2013/12/01/default-puerto-ricos-inevitable-option/#46ab9fc410b9 (Dec. 1, 2013, 12:16 PM) ("Bondholders have already taken a big hit and are going to take a long, slow and inevitable bigger one if they don't restructure now."). Defendants did warn of the risk of default, stating that "the municipal bond market [had] evidence[d] heightened investor concerns . . . with Puerto Rico," which could "cause . . . **potential for default** on debt service payments we guarantee." (Akram Decl., Ex. A at 116 (emphasis added).)[11]

Nor has Plaintiff adequately pled that Adams' statements were made with "actual knowledge" that they were false or misleading. Slayton, 604 F.3d at 766. The law requires a securities fraud plaintiff to "allege[] that defendants . . . had access to non-public information contradicting their public statements." Scholastic, 252 F.3d at 76. The "contradictory facts existing at the time [Adams'] statements were made," as described in Plaintiff's opposing brief, were, as noted, public knowledge, including the downgrading of Puerto Rican bonds by Moody's on February 7, 2014. (Opp. at 9.) The only alleged non-public information cited by Plaintiff is that "CW2 recalled internal discussions at the committee meetings where the witness presented during the first half of 2014 about the validity of the portfolio, including 'do we have the tools, do we have the capabilities to, how do we assess the losses, how do we project the losses.'" (Am.

[11] Plaintiff appears to contend that Defendants did not cite public comments on Puerto Rico's risk of default such as "Moody's . . . downgrad[ing] [of] the bonds in the Company's PRBP" on February 7, 2014. (Opp. at 10.) "[C]lear legal precedent . . . states that there is no obligation to disclose information already in the public domain . . . ." Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 251 (S.D.N.Y. 2000) (where the plaintiff relied on public documents to show "that defendants misrepresented the performance of [the company] in [its] offering materials," the plaintiff's allegations were "flawed").

Complaint ¶ 66.) Defendants respond persuasively that this claim about "internal discussions" does not "provide any information indicative of fraud" (Br. at 22; see also In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007)), and that Plaintiff never explains why or how these discussions conflicted with Adams' expressed expectation, early in the Class period, that Ambac would suffer no losses. (See Opp. at 19-20.) The discussions described by CW2 are consistent with Adams' and Trick's statements that Defendants "[we]re actively reviewing [Ambac's] Puerto Rico exposure." (Avram Decl., Ex. C at 6; Avram Decl., Ex. E at 6.) Similarly, Tavakoli's acknowledgement at a quarterly staff meeting in 2013 (or 2014) that Ambac "had some exposure to Puerto Rico" (Am. Complaint ¶ 68) is consistent with Adams' statement that Ambac "did take a small reserve against [its] Puerto Rico exposure in the third quarter" of 2013 (Akram Decl., Ex. C at 6).

**vi. Risk Management**

Plaintiff has not adequately alleged that Defendants' (repeated) statements that Ambac's "primary goal" was "actively managing its assets and liabilities with a focus on mitigating or remediating losses on poorly performing transactions" were false or misleading. See ECA, 553 F.3d at 206. Defendants argue that these statements were "puffery" and were "too general to cause a reasonable investor to rely upon them." (Br. at 17.)

Where a plaintiff complains of statements that were "merely generalizations" regarding the company's business practices, "[s]uch generalizations are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." ECA, 553 F.3d at 206. Defendants' statements are not actionable because they are legally indistinguishable from statements that have been held to be "puffery." See ECA, 553 F.3d at 206 (where the company asserted (a) that it "had risk management processes that are highly disciplined and designed to

preserve the integrity of the risk management process"; (b) that it "set the standard for integrity"; and (c) that it would "continue to reposition and strengthen its franchises with a focus on financial discipline," courts have held that such "statements . . . [we]re no more than 'puffery' which does not give rise to securities violations" (citations, brackets, and internal quotation marks omitted)); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (where the company "t[old] its investors that it would not 'compromise its financial integrity,'" "touted its 'commitment to create earnings opportunities,'" and "proffer[ed] its conviction that [its] 'business strategies would lead to continued prosperity,'" "[t]hese statements consist[ed] of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (brackets and internal quotation marks omitted)). Under these precedents, no reasonable investor could have relied on Defendants' statement that Ambac's "primary goal" was "actively managing its assets and liabilities with a focus on mitigating or remediating losses on poorly performing transactions" (Am. Complaint ¶ 146 (ellipsis omitted)). See ECA, 553 F.3d at 206.

**(2) Plaintiff Has Not Adequately Pled Scienter**

Assuming arguendo that Plaintiff had adequately pled a misstatement or omission, the Court still likely would dismiss the Complaint based on Defendants' persuasive argument that the Amended Complaint "fails to allege a strong inference of scienter." (Br. at 18.) Defendants contend that the facts alleged do not show "that defendants had the motive and opportunity to commit fraud" because the "allegations that the Individual Defendants were motivated to make false statements so that Ambac could reclaim its 'AAA' credit rating are meritless," and "Plaintiff's theory that the Individual Defendants were motivated to make false statements so that they could maintain their allegedly excessive 'incentive-based' compensation as executives

is also meritless." (Br. at 18-20 (internal quotation marks omitted).) In addition, Plaintiff does not present facts which show "strong circumstantial evidence of conscious misbehavior or recklessness" because cited "public reports are insufficient to support a strong inference of scienter," and Plaintiff's confidential witness(es) do not "provide any information indicative of fraud." (Id. at 18, 21-22.)

Plaintiff argues that that he has sufficiently alleged that "Defendants had the motive and opportunity to conceal Ambac's true risk and loss exposure in order to . . . regain the Company's coveted AAA credit rating," and "Defendants were also motivated to conceal Ambac's true loss exposure to the PRBP to reap substantial bonuses." (Opp. at 22-23 & nn. 23-24.) Plaintiff also argues that the Amended Complaint "alleg[es] facts . . . constituting strong circumstantial evidence of conscious misbehavior or recklessness" because, among other things, "Defendants admittedly actively reviewed Ambac's Puerto Rico exposure" and "**would have** informed themselves of the relevant economic factors," and "[e]ach [confidential witness] was present at, or was a member of Ambac's committee meetings, and confirmed the Defendants' attendance at such meetings and discussions of Ambac's Puerto Rico exposure." (Id. at 17-20 (emphasis added) (brackets and internal quotation marks omitted).) Plaintiff also argues that Defendants' "conscious misbehavior or recklessness" can be "**inferred** from Defendants' direct communications with the Puerto Rican government regarding loss mitigation strategies," and from the "fact that [the alleged] false statements concerned the core operations of the company." (Id. at 21 (emphasis added).) Plaintiff says intent may be inferred from "Ambac's last minute [bond] buybacks to extinguish guarantees on Puerto Rican bonds." (Id. (internal quotation marks omitted).)

**Motive and Opportunity**

Plaintiff's allegation that "Defendants[] . . . sought to conceal Ambac's true credit risk and loss exposure . . . in order to reclaim Ambac's 'AAA' credit rating" (Am. Complaint ¶ 1) is insufficient to allege a motive for fraud. See Kalnit, 264 F.3d at 139; San Leandro, 75 F.3d at 814; In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010). In San Leandro, the United States Court of Appeals for the Second Circuit held, "We do not agree that a company's desire to maintain a high . . . credit rating qualifies as a sufficient motive for fraud . . . because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." 75 F.3d at 814 (brackets and internal quotation marks omitted). In In re Ambac Financial Group, Inc. Securities Litigation, the District Court also held that "the desire to maintain a high corporate credit rating is not enough to plead motive, even though Ambac's credit rating was fundamental to its business model." 693 F. Supp. 2d at 266.[12]

Nor does Plaintiff show motive for fraud by pleading that "Defendants' annual cash bonus opportunity is based on Company and individual performance reflecting the Company's financial results" (Am. Complaint ¶ 453 (ellipsis and internal quotation marks omitted)). See Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995); Ambac Fin. Grp., 693 F. Supp. 2d at 266. "[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." Acito, 47 F.3d at 54; see also Kalnit, 264 F.3d at 139 ("Insufficient motives . . . include . . . the desire to keep stock prices high to increase officer compensation."). As Southern District of New York Judge Naomi Reice Buchwald held

---

[12] Plaintiff unsuccessfully attempts to distinguish this crystal clear case law by claiming (unpersuasively and without citing any authority) that "[f]ighting to regain a credit rating . . . is a much more dire circumstance than maintaining an already existing rating" (Opp. at 23 n.23). See Kalnit, 264 F.3d at 138.

in In re Ambac Financial Group, Inc. Securities Litigation, "The desire of Ambac officers to increase company profits, keep their jobs, and increase compensation, are classic examples of motives that fail under the Second Circuit analysis as too general." 693 F. Supp. 2d at 266. Plaintiff's pleadings, in this case, fail for the same reason. See id.; see also Acito, 47 F.3d at 54; Kalnit, 264 F.3d at 139.

**Conscious Misbehavior or Recklessness**

Plaintiff has not adequately alleged facts which show strong circumstantial evidence of conscious misbehavior or recklessness. See Scholastic, 252 F.3d at 76 (a plaintiff must "allege[] that defendants . . . had access to non-public information contradicting their public statements"); Youngers v. Virtus Inv. Partners Inc., 195 F. Supp. 3d 499, 516, 519 (S.D.N.Y. 2016); In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 452 (S.D.N.Y. 2005); White v. H&R Block, Inc., 2004 WL 1698628, at *9 (S.D.N.Y. July 28, 2004). Plaintiff's reliance upon public information about the downgrading of Puerto Rican bonds by Moody's to levels indicating a present or imminent default and high credit risk is misplaced. (Opp. at 9, 20.) Rather, Plaintiff must "allege[] that defendants . . . had access to **non-public** information contradicting their public statements." Scholastic, 252 F.3d at 76 (emphasis added); Youngers, 195 F. Supp. 3d at 516, 519 ("[T]he contradictory information must have been non-public in order to raise a strong inference of intent . . . ."); GeoPharma, 399 F. Supp. 2d at 452 ("Cases in this Circuit assume that the contradictory information in question must be non-public."); see also Youngers, 195 F. Supp. 3d at 516, 519 (where the plaintiffs' "counsel suggested that news articles . . . presented Defendants with knowledge of facts or access to information contradicting their public statements"); GeoPharma, 399 F. Supp. 2d at 452 (where the plaintiffs "pled scienter based solely on the contradiction between public information and the company's public statements");

White, 2004 WL 1698628, at *9 (where the plaintiff "ha[d] not identified any . . . non-public reports or statements in the possession of defendants").

Nor has Plaintiff adequately alleged evidence of conscious misbehavior or recklessness by relying upon information derived from "confidential witnesses." See discussion of confidential witnesses at pp. 19-20, 24-25 supra; see also Teamsters Local 445, 531 F.3d at 196; Campo, 371 F. App'x at 216-17; In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015); Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011). For one thing, the Amended Complaint does not allege that two of the four "confidential witnesses" (i.e. "CW1" and "CW3") had any contact with the Individual Defendants. In such a case, "the law is abundantly clear that [their] allegations are insufficient to support scienter." Glaser, 772 F. Supp. 2d at 594.

Plaintiff alleges four "facts" provided by the remaining two confidential witnesses (i.e. CW2 and CW4) to support his argument of conscious misbehavior or recklessness. These four "facts" are unavailing because they do not contradict any public statement identified by Plaintiff. See Teamsters Local 445, 531 F.3d at 196; Campo, 371 F. App'x at 216-17. The four alleged facts are as follows:

i. "CW2 recalled internal discussions at the committee meetings where the witness presented during the first half of 2014 about the validity of the portfolio, including 'do we have the tools, do we have the capabilities to, how do we assess the losses, how do we project the losses.'" (Am. Compl. ¶ 66.)

ii. "CW2 stated that at the [Asset and Liability Committee ('ALCO')] meetings attended by Adams, Trick and Matanle, . . . . they discussed whether Ambac could capture all of the exposure related to the portfolio because, historically, Ambac did not have a good model or the tools to do it because it had not happened before." (Id. ¶ 67.)

iii. "According to CW2, at the ALCO meetings he attended with Adams, Trick and Matanle, defendant Matanle recommended the Puerto Rico bond portfolio reserves that should be taken." (Id. ¶ 69.)

iv. "CW4 recalled attending a quarterly staff meeting in 2013 or 2014 where defendant Tavakoli acknowledged that Ambac had some exposure to Puerto Rico." (Id. ¶ 68.)

Allegations i. and ii. above are financial matters commonly discussed at comparable company committee meetings. See, e.g., Bd. of Trustees of Operating Engineers Pension Tr. v. JPMorgan Chase Bank, Nat'l Ass'n, 2013 WL 1234818, at *4 (S.D.N.Y. Mar. 27, 2013) ("Th[e] committee performed periodic detailed assessments of specific areas of risk concern . . . ." (brackets and internal quotation marks omitted)); In re Lehman Bros. Sec. & Erisa Litig., 799 F. Supp. 2d 258, 291-92 (S.D.N.Y. 2011) (stating that the company's "[Global Real Estate Group] made a presentation to [the company's] Executive Committee that recognized the significant risks inherent in . . . [the company's] global commercial real estate portfolio"); Ferber v. Travelers Corp., 802 F. Supp. 698, 704 (D. Conn. 1992) ("As members of the Investment Committee, the individual defendants reviewed reports on specific investments, the progress of investment portfolios and evaluated investment strategies."). And, they do not indicate how ALCO committee members resolved any concerns about available tools, models, and accounts. Nor does Plaintiff explain how or why these meeting observations contradict the public statements contained in Ambac's 2013 Form 10-K, filed with the SEC on March 3, 2014, where the Company stated, among other things, that "Differences in the models that we employ, and/or flaws in these financial models and/or faulty assumptions inherent in these financial models and those determined by management, could lead to increased losses and loss reserves." (Akram Decl., Ex. D at 39-40.) Allegations i. and ii. simply do not support Plaintiff's claim of conscious misbehavior or recklessness. See Teamsters Local 445, 531 F.3d at 196; Campo, 371 F. App'x at 216-17.

Plaintiff also fails to explain why allegations iii. and iv. above support Plaintiff's argument of conscious misbehavior or recklessness. On the contrary, those allegations appear to

be consistent with Adams' statement during the Earnings Conference Call on November 14, 2013 that Ambac had "take[n] some small reserves on Puerto Rico." (Akram Decl., Ex. B at 12; see also Akram Decl., Ex. C at 6; Akram Decl., Ex. E at 8.) And, as to iii., Tavakoli "acknowledged that Ambac had some exposure"; and Ambac's taking of loss reserves may be said to reflect that. See In re Converium Holding AG Sec. Litig., 2006 WL 3804619, at *1 (S.D.N.Y. Dec. 28, 2006) ("'[L]oss reserves[]' . . . represent the amount the company estimates it will have to pay to cover . . . claims under the policies that have been written to date."). As to iv., Matanle's "recommend[ation] th[at] Puerto Rico bond portfolio reserves . . . should be taken" is also consistent with Adams' statement that Ambac did take loss reserves.

Where, as here, information provided by a confidential witness does not "support[] plaintiffs' allegations," the court is "preclude[d] . . . from concluding that an inference of scienter is cogent and at least as compelling as [an] opposing inference." Campo, 371 F. App'x at 216-17 (where confidential witnesses did not allege facts supporting plaintiffs' allegations); see also Teamsters Local 445, 531 F.3d at 196 ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Nor has Plaintiff adequately alleged circumstantial evidence of conscious misbehavior or recklessness by relying upon allegedly "suspicious resignations of [three of] Ambac's officers" (Opp. at 22).[13] See, e.g., New Orleans, 455 F. App'x at 14 n.3 ("[A]llegations of a

---

[13] Plaintiff states that:

- Ambac "announced on December 23, 2014 that Defendant Adams had resigned from her positions as President, CEO, and member of the Board of Ambac," which "would become effective as of the close of business on December 31, 2014." (Am. Complaint ¶ 136.)

company's . . . removal of its executives . . . cannot establish scienter independently."). Plaintiff argues that the "sudden and suspicious timing of these resignations . . . demonstrates an inference of scienter." (Opp. at 22.) But Defendants more persuasively say that, "without allegations linking the departures to the fraud," these departures "are insufficient to raise a strong inference of scienter." (Br. at 23.)

"For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious." Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012), aff'd sub nom. IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383 (2d Cir. 2015). For example, in one securities fraud case, the court found it suspicious that one defendant resigned "the day [the company] announced its true . . . inventory numbers," and the other defendant resigned "two months later, during investigations by the [company's] Audit Committee and the SEC," and both executives "exercised clawback provisions in their resignation agreements." See In re Salix Pharm., Ltd., 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016). The three resignations alleged here, by contrast, were not highly unusual or suspicious because none of them occurred at or about the time that Defendants' alleged fraud was disclosed. Adams' resignation was effective approximately 6 months before Governor Padilla's announcement on June 29, 2015 that Puerto Rico would likely default on its debts, and 10 months before Ambac's

---

- Non-party "Joan Allman had been Ambac's Managing Director of Public Finance Credit Oversight Team beginning in May 2005," and "abruptly resigned[] sometime in July 2016." (Id. ¶ 355.)
- "[S]hortly after the Commonwealth [of Puerto Rico] defaulted for the fourth time, on August 9, 2016, the Company announced that Matanle would retire by mutual agreement with Ambac, effective September 30, 2016." (Id. ¶ 443.)

goodwill impairment charge was taken (on November 9, 2015).[14] Allman's resignation occurred approximately 12 months after Governor Padilla's announcement, and approximately 8 months after the goodwill impairment charge was taken. And, Matanle's resignation was effective approximately 15 months after Governor Padilla's announcement, and 11 months after the goodwill impairment charge was taken. See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc., 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) (defendants' resignations were not "highly unusual [or] suspicious" when defendants "resigned . . . several months after the Class Period ended"); Lighthouse Fin., 902 F. Supp. 2d at 343 (the defendants' resignations were not "highly unusual [or] suspicious" where the resignations did not occur during an investigation of "the way [the company] valued asserts on its balance sheet").

Plaintiff's remaining allegations are only briefly discussed in his opposing brief at p. 21 and do not adequately allege circumstantial evidence of conscious misbehavior or recklessness. See Teamsters Local 445, 531 F.3d at 196; New Orleans, 455 F. App'x at 14 n.3; First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 167 (2d Cir. 2004). For example, Plaintiff argues that Defendants' fraudulent "[k]nowledge is inferred from Defendants' direct communications with the Puerto Rican government regarding loss mitigation strategies as early as November 2014." (Opp. at 21.) Any such inference is unpersuasive because "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Teamsters Local 445, 531 F.3d at 196.

---

[14] On November 9, 2015, Ambac issued a press release announcing, among other things, a $514.5 million "goodwill impairment charge." (Akram Decl., Ex. N at 2.) According to the Amended Complaint, "Ambac was forced to record [the] goodwill impairment charge . . . as a result of, among other things, a 'substantial decrease in the Financial Guarantee reporting unit's fair value' driven by the decrease in Ambac's market capitalization and stock price and 'wider Ambac credit spreads' relating at least in part to Puerto Rico." (Am. Complaint ¶ 336.)

Plaintiff also argues that the allegedly "false statements concerned the core operations of the company," and those support a "strong inference of scienter." (Opp. at 21.) But "allegations of a company's core operations . . . cannot establish scienter independently." New Orleans, 455 F. App'x at 14 n.3.

And, Plaintiff argues that Defendants engaged in "belated buybacks [of Puerto Rican bonds] in order to conceal that Ambac was severely under-reserved for its loss exposure on Puerto Rican bonds." (Opp. at 21.) Defendants contend persuasively that Plaintiff's buyback argument "is classic 'fraud by hindsight,' which has long been rejected by the Second Circuit." (Br. at 22.) Moreover, Plaintiff does not provide any supporting detail, i.e. he presents no support for the inference that "belated buybacks" were meant to "conceal that Ambac was severely under-reserved." Plaintiff has offered "no rational basis upon which to ground an inference . . . of scienter." See First Capital, 385 F.3d at 167 (where plaintiffs alleged that a transfer of property interests was made "in contemplation of bankruptcy," but "[t]he transfer predated the bankruptcy filing by two years and occurred before judgments were entered against [the transferor]." (brackets omitted)).

**(3) Loss Causation**

Defendants argue that Plaintiff fails to allege loss causation because, among other things, the Amended Complaint "acknowledges" that nearly a year before the Puerto Rican Governor's announcement on June 29, 2015 that Puerto Rico would likely default on its debts, "Ambac voluntarily posted to its website a presentation showing granular detail of its Puerto Rico exposure." (Br. at 24 (citing Am. Complaint ¶ 51).) Yet "Ambac's stock price did not decline following this disclosure." (Id.) Defendants also argue that "the drop in Ambac's stock price []as

well as its competitors' stock prices and the drop in Puerto Rico bond prices[] following the Governor's announcement . . . undercuts any 'corrective disclosure' theory." (Id. at 25.)

Plaintiff responds that "Defendants' argument that they previously disclosed the information in the governor's announcement 'well before' is . . . unavailing because . . . their purported risk disclosures were inadequate because they were boilerplate." (Opp. at 25.) Plaintiff also argues that "it is not the plaintiff's burden at this stage to eliminate all other causes of a stock drop even in the event of a marketwide drop." (Id. (citing Loreley Fin., 797 F.3d at 189).)

Assuming arguendo that Plaintiff had adequately pled actionable misstatements or omissions as well as Defendants' scienter (which he has not), the Court would likely find that Plaintiff has adequately pled loss causation. See Loreley Fin., 797 F.3d at 187-89. It would be premature to draw any conclusions as to what factors caused the drop in other companies' stock prices following the Governor's announcement. See id. "The requirement . . . to plead a causal link does not place on Plaintiff[] a further pleading obligation to rule out other contributing factors or alternative causal explanations." Id. at 189. "Whether Plaintiff[] can prove these allegations—and whether defendants in turn can proffer evidence that the [stock price] would have [dropped] regardless . . . are evidentiary matters for later phases of this lawsuit. It is sufficient under Rule 12(b)(6) that the allegations themselves give Defendants some indication of the risk concealed by the misrepresentations that plausibly materialized." See id. at 188-89.

**(4) No "Control Person" Claims**

Because the Court holds (supra pp. 11-35) that Plaintiff has not alleged a primary violation of the Securities Exchange Act or Rule 10b-5, he "cannot establish control person liability." See ATSI Commc'ns, 493 F.3d at 108.

## IV. Conclusion & Order

For the reasons stated above, Defendants' motion to dismiss [#31] is granted.

Dated: New York, New York
September 5, 2017

RMB

**RICHARD M. BERMAN**
**U.S.D.J.**